## <u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 21-5257

_____

FLYERS RIGHTS EDUCATION FUND, INC, *et. al.,*
*Appellants,*

v.

FEDERAL AVIATION ADMINISTRATION,
*Appellee.*

_____

Appeal from the United States District Court for the District of Columbia in Civil
Case No. 1:19-cv-03749-CKK
Judge Colleen Kollar-Kotelly

_____

## BRIEF FOR APPELLANTS

_____

Joseph E. Sandler
Christina E. Bustos
SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK P.C.
1090 Vermont Ave N.W. Suite 750
Washington, D.C. 20005
(202) 479-1111
sandler@sandlerreiff.com
bustos@sandlerreiff.com
*Counsel for Petitioners*

May 25, 2022

**CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

**A. Parties:**

**<u>Appellants</u>**

The Appellants in this case are Flyers Rights Education Fund, Inc., d/b/a FlyersRights.org ("FlyersRights"), and Paul Hudson, the President of FlyersRights. FlyersRights is a District of Columbia nonprofit corporation recognized as an organization exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986 as amended. FlyersRights educates the public about issues affecting airline passengers, and advocates for the interests of airline passengers. FlyersRights has no parent, subsidiary or affiliate and has never issued shares or debt securities to the public.

**<u>Appellee</u>**

The Appellee is the Federal Aviation Administration (the "FAA").

**<u>Amici</u>**

Six aviation safety experts – Ajit Agety, Geoff Barrance, David Gellert, Chris Moore, Ed Pierson, and Gregory Travis – filed a brief *amici curiae* with this Court (Doc. #1937245) in support of Appellants' Opposition to the FAA's Motion for Summary Affirmance (Doc. # 1933122).

The same six aviation safety experts have requested the parties' consent to file a brief *amici curiae* in this Court, in support of Appellants, on the merits of this appeal.  Appellants have consented. The FAA took no position on the request.

## B. Rulings Under Review

The ruling under review is the Memorandum Opinion of the United States District Court for the District of Columbia, the Honorable Colleen Kollar-Kotelly, issued September 16, 2021, granting the FAA's motion for summary judgment and denying the motion for summary judgment of Appellants.  Memorandum Opinion ("Dist. Ct. Op."), Joint Appendix ("JA") 455-475; Order, JA 476. The District Court's Memorandum Opinion is unpublished. *Flyers Rights Education Fund, inc. v. Federal Aviation Administration*, No. 19-cv-3749, 2021 WL 4206594 (D.D.C., Sept. 16, 2021).

## C. Related Cases

FlyersRights is not aware of any related cases.

Respectfully submitted,

/s/ Joseph E. Sandler
Joseph E. Sandler

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the undersigned counsel of record for Appellants certifies that Flyers Rights

Education Fund, Inc. is a District of Columbia nonprofit corporation recognized as an organization exempt from taxation under section 501(c)(3) of the Internal Revenue Code.  FlyersRights has no parent, subsidiary or affiliate and has never issued shares or debt securities to the public.

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES ............ ii

CORPORATE DISCLOSURE STATEMENT ...................................................... iii

TABLE OF CONTENTS.............................................................................v

TABLE OF AUTHORITIES ................................................................... vii

GLOSSARY..................................................................................................ix

STATEMENT OF JURISDICTION...................................................................1

ISSUES PRESENTED FOR REVIEW ..............................................................1

STATUTES AND REGULATIONS..................................................................2

STATEMENT OF THE CASE..........................................................................3

      A. Certification and Failure of the 737 MAX .................................................3

      B. Ungrounding Process and FOIA Request...................................................5

      C. Developments While Summary Judgment Motions Were Pending.........8

SUMMARY OF THE ARGUMENT ...................................................................11

ARGUMENT ..................................................................................................13

I.    STANDARD OF REVIEW.............................................................................13

II.   THE WITHHELD RECORDS ARE CONFIDENTIAL BECAUSE BOEING COULD NOT HAVE BEEN ASSURED PRIVACY GIVEN THE FAA'S PUBLIC PLEDGES TO DISCLOSE ALL INFORMATION ON WHICH THE UNGROUNDING WAS BASED..................................................................14

      A.    Information Cannot Be Treated as Confidential At Least Where the Government Has Affirmatively Indicated That It Would Be Made Public ...............................................................................15

      B.    FAA and Boeing Made Public Pledges of Transparency with Respect to the Ungrounding Decision ..........................................19

v

C.  The FAA's Transparency Pledges Could Only be Interpreted as a Commitment to Disclose Documents Forming the Factual Basis for the Ungrounding ................................................................... 23

   1.  Certification Plans: Testing methods, plans and conditions ......... 23

   2.  Means of Compliance ........................................................ 25

   3.  Flight test plans and criteria; flight test results ........................... 25

   4.  Safety Analyses ............................................................. 27

   5.  Withholdings In All Are Fundamentally Inconsistent with Transparency ........................................................... 29

D.  The Specific Pledges of Transparency as to the 737 MAX Information Superseded the Older General Assurances Relied Upon by the District Court .......................................................... 31

III.  THE DISTRICT COURT ERRED IN PERMITTING FAA TO WITHHOLD A BODY OF SECRET LAW IN THE FORM OF BOEING'S "MEANS OF COMPLIANCE" .......................................................... 33

IV.  THE WITHHELD FAA COMMENTS WERE NOT "OBTAINED FROM A PERSON" ................................................................ 36

V.  THE DISTRICT COURT ERRED IN HOLDING THAT THE FAA RELEASED ALL REASONABLY SEGREGABLE INFORMATION .............. 37

CONCLUSION ................................................................. 41

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................................. 41

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

*Besson v. U.S. Dep't of Commerce*, Case No. 18-cv-02527-APM, 2020 WL 4500894 (D.D.C., Aug. 5, 2020)..............................................................................17

*Cause of Action Institute v. Export-Import Bank of the U.S.*, Case No. 19-cv-1915-JEB, 2022 WL 252028 (D.D.C., Jan. 27, 2022) ......................................................16

*Center for Investigative Reporting v. Dep't of Labor*, Case No. 18-cv-02414-DMR, 2020 WL 2995209 (N.D. Cal., June 4, 2020).................................................... 18, 19

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980) ......35

*Electronic Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1 (D.C. Cir. 2014).35

*Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019) . 1, 6, 15, 16

*Grumman Aircraft Engineering Corp. v Renegotiation Bd.*, 425 F.2d 578 (D.C. Cir. 1970) ...................................................................................................... 11, 36

*Gulf & Western Indus., Inc. v. U.S.*, 615 F.2d 527, 529-30 (D.C. Cir. 1980) ........36

*Humane Society Int'l v. U.S. Fish & Wildlife Service*, No. 16-cv-720-TK, 2021 WL 1197726 (D.D.C., March 29, 2021) ......................................................................16

*Mobley v. Central Intelligence Agency*, 806 F.3d 568 (D.C. Cir. 2015) ..........14

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002) ................14

*Pavement Coatings Technology Council v. United States*, 995 F.3d 1014 (D.C. Cir. 2021) ......................................................................................................................13

*Renewable Fuels Ass'n v. U.S. Environmental Protection Agency*, 519 F. Supp. 3d 1 (D.D.C. 2021) ................................................................................................ 17, 19

*Reporters Comm. For Freedom of the Press v. FBI*, 3 F.4th 350 (D.C. Cir. 2021) 13, 14

*Southern Alliance for Clean Energy v. U.S. Dept. of Energy*, 853 F. Supp. 2d 60 (D.D.C. 2012)...........................................................................................................37

*Stolt-Nielsen Transp. Group Ltd. v. United States*, 534 F.3d 728 (D.C. Cir. 2008) ................................................................................................................... 38, 40

*Stotter v. U.S. Agency for Int'l Development*, Case No. 14-cv-2156-KBJ, 2020 WL 5878033 (D.D.C., Oct. 3, 2020) ............................................................................... 16

*Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106 (D.C. Cir. 2007) ......................... 40

*United States v. The Boeing Co.*, No. 4:21-cr-00005-O (N.D. Tex., Jan. 7, 2021) ......................................................................................................................... 9

*WP Co. v. U.S. Small Business Admin.*, 502 F. Supp. 3d 1 (D.D.C. 2020) ...... 16, 18

## STATUTES

5 U.S.C. § 552 .......................................................................................... 5, 15, 36, 38

## REGULATIONS

14 C.F.R. §21.20 ....................................................................................................... 34

## OTHER AUTHORITIES

*Airworthiness Directives: The Boeing Company Airplanes, Final Rule*, 85 Fed. Reg. 74560 (Nov. 20, 2020) ..................................................................................... 3

*Airworthiness Directive 2021-09-08*, 86 Fed. Reg. 22860 (April 30, 2021) .... 10

Jonathan Manes, *Secret Law*, 106 Geo. L. J. 803, 851 (2018) ............................. 35

*Memorandum from Attorney General for Heads of Executive Departments and Agencies Re: Freedom of Information Act Guidelines* (March 15, 2022) .............. 14

*Notification of Rescission of Emergency Order of Prohibition*, 85 Fed. Reg. 74260 (Nov. 20, 2020) ........................................................................................................ 8

*Office of Inspector General, Weaknesses in FAA's Certification and Delegation processes Hindered its Oversight of the 737 MAX 8* at 25-41 (Feb. 23, 2021) ...... 10

*Operators of Boeing Company Model 737-8 and Boeing Company Model 737-9 Airplanes: Emergency Order of Prohibition*, 84 Fed. Reg. 9705 (March 18, 2019) ................................................................................................................................... 3

*Summary of FAA's Review of the Boeing 737 MAX* (Nov. 18, 2020) ..................... 8

# GLOSSARY

| | |
|---|---|
| 737 MAX | Boeing Company Model 737-8 and 737-9 Airplanes |
| CFR | Code of Federal Regulations |
| FAA | Federal Aviation Administration |
| FlyersRights | Appellant Flyers Rights Education Fund, Inc. d/b/a FlyersRights.org |
| FOIA | Freedom of Information Act, 5 U.S.C. §552 |
| JA | Joint Appendix (Not Deferred) |
| MCAS | Maneuvering Characteristics Augmentation System |
| U.S.C. | United States Code |

## STATEMENT OF JURISDICTION

The District Court had jurisdiction of this action under 28 U.S.C. § 1331 and under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B), which confers jurisdiction on the U.S. District Court for District of Columbia to order production by an agency based in the District of Columbia, of records improperly withheld under FOIA.

The District Court entered its Opinion and Order granting summary judgment to the FAA, on September 16, 2021. JA 455-476. Appellants timely filed their Notice of Appeal on November 15, 2021, which is within the 60-day period after entry of judgment prescribed by Fed. R. App. P. 4(A)(1)(B). Jurisdiction is proper in this court under 28 U.S.C. §1291.

## ISSUES PRESENTED FOR REVIEW

(1)  Regardless of whether withholding a document under Exemption 4 of the Freedom of Information Act requires the agency to meet the second prong of the test in *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019), can an agency withhold a document if the agency has publicly pledged transparency with respect to that category of documents?

(2) Did the District Court err in finding that Exemption 4 applied to the documents withheld by the FAA under Exemption 4 to support the ungrounding of the 737 MAX aircraft, when both FAA and Boeing

1

expressly and publicly committed to making the FAA's review of the airworthiness of the reconfigured aircraft transparent to the public?

(3)  When a federal agency allows a regulated private entity to create its own procedures for demonstrating compliance with agency regulations, effectively accepting the procedures as agency policy, can those procedures be withheld as "confidential" commercial information under Exemption 4 to FOIA?

(4) Did the District Court err in ruling that documents containing comments by the FAA on Boeing Company submissions were "obtained from a person" within the meaning of Exemption 4 to FOIA?

(5) Did the District Court err in finding that the FAA met it burden as to segregability when the agency disclosed no substantive information of any kind and the nature of the withheld documents compels the conclusion that there must be some segregable non-exempt portions of the subject documents?

## STATUTES AND REGULATIONS

Copies of the pertinent statutes and regulations are set forth in the Addendum.

## STATEMENT OF THE CASE

### A.  Certification and Failure of 737 MAX

The B737 MAX aircraft series is the fourth generation of the B737 aircraft. Boeing applied for certification of the B737 MAX in 2012, and the FAA certified the aircraft in March 2017.  *Boeing 737 MAX Flight Control System: Joint Authorities Technical Review: Observations Findings and Recommendations I* (Oct. 2019) ("JATR Report").  Twenty months later, on October 29, 2018, a 737 MAX operated by Lion Air crashed after taking off from Jakarta, Indonesia, killing all 189 passengers and crew members. On March 10, 2019, a 737 MAX operated by Ethiopian Airlines similarly crashed minutes after takeoff from Addis Ababa, Ethiopia, killing all 157 passengers and crew members.  The FAA then grounded the aircraft.  *Operators of Boeing Company Model 737-8 and Boeing Company Model 737-9 Airplanes: Emergency Order of Prohibition*, 84 Fed. Reg. 9705 (March 18, 2019).

 The 737 MAX had engines that did not fit under the wings of the older version of the airplane. Boeing pigeonholed the new engines by taking certain steps to mount them forward of the wing and further away from the ground, generating greater lift for the aircraft and creating a tendency for the nose to pitch up during flight. R. Vartabedian, *How a 50 Year Old Design Came Back to Haunt Boeing With Its Troubled 737 MAX Jet*, Los Angeles Times  (March

15, 2019), https://www.latimes.com/local/california/la-fi-boeing-max-design-20190315-story.html.  To compensate, the 737 MAX's flight control system contains a Maneuvering Characteristics Augmentation System ("MCAS"), that is automatically activated when one sensor indicates the nose going up, signaling a potential stall situation. MCAS causes the horizontal stabilizer to force the nose down.  But in the crashes, the MCAS activated repeatedly, when it should not have, with the pilots unable to control the aircraft or override MCAS, so that the MCAS kept forcing the planes to head down until they crashed.  Majority Staff, U.S. Senate Committee on Transportation and Infrastructure, *The Design, Development & Certification of the Boeing 737 MAX* 7-12 (Sept. 2020).

In October 2019, an expert international panel commissioned by the FAA harshly criticized the process followed by the FAA in its original certification of this aircraft, including delegating many agency functions to Boeing. JATR Report at II-XIII.

In September 2020, an extensive report on the causes of the failures of the 737 MAX aircraft was released by the Majority Staff of the U.S. House Committee on Transportation and Infrastructure.  *Final Committee Report, The Design Development and Certification of the Boeing 737 MAX* (Sept. 2020). The report set out five "central themes that affected the design development and certification of the 7347 MAX and FAA's oversight of Boeing," including a

"Culture of Concealment" leading Boeing to withhold "crucial information from the FAA, its customers and 737 MAX pilots." *Id*. at 12-13

## B. <u>Ungrounding Process and FOIA Request</u>

Throughout 2019, Boeing submitted proposed solutions and fixes to the FAA, seeking FAA's determination that aircraft would be safe to fly again. FAA, *See FAA Updates on Boeing 737 MAX* https://www.faa.gov/newsroom/faa-updates-boeing-737-max-0 (last visited May 24, 2022).

In October 2019, FlyersRights submitted a FOIA request to the FAA seeking the Boeing submissions on which the FAA would rely in determining when the 737 MAX aircraft should be re-certified to fly.  In December 2019, FlyersRights filed suit in the District Court to compel the FAA to produce the requested records. JA 8-18. After the parties narrowed the scope of the request by agreement, the FAA identified 86 responsive documents consisting of 9,443 pages.  District Ct. Op. at 4, JA 458.

Ultimately the FAA filed a *Vaughn* Index identifying 108 documents. JA 19-53.  Of those 108 documents, the FAA produced only five in full. Some meaningless cover sheets were released. The remaining 83 documents were either withheld in full or all the substantive contents were redacted, all under FOIA Exemption 4, 5 U.S.C. §552(b)(4), covering "commercial or financial information obtained from a person and privileged or confidential."

5

The key categories of information withheld are documents showing the actual process followed by the FAA in determining that, with Boeing's proposed design changes, the aircraft is safe to fly again – specifically, the certification plans, which set out the steps to be taken by the manufacturer to show that the aircraft complies with FAA standards; methods to be used to test the aircraft and particular components; plans for flight tests; the actual results of those tests; and safety analyses, that is, the results of assessments of how design changes mitigate potential failure situations. FlyersRights pressed its FOIA claim for access to these categories of documents, referred in the District Court proceeding as the "Disputed Information Categories." *See* District Ct. Op. at 4, JA 458.

In the fall of 2020, the parties filed cross-motions for summary judgment. Docket Numbers 21, 22, 23, 24, 25.

On September 16, 2021, the District Court denied FlyersRights' motion for summary judgment and granted the FAA's cross-motion. Dist. Ct. Op., JA 455-476. The District Court held that the FAA had properly withheld all of the documents at issue under Exemption 4. The District Court noted that under *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019), records are treated as "confidential" if they "'at least,'" are "'both customarily and actually treated as private by its owner'" and "'provided to the government

6

under an assurance of privacy.'"  Dist. Ct. Op. at 11, JA 465 (quoting *Food Marketing Inst*., 139 S. Ct. at 2366).

The District Court noted that it is an open question whether the second prong must be met. JA 469. The Court held, however, that even if that prong must be met, the withheld information in this case was provided by Boeing to the FAA under an "assurance of privacy" based on FAA general directives and a nearly 40-year-old agreement with Boeing.  Dist. Ct. Op. at 16-18, JA 470-72. Top FAA and Boeing officials had repeatedly promised the public complete transparency regarding the ungrounding process, and FlyersRights had submitted uncontradicted declarations from aviation safety experts demonstrating that no such transparency was possible without disclosure of the Disputed Information Categories. The District Court ruled, however, that FlyersRights had not identified "'any statement in which these executives and officials committed to releasing any specific document or any particular piece of Boeing's proprietary information.'" Dist. Ct. Op. at 19, JA 473 (quoting FAA Cross-Motion and Opposition).

The District Court further ruled that the "means of compliance" by which Boeing demonstrated compliance with FAA requirements were properly treated as "proprietary" even though they effectively constitute legally binding agency policy. *Id*. at 13, JA 467. The District Court also held that FAA's own comments on Boeing's project deliverables included in seventy-nine pages of charts created

7

collaboratively by Boeing and the FAA were "obtained from a person" for purposes of Exemption 4 because the FAA's comments would reveal Boeing technical data. Dist. Ct. Op. at 9-10, JA 463-464. Finally, the District Court found that FAA had demonstrated that it released all reasonably segregable information, taking at face value the declaration of an FAA official that the agency had undertaken a line-by-line review and was unable to find anything of substance to release in 83 documents consisting of almost 10,000 pages.   Dist. Ct. Op. at 20-21, JA 474-475.

### C.  Developments While Summary Judgment Motions Were Pending

In November 2020, while the parties' cross-motions for summary judgment were pending before the District Court, the FAA issued two related orders: one ungrounding the 737 MAX, FAA, *Notification of Rescission of Emergency Order of Prohibition*, 85 Fed. Reg. 74260 (Nov. 20, 2020) ("Ungrounding Order") ; and a final Airworthiness Directive, finding the 737 MAX fit and safe to operate again based on Boeing's submitted design changes.  FAA, *Airworthiness Directives: The Boeing Company Airplanes, Final Rule*, 85 Fed. Reg. 74560 (Nov. 20, 2020) ("Final AD"). The agency also issued a final *Summary of FAA's Review of the Boeing 737 MA*X (Nov. 18, 2020), JA 335-433 (the "*Final Summary*").

On January 7, 2021, Boeing admitted to a criminal conspiracy to defraud the FAA by withholding critical information from and misleading the agency

about the 737 MAX and agreed to pay $2.5 billion in fines and compensation. Deferred Prosecution Agreement, *United States v. The Boeing Co.*, No. 4:21-cr-00005-O (N.D. Tex., Jan. 7, 2021), Doc. No. 4. A key element of the conspiracy was the withholding by Boeing of information about a test flight (*id.* at A9-A11) – exactly the type of information withheld by the FAA from the public, at Boeing's insistence, in this case. In announcing the Deferred Prosecution Agreement, the Assistant Attorney General stated that the "tragic crashes" of the 737 MAX "exposed fraudulent and deceptive conduct by employees of" Boeing, who "chose the path of profit over candor by concealing material information from the FAA… and engaging in an effort to cover up their deception." U.S. Dept. of Justice, Press Release, *Boeing Charged with 737 Fraud Conspiracy and Agrees to Pay over $2.5 Billion* (Jan. 7, 2021), https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-pay-over-25-billionMAX (last visited May 10, 2022).

In February 2021, the Inspector General of the U.S. Department of Transportation issued a report on the original certificate of the 737 MAX by the FAA concluding, among other things, that the delegation by the FAA to Boeing itself of much of the certification work – mostly allowing the fox to guard the henhouse – was partly responsible for the certification of a fatally flawed aircraft. USDOT, *Office of Inspector General, Weaknesses in FAA's*

*Certification and Delegation processes Hindered its Oversight of the 737 MAX 8* at 25-41 (Feb. 23, 2021).  Referring to the Organization Designation Authority ("ODA"), the policy allowing Boeing to mostly certify its own planes, the OIG Report found that "the Boeing ODA process and structure do not ensure the ODA is adequately independent," with FAA personnel "feeling pressure from Boeing company management to approve items or affirm compliance with regulations without sufficient time to perform a review." *Id*. at 9.

Dozens of 737 MAX aircraft were re-grounded for several weeks in April 2021 due to production-related electrical problems. FAA, *Airworthiness Directive 2021-09-08*, 86 Fed. Reg. 22860 (April 30, 2021).  In May 2021, the FAA and Boeing entered a settlement agreement in which Boeing agreed to pay a $17 million civil penalty for installing unapproved equipment on 737 MAX and other aircraft and for submitting MAX aircraft for certification with improperly installed equipment.  Settlement Agreement Between FAA and the Boeing Company, https://www.faa.gov/sites/faa.gov/files/2021-08/Boeing-Settlement_Agreement.pdf (last visited May 10, 2022).

According to a recent report by a former Boeing senior manager, since the MAX was ungrounded, pilots have reported 42 instances of flight malfunctions, half involving the flight control system.  Ed Pierson, *Boeing 737 MAX — How Is It Really Going* https://assets.website-

10

files.com/605147e156c3ef53cbf81d16/61e4ac0fb36e3b386c66ee75_Boeing%

20737%20MAX%20-%20How%20Is%20It%20Really%20Going%3F.pdf

(Feb. 10, 2022).

## SUMMARY OF THE ARGUMENT

It is an open question in this Circuit whether, in order to withhold information as "confidential" under Exemption 4 of FOIA, an agency must meet the second prong of the *Food Marketing* test – that the information was provided by the submitter to the agency under "an assurance of privacy." But the Court need not resolve that question in order to decide this case. It need only determine, as lower courts have done, that information cannot be withheld by an agency as "confidential" if the agency has made affirmative public representations that it the information would be publicly disclosed.

In this case, with respect to the specific classes of documents submitted by Boeing to support the ungrounding of the 737 MAX – documents setting out the "fixes" that would supposedly make the aircraft safe to fly again – the FAA gave every indication that those documents would *not* be maintained in confidence. To the contrary, at the time those documents were being submitted by Boeing to the FAA, the FAA was publicly pledging complete transparency with respect to the process and basis for any ungrounding of the 737 MAX.

11

In the context of the decision to allow a modified version of this specific aircraft to fly again, and against the backdrop of concealment and fraud that led to the MAX tragedies, these pledges could only reasonably be interpreted as meaning that the FAA would publicly disclose all the essential information needed to evaluate and assess its ungrounding decision.  And in the court below, Appellants submitted uncontroverted declarations from independent aviation experts making clear that, without disclosure of the categories of information at issue in this case, it is simply not possible to determine whether the fixes submitted by Boeing, and relied upon by the FAA, actually make the aircraft safe to fly again.  Accordingly, the agency in effect affirmatively represented that the categories of information at issue would be publicly disclosed.  For that reason, the District Court erred in determining that this information could be withheld under Exemption 4.

Additionally, two of the categories of information were improperly withheld under Exemption 4 in any event.  The "means of compliance" that Boeing was allowed to develop and use to demonstrate compliance with agency regulations – in lieu of published standards – constitute binding agency policy and cannot be treated as "confidential" commercial information. To do so would be to allow the company to create its own body of secret law.

The District Court also erred in ruling that charts prepared by FAA and Boeing containing FSAA's own comments on Boeing's submissions were "obtained from a

person" within the meaning of Exemption 4. The FAA's own comments, even including its own reformulations of Boeing information, are information generated by the Government, not information "obtained from" a private entity or individual.

Finally, the District Court erred in finding no substantive information could be segregated from Boeing's proprietary information and disclosed.

## ARGUMENT

### I.    STANDARD OF REVIEW

"We review *de novo* a district court's decision on summary judgment in a FOIA case." *Reporters Comm. For Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021). "'This circuit applies in FOIA cases the same standard of appellate review applicable generally to summary judgments.'" *Pavement Coatings Technology Council v. United States*, 995 F.3d 1014, 1020 (D.C. Cir. 2021) (quoting *Petroleum Info. Corp. v. U.S. Dept. of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992)). "'In the FOIA context this requires that we ascertain whether the agency has sustained its burden of demonstrating that the documents requested are… exempt from disclosure.'" *Id*. (quoting *Am. C.L. Union v. U.S Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) (internal quotation omitted)).

"At this stage, 'the inferences to be drawn from the underlying facts …must be viewed in the light most favorable to the party opposing the motion…'" *Id*. at 1020-21 (quoting *Judicial Watch, Inc. v. U.S. Secret Service*, 726 F.3d 208, 215 (D.C. Cir. 2013) (internal quotation omitted).

13

## II.    THE WITHHELD RECORDS ARE NOT CONFIDENTIAL BECAUSE BOEING COULD NOT HAVE BEEN ASSURED PRIVACY GIVEN THE FAA'S PUBLIC PLEDGES TO DISCLOSE ALL INFORMATION ON WHICH THE UNGROUNDING WAS BASED

"At all times courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure'. . ." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Dept. of State v. Ray*, 502 U.S. 164, 173 (1991)). "The burden of proving the applicability of an exemption falls on the agency." *Reporters Committee*, 3 F.4th at 357. The FOIA exemptions "are exclusive and must be narrowly construed." *Mobley v. Central Intelligence Agency*, 806 F.3d 568, 580 (D.C. Cir. 2016). "Those 'limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Reporters Committee*, 3 F.4th at 357 (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)). As a recent directive by the Attorney General confirms, "In case of doubt, openness should prevail." *Memorandum from Attorney General for Heads of Executive Departments and Agencies Re: Freedom of Information Act Guidelines* (March 15, 2022), *https://www.justice.gov/ag/page/file/1483516/download* (last visited May 24, 2022).

In this case, the District Court endorsed a wholesale withholding by the FAA of all the substantive information about how the agency actually tested and evaluated

the proffered fixes to the 737 MAX and the results – essentially all of the crucial information forming the basis for the FAA's decision to unground the aircraft.  The District Court permitted all that information to be treated as confidential, finding that – regardless of whether an "assurance of privacy" is always required or not – the information here was provided by FAA to Boeing with such an assurance, despite explicit public representations by the FAA, not of confidentiality or privacy, but of complete transparency, with respect to the ungrounding process.

It is not necessary in this case for this Court to resolve the issue of whether the second prong of the *Food Marketing* test must be met in all cases. The Court need only rule that information cannot be treated as "confidential" at least where the Government has affirmatively indicated that such information could or will be made public – which was exactly the situation here.

### E.    <u>Information Cannot Be Treated as Confidential At Least Where the Government Has Affirmatively Indicated That It Would Be Made Public</u>

Exemption 4 protects from disclosure "commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4). In *Food Marketing Institute*, the Supreme Court rejected the substantial competitive harm test of *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974), that had been applied by the federal courts for decades. In its place, the Supreme Court set out a new test: that information will be considered confidential

15

"whenever it is customarily kept private, or at least closely held, by the person imparting it." *Food Marketing Inst*., 139 S. Ct. at 2363.  The Court further indicated that "information might be considered confidential only if the party receiving it provides some assurance that it will remain secret."  *Id*. The Court found it unnecessary, however, to decide whether this second condition must be satisfied in all cases, because the Court determined that this condition had in fact been satisfied in the case before it. *Id*. at 2363-64.

"[I]t is an open question in this Circuit whether government assurances that information will remain private is necessary for such information to qualify as 'confidential' under Exemption 4." *WP Co. v. U.S. Small Business Admin*., 502 F. Supp. 3d 1, 12 (D.D.C. 2020). The rulings of the U.S. District Court for the District of Columbia have varied.

To be sure, as the District Court noted, no ruling has squarely held that the second prong must be met in all cases.  Dist. Ct. Op. at 16, JA 470.  A number of decisions have held that whether an agency received an assurance of privacy is at the least a relevant factor to be considered in determining whether withheld records are "confidential" for purposes of Exemption 4. *E.g., Cause of Action Institute v. Export-Import Bank of the U.S*., Case No. 19-cv-1915-JEB, 2022 WL 252028 (D.D.C., Jan. 27, 2022); *Humane Society Int'l v. U.S. Fish & Wildlife Service*, No. 16-cv-720-TK, 2021 WL 1197726 at *5 (D.D.C., March 29, 2021); *Stotter v. U.S.

16

*Agency for Int'l Development*, Case No. 14-cv-2156-KBJ, 2020 WL 5878033 at *5 (D.D.C., Oct. 3, 2020). Other decisions, like the one in this case, have determined it unnecessary to address the issue, based on a finding that, regardless of whether such as an assurance is generally required, it had been provided in the case at bar. *E.g., Besson v. U.S. Dep't of Commerce*, Case No. 18-cv-02527-APM, 2020 WL 4500894 at *5 (D.D.C., Aug. 5, 2020). And one decision has found that an assurance of privacy is simply not required based on a prior decision of this Court. [1]

It is unnecessary for the Court, in this case, to resolve the issue of whether an assurance of privacy is generally required. It is only necessary for this Court to hold that, at least where the Government has given an affirmative indication that the information at issue could or would be made public, that information cannot be treated as "confidential" under *Food Marketing*. Such an approach has been endorsed by the U.S. Department of Justice, which has explained that agency "notices or communications could also explicitly notify submitters of the agency's intention to publicly disseminate the information. In those situations, the information, when objectively viewed in context, would be deemed to have lost its

---

[1] In *Renewable Fuels Ass'n v. U.S. Environmental Protection Agency*, 519 F. Supp. 3d 1 (D.D.C. 2021), the Court ruled that no assurance of privacy should be required, based on this Court's decision in *Critical Mass Energy Project v. Nuclear Regulatory Comm'n,* 975 F.2d 871 (D.C. Cir. 1992) which was not overruled by *Food Marketing*. However, *Critical Mass* addressed the situation in which information is voluntarily submitted to the Government—not as in this case, where Boeing was *required* to submit information in order to obtain an ungrounding order.

17

'confidential' character under Exemption 4… given that the submitter was on notice that it would be disclosed."  Dept. of Justice, *Exemption 4 after the Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media*, https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media (last visited May 24, 2022).

Post-*Food Marketing*, several lower courts have ruled to the same effect. For example, in *WP Co*., the Court ruled that the SBA could not withhold certain loan data collected from borrowers under the Paycheck Protection Program because the loan application notified borrowers that their information would be publicly released if requested under FOIA. "SBA does not explain how the loan data could remain 'confidential' for purposes of Exemption 4 when the Government not only provided no assurance of privacy, but also told borrowers explicitly that the information would be disclosed."  *WP Co*., 502 F. Supp. 3d at 17. Similarly, in *Center for Investigative Reporting v. Dep't of Labor*, Case No. 18-cv-02414-DMR, 2020 WL 2995209 (N.D. Cal., June 4, 2020), the Court held that forms submitted to OSHA by employers reporting death and injuries on the job could not be withheld under Exemption 4 because OSHA had pledged in a rulemaking that it would post data from those forms on a publicly accessible website – even though OSHA later changed its position to state that the data should be kept private.  "[I]nformation *loses* its character of confidentiality where there is express agency notification that

18

submitted information will be publicly disclosed." *Center for Investigative Reporting*, 2020 WL 2995209 at *5 (emphasis in original). Even the Court in *Renewable Fuels*, which found no requirement for any assurance of privacy, suggested that the "better approach would be that privately held information is generally confidential absent an express statement by the agency that it would not keep information private, or a clear implication to that effect…" *Renewable Fuels*, 519 F. Supp. 3d at 12.

In this case, the Court should rule to the same effect and find that based on the Government's public representations, as set forth below, the information at issue was not properly treated as "confidential."

### F.    FAA and Boeing Made Public Pledges of Transparency with Respect to the Ungrounding Decision

With respect to the specific classes of documents submitted by Boeing to support ungrounding, the FAA gave every indication that those documents would *not* be maintained in confidence. To the contrary, there was effectively an express affirmative commitment by FAA that these documents *would* be made public.

In March 2019, FAA Acting Administrator Daniel K. Elwell stated, as to the ungrounding of the 737 MAX, "The 737 MAX will return to service for U.S. carriers and in U.S. airspace only when the FAA's analysis of the facts and technical data indicate that it is appropriate.  In our quest for continuous safety improvement, *the FAA welcomes external review of our systems, processes and recommendations*."

19

*Statement of Daniel Elwell; The State of Airline Safety: Federal Oversight of Commercial Aviation, Hearing before the Senate Commerce Committee, Subcommittee on Aviation and Space* 9 (March 27, 2019) https://www.commerce.senate.gov/2019/3/the-state-of-airline-safety-federal-oversight-of-commercial-aviation (last visited Oct. 26, 2020)(emphasis added).

Less than two months later, the FAA Administrator, after reviewing the specific steps to be taken in the re-certification process, stated in response to written questions that, "The FAA has shared actions, the timeline of what the agency knew and when*, and the FAA process to certify a design change for the 737 MAX and ensure it is safe to fly*." *Status of the Boeing 737 MAX, Hearing before the H. Comm. on Transportation & Infrastructure, Subcomm. on Aviation*, 116th Cong. 86 (2019) (emphasis added).

In December 2019, the new FAA Administrator, Steve Dickson, told a U.S. House committee that, "Today's unprecedented U.S. safety record was built on the willingness of aviation professionals to embrace hard lessons… *The FAA both welcomes and invites scrutiny of our processes and procedures*." *The Boeing 737 MAX: Examining the Federal Aviation Administration's Oversight of the Aircraft's Certification: Hearing before the House Comm. on Transportation & Infrastructure,* 116th Cong. 14 (2019) (emphasis added). The Administrator went on to say that, "We believe that transparency, open and honest communication, and our willingness to

improve our systems and processes are the keys to restoring public trust in the FAA and the safety of the 737 MAX." *Id.*

Most of the disputed documents were submitted by Boeing to the FAA from September through December of 2019, or later, well after these pledges of transparency were made. *See, e.g.*, *Vaughn* Index, JA 19-23, 25, 36, 43-44, documents numbered 2, 4, 5, 6, 11, 13, 18, 28, 56, 76, 77.

At a Senate hearing in June 2020, specifically about the FAA's oversight of aircraft certification, Administrator Dickson reiterated, in his prepared statement, that "we believe that transparency, open and honest communication and our willingness to improve our systems and processes are the keys to restoring public trust in the FAA and in the safety of the 737 MAX when it is returned to service." During the hearing, the Administrator stated, "I am trying to promote a culture both within the agency and really with all of our stakeholders of transparency and openness and this is an opportunity for us to do this." *Examining the Federal Aviation Administration's Oversight of Aircraft Certification: Hearing before the committee on Commerce, Science and Transportation*, 116th Cong., June 17, 2020 https://www.commerce.senate.gov/2020/6/examining-the-federal-aviation-administration-s-oversight-of-aircraft-certification at 35:37.

Boeing itself has recognized, acknowledged and supported the agency's commitment to transparency in the re-certification process. In a 2020 television

interview, Boeing CEO David Calhoun stated that, "I think transparency of the lessons I learned over the past year. That is where Boeing fell short and we will not fall short on that subject under my leadership.  It will be uncomfortable but *we will be transparent on every subject*, whether it is training, *whether it's the certification process*, everything along the way…. [Y]ou'll know what I know."   CNBC Interview, of David Calhoun (Jan. 29, 2020), https://www.youtube.com/watch?v=kOuIKggApLc  (last visited Oct 23, 2020) (emphasis added). A month later, Mr. Calhoun publicly stated:

> We're going to have the most open book the world has ever seen on this subject.  Transparency is what we lost for a moment and it's what we have to regain because it speaks to the trust that the world has in us. Ultimately, that's . . . people are going to have to just be comfortable that we are going to share any and all issues that arise in the course of designing and producing airplanes, so that when things do go a little wrong, we can get ahead of them, we can do it in the open air with all of our employees and with the public.

KING-TV Channel 5 (Seattle) Interview, Feb. 19, 2020, https://www.youtube.com/watch?v=rbKCSqKRDzl (last visited oct. 23, 2020).

Thus, the FAA repeatedly and publicly committed to make public the basis for any decision to unground the 737 MAX—and Boeing itself echoed those commitments.

22

### G. The FAA's Transparency Pledges Could Only be Interpreted as a Commitment to Disclose Documents Forming the Factual Basis for the Ungrounding

These public pledges of transparency with respect to ungrounding were not mere generalities or niceties. In the context of the decision to allow a modified version of this specific aircraft to fly again, and against the backdrop of concealment and fraud that led to the MAX tragedies, these pledges could only reasonably be interpreted as meaning that the FAA would publicly disclose all the essential information needed to evaluate and assess its ungrounding decision. And in that regard, Appellants submitted to the District Court uncontroverted declarations from seven independent experts making clear that, without access to the Disputed Information Categories, it would not be possible to determine whether the fixes submitted by Boeing, and relied upon by the FAA, actually make the aircraft safe to fly again.

The record demonstrates that the FAA's repeated pledges would be utterly inconsistent with any expectation that the FAA would withhold from the public information reflecting the actual steps planned and conducted with and by the FAA, constituting the agency's ungrounding process. There is simply no way to be "transparent" about the ungrounding process while withholding those categories of information (the Disputed Information Categories). That is because those categories

of information are the *bare minimum* of information needed to understand what the FAA did to review the proposed fixes and the results of that review.

### (1) Certification Plans: Testing methods, plans and conditions

As former FAA Acting Administrator Elwell explained to Congress in March 2019, with respect to certification plans, test plans and methods and test results:

> The FAA is directly involved in the testing and certification of new and novel features and technologies. When as new design, or a change to an existing design, of aircraft is being proposed, the designer must apply to the FAA for a design approval….
>
> Once the certification basis is established for a proposed design, the FAA and the applicant develop and agree to a certification plan and initial schedule. In order to receive a type certificate, the applicant must conduct an extensive series of tests and review to show that the product is compliant with existing standards and any special conditions, including lab tests, flight tests and conformity inspections. . ..

*Statement of Daniel K. Elwell before the Senate Commerce Committee, Subcommittee on Aviation and Space on the State of Airline Safety: Federal Oversight of Commercial Aviation* 5-6 (March 27, 2019) https://www.commerce.senate.gov/2019/3/the-state-of-airline-safety-federal-oversight-of-commercial-aviation (last visited Oct. 26, 2020).

The significance of certification plans was further explained by Michael Neely, an aerospace consultant who spent 20 years at Boeing as a system engineer and project engineer. Mr. Neely worked on Boeing commercial aircraft development programs and has direct knowledge of Boeing's engineering

procedures and processes, specifically the importance of timely safety engineering application to comply with FAA regulations. Declaration of Michael Neely ("Neely Decl.") ¶3-5, JA 66-67.   Mr. Neely explained that the "Certification Plan (CP) is a 'road map' that both the FAA and Manufacturer (Boeing) agree on and follow.   In general, the certification plan contains detailed descriptions of the type design change, methods of compliance, how much and type of testing is necessary, when and where you will use designees and schedule information." Neely Decl. Ex. D at 3, JA 131. Boeing modified and/or created certification plans "for recertifying the 737-MAX MCAS changes and submitted to the FAA, thus it is critical to produce for review." *Id.*

### (2) Means of compliance

"Means of compliance" are the standard specifications and testing methods used by an aircraft manufacturer to demonstrate compliance with FAA regulations. Most of these are publicly available from the major materials/equipment standards and testing body, ASTM International.   *See e.g.*, FAA, *Accepted Means of Compliance; Airworthiness Standards; Normal Category Airplanes*, 83 Fed. Reg. 21850 (May 11, 2018) (updating list of acceptable ASTM standards). However, manufacturers may propose other testing methods or standards to FAA. *Id.*

What testing methods were accepted by FAA from Boeing to demonstrate compliance with FAA regulations is at the heart of understanding what FAA did to

review Boeing's proposed fixes. There can be no transparency in the process without disclosing the means of compliance.

### (3) Flight test plans and criteria; flight test results

As Mr. Neely noted, "[c]ommercial flight testing is conducted to certify that the aircraft meets all applicable safety and performance requirements of the government certifying agency. . . Boeing submitted flight Test Reports to the FAA, but these reports were not produced…"  Neely Decl. Ex. D at 9, JA 137.

The importance of such flight test information was underscored by another of Plaintiff's experts, Dr. Javier de Luis, an aeronautical engineer and scientist with 30 years of experience, who has been a lecturer and instructor in the Department of Aeronautics and Astronautics at MIT and was Project Manager for two key experiments onboard the Space Shuttle.  Declaration of Javier de Luis, PhD, ("de Luis Decl") ¶¶2-4 & Ex. A, JA 153-154, 158-162. Dr. Javier de Luis noted that while the FAA claims more than 4,000 hours of flight testing, the "FAA does not disclose what the test flight plans actually were or any of the specific results of the test flights. Without such information, there is no way to confirm whether the test flight for particular component or feature actually demonstrated that the component or feature worked properly and safely."  De Luis Decl. 6 ¶ 12, JA 155.  After reviewing the *Final Summary*, Dr. de Luis explained that the "key question in evaluating the basis for the FAA's decision is, is the MAX safe to fly without MCAS?"  Supplemental

26

de Luis Declaration ¶10, JA 436. He stated, however, that it "is impossible for me or any other independent expert to address this question. . . without being able to review results of the actual test of the aircraft conducted with and without MCAS in operation – the information contained in the Disputed Information Categories. . . Without knowing the design and results of the tests and analyses performed, there is no way to tell whether the MCAS fixes approved by the FAA are adequate." *Id*. ¶11, JA 437.

Similarly, Mr. Neely noted that the *Final Summary* indicates that the "updated flight control system was tested and asserts in conclusory fashion that it worked." Supplemental Declaration of Michael Neely ¶7, JA 445 (citing *Final Summary* at 40-42, JA 375-377). "But in the 100 some pages of the Final Summary, there is no actual information how this design change was concluded and tested with specific test results." *Id.* "[W]ithout the Disputed Information Categories withheld by the FAA from public disclosure in this case, . . . it is not possible for me or any other independent expert . . .to determine whether the design modifications that the FAA has determined now make the 737 MAX safe to fly in fact do make it safe to fly." *Id*. ¶5, JA 445.

### (4) Safety Analyses

With respect to Safety Analyses, Mr. Neely quoted the Safety Recommendation Report of the National Transportation Safety Board on how

27

fundamental such analyses are to the basic nature of the certification process: "'Safety assessments proceed in a stepwise, data-driven manner to ensure that all significant single-failure conditions have been identified and all combinations of failure that could lead to hazardous or catastrophic airplane-level effects have been considered and appropriately mitigated.'"  Neely Decl. ¶15, JA 73 (quoting NTSB, *Safety Recommendation Report, Assumptions Used in the Safety Assessment Process and Effects of Multiple Alerts and Indications on Pilot Performance* 5 (Sept. 19, 2019).  Mr. Neely noted that, in reviewing "the FAA's document number 26 in the Vaughn Index, …references the aforementioned detail Safety Analysis documents where Boeing modified as part of its design change for the 737 MAX, but the FAA heavily redacted producing the actual safety analysis documents."  Neely Decl. ¶28, JA 76.  Yet, "defects in the safety analyses" of the existing aircraft contributed directly to the failures and crashes, …resulting in the deaths of hundreds of people."  *Id*. ¶29, JA 76.  "It would be impossible to determine whether the flaws in the 737 MAX safety analyses have been addressed without obtaining the safety analyses Boeing has submitted to the FAA in support of re-certification."  *Id*. ¶30, JA 78.

Another expert, Richard Spinks, a professional engineer and project manager with thirty-eight years of experience in process safety, after reviewing the productions and the *Vaughn* Index, states that, "Information included in the produced documents is wholly insufficient to provide an independent assessment of

system reliability.  Of particular concern is the absence of any information regarding the system safety analysis."   Declaration of Richard A. Spinks, P.E., ("Spinks Decl.") ¶7, JA 146. Mr. Spinks noted that the FAA has actually made public a description of the functionality and failure effects of the angle of attack sensors yet has withheld under Exemption 4 a functional description of MCAS and its susceptibility to component failures.  "Since the reliability of MCAS is dependent upon the effects of ALL system input and output devices, the arbitrary exclusion of other critical components cannot be reasonably justified."  *Id*. ¶8, JA 146.  Mr. Spinks concluded that, as to the Safety Analyses, "[w]itholding of critical safety information is inconsistent with the transparency promised by both Boeing and the FAA. Boeing was aware of the confidentiality clauses when they made their public commitment to transparency, effectively waiving their confidentiality rights in the interest of public safety and public trust." Spinks Decl. ¶14, JA 147.

### (5) Withholdings In All Are Fundamentally Inconsistent with Transparency

Apart from the fact that transparency inherently demands disclosure of these specific information categories, the overall commitment to transparency is simply inconsistent with withholding categories of information essential to determining the basis for any re-certification decision. Another of Plaintiff's experts, Dennis Coughlin, an avionics technician and instructor with thirty-one years of experience, states that the "lack of detail in any of the disclosures by the FAA and Boeing raises

29

more safety questions and safety concerns than are answered." Declaration of Dennis Coughlin ("Coughlin Decl.") ¶7, JA 218. For example, with "MCAS, Boeing is proposing changes to the Flight Control Laws for MCAS that govern its function but has not released the new settings to the aviation community so they could be independently evaluated." *Id*. ¶10. Mr. Coughlin identifies thirteen separate questions that cannot be resolved by outside experts, related to this issue, in the absence of the withheld information. *Id*. Mr. Coughlin concluded that, "The technical details of how Boeing intends to demonstrate compliance of various equipment and software components with FAA requirements are **essential** to assurance that any ungrounding of the MAX will be safe. Failure to do so by the FAA and Boeing will only result in serious doubts about the safety of the MAX by experts and the general public." *Id*. ¶11, JA 219 (emphasis in original).

Similarly, Gregory Barrance, an aeronautical avionics systems and safety engineer with more than 30 years of experience, including serving as a systems and safety engineer for major aircraft manufacturers, explained that without the withheld information, it may not be possible to review two critically important issues: (i) whether the MCAS should be kept as part of the automatic trim system and (ii) whether any implementation of MCAS is safe for return to service without a third Angle of Attack sensor. Declaration of Gregory Barrance ("Barrance Decl.") ¶8, JA 173.

Plaintiffs' experts further confirmed that Boeing could not reasonably have expected confidential treatment, given FAA's assurances of transparency.  As Mr. Neely concluded:

> The technical details of how Boeing intends to demonstrate compliance of various equipment and software components with FAA requirements; how Boeing intends to achieve certification of these components by the FAA; the methods of testing; and the results of testing including safety analyses and flight test results, *are the most critical and essential information that would need to be made public in order to disclose the actual basis for any decision by the FAA to unground the aircraft*;. . .It is my understanding that the FAA specifically and publicly committed to transparency with the public regarding the re-certification process of 737 MAX . . . *Consequently Boeing would have clearly understood the FAA could not meet its commitment to transparency without making these categories of information publicly available.*

Neely Declaration, ¶¶25-27, 32, JA 75-76, 78 (emphasis added).

## H.   The Specific Pledges of Transparency as to the 737 MAX Information Superseded the Older General Assurances Relied Upon by the District Court

The District Court determined that it was unnecessary to address the question of whether an assurance of privacy is generally required under *Food Marketing* because, in this case, the District Court found the withheld information in fact "was provided by Boeing to the FAA under an 'assurance of privacy.'"  District Ct. Op. at 16, JA 470.  In reaching that conclusion, the District Court relied on FAA general guidelines precluding release of proprietary information; a nearly 40-year old agreement with Boeing requiring the agency to obtain written permission to include company information in airworthiness documents; and "implied" assurances "based

31

on the context and the history of the FAA and Boeing's relationship" as described in declarations submitted by agency officials. *Id*. at 16-17, JA 470-471.

As to the FAA's pledges of transparency with respect to the basis for ungrounding the 737 MAX, the District Court found that Appellants did not "'identify any statements in which these [FAA and Boeing] executives and officials committed to releasing any specific document or any particular piece of Boeing's proprietary information.'" District Ct. Op. at 19, JA 473 (quoting FAA Cross Motion for Summary Judgment, Doc. No. 23-4 at 22). FAA's representation to the District Court, however, was actually that "FAA's statements regarding the importance of transparency were not a commitment or indication by the FAA that it intends to release Boeing's proprietary certification documents, or information within these documents, to the public *beyond what is necessary to document and explain changes to the 737 MAX before it is returned to service*." Declaration of Earl Lawrence ¶13, JA 332 (emphasis added). And as demonstrated above, the uncontroverted sworn declarations of Appellants' experts established that release of the Disputed Information Categories of documents is indeed absolutely "necessary to document and explain changes" to the aircraft before it was returned to service.

The FAA may not have referred to any "specific document" in its pledges of transparency and disclosure. But it did refer to the entire category of technical information relied upon by the agency in its decision to allow the 737 MAX to fly

again. The FAA clearly pledged to make that category of information available to the public.

In these circumstances, the general FAA policies regarding confidential treatment afforded to technical data effectively have been superseded, as to the information forming the basis for the 737 MAX ungrounding, by the *specific* pledges of transparency and disclosure made by the FAA.  It would simply not have been reasonable for Boeing to rely on the general policies in the face of the FAA's specific pledges related to the technical data on which the ungrounding decision was based.

Whatever else, the Court's ruling in *Food Marketing* cannot mean that an agency can pledge complete transparency with respect to a specific category of documents submitted to the agency by a company, then treat all of those documents as confidential under Exemption 4.  The District Court erred in allowing the FAA to do so.

## III.   THE DISTRICT COURT ERRED IN PERMITTING FAA TO WITHHOLD A BODY OF SECRET LAW IN THE FORM OF BOEING'S "MEANS OF COMPLIANCE"

As the *Vaughn* Index indicates, twenty-seven of the documents withheld under Exemption 4 set out Boeing's "means of compliance" with FAA regulations – in other words, the procedures by which the FAA would allow Boeing to show that its fixes to the MAX would meet FAA requirements.  See Dist. Ct. Op. at 6, JA 460 (chart line 3), citing documents in *Vaughn* Index. As the FAA explained, "FAA

33

and some standards organizations publish means of compliance that have already been accepted" and "applicants can choose to use these available methods" but the FAA also allows aircraft manufacturers to "develop their own means of compliance that are specific to their airplane design." Declaration of Susan Cabler, ("Cabler Decl.") ¶¶26, 29, JA 234-236.

These "means of compliance," in other words, are procedures that, if followed will result in a determination of compliance. They are applied by the FAA to make a legally binding determination about whether a particular design complies with FAA regulations. FAA regulations require an applicant for aircraft certification to "provide the FAA the means by which compliance has been shown." 14 C.F.R. §21.20.

These means of compliance are substituted for procedures published by FAA itself (or by private bodies and publicly adopted by the FAA). *See e.g.*, FAA, *Accepted Means of Compliance; Airworthiness Standards; Normal Category Airplanes*, 83 Fed. Reg. 21850 (May 11, 2018) (updating list of acceptable published standards). That FAA – consistent with its penchant for delegating security of the henhouse to the foxes – allows aircraft manufacturers to make up their own procedures for demonstrating compliance, does not change the nature of these procedures as binding rules. Inherently, such a set of procedures cannot be withheld under FOIA.

It is a bedrock principle of FOIA that "an agency is not permitted to develop a 'body of "secret law," used by it in the discharge of its regulatory duties…'" *Electronic Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983) (internal quotation omitted)). "'[T]o prevent the development of secret law, we must require [an agency] to disclose orders and interpretations which it actually applies to cases before it, . . .'" *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980) (quoting *Sterling Drug, Inc. v. FTC*, 450 F.2d 698, 708 (D.C. Cir. 1971)). Although these cases involved Exemption 5, "[i]f secret law can be withheld under any of these exemptions, FOIA becomes a license for secret law rather than a limit. There is good reason to believe that the exemptions were not meant to permit withholding of agency law." Jonathan Manes, *Secret Law*, 106 GEO. L. J. 803, 851 (2018).

The District Court erroneously concluded that the "means of compliance" are not binding agency policy because the FAA ultimately determines whether the manufacturer has demonstrated that its design complies with applicable regulations. District Ct. Op. at 13, JA 467. But the FAA uses the means of compliance to make that determination. The FAA may have the right to accept or reject Boeing's means of compliance. But if it accepts them, those means *do* function as "working law" for the FAA.

35

For these reasons, the District Court erred in finding that the "means of compliance" could be withheld under Exemption 4.

## IV. THE WITHHELD FAA COMMENTS WERE NOT "OBTAINED FROM A PERSON"

In order to be covered by Exemption 4, information must be "obtained from a person." 5 U.S.C. § 552(b)(4). The FAA concedes that it has withheld in full 79 pages of "records that contain FAA comments to Boeing certification documents." FAA Memorandum in Support of Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion, R. 23-4 at 13. *See* Vaughn Index, JA 32-33, 35, 45, documents numbered 41, 45, 50, 83. Exemption 4 does not apply to any "FAA Comments." Rather, it "has been interpreted to encompass only information received from persons outside the Government." *Grumman Aircraft Engineering Corp. v Renegotiation Bd.*, 425 F.2d 578, 582 (D.C. Cir. 1970).

The FAA contended that the seventy-nine pages entirely withheld "consisted of charts created through collaboration by Boeing and FAA," containing FAA comments that "would reveal technical data and Boeing's proprietary methods of compliance if released." Cabler Decl. ¶51, JA 244. The District Court concluded that these charts were "obtained from a person" because disclosure could "'allow others to extrapolate'" Boeing's proprietary information. District Ct. Op at 10-11, JA464-465 (quoting *Ctr. For Auto Safety v. Dep't of Treasury*, 133 F. Supp. 3d 109, 123 (D.D.C. 2015)).

36

To be sure, if an agency-created record contains information that was supplied by a company, it could be considered to have been "obtained from a person." *Gulf & Western Indus., Inc. v. U.S.*, 615 F.2d 527, 529-30 (D.C. Cir. 1980). On the other hand, "the mere fact that information was the product of negotiations between a 'person' and the agency does not make that information 'obtained from a person" …" *Southern Alliance for Clean Energy v. U.S. Dept. of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012). "[I]nformation generated by the government is not exempt from disclosure under Exemption 4 simply because it is based upon information supplied by persons outside the agency." *Id*. at 75. "[T]he key distinction---is between information that is either repeated verbatim or slightly modified by the agency and information that is substantially reformulated by the agency such that it is no longer a 'person's' information…" *Id*. at 68.

In this case, the FAA itself has described the withheld charts as a product of "collaboration" between the FAA and Boeing and has characterized the charts in the *Vaughn* index as "FAA comments" to Boeing's certification documents.  These charts manifestly do not consist merely of Boeing information "repeated verbatim." Whatever Boeing supplied was sufficiently "reformulated" by FAA to the point that FAA itself characterized the charts as containing the FAA's *own* comments.  Those comments are not "obtained from a person."  The FAA was obligated to release them. The District Court erred in finding otherwise.

37

## V.  THE DISTRICT COURT ERRED IN HOLDING THAT THE FAA RELEASED ALL REASONABLY SEGREGABLE INFORMATION

Of the more than 9,000 pages of documents the FAA identified as being responsive to Appellants' narrowed FOIA request, the FAA essentially released nothing of substance.  FOIA requires that "any reasonably segregable portion of a record" must be released after redaction of the exempt portions. 5 U.S.C. § 552(b). In this case, the District Court accepted FAA's blanket assertion that its decision to withhold all of the substantive information in those documents reflected a line-by-line review in which no reasonably segregable information was found. District Ct. Op. at 20-21, JA 474-75.

It is well-established that "'an agency cannot justify withholding an entire document simply by showing that it contains some exempt material.'" *Stolt-Nielsen Transp. Group Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (quoting *Mead Data Cent,, Inc v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). An "'agency may not sweep a document under a general allegation of exemption.'" *Id*. (quoting *Vaughn v. Rosen*, 484 F.2d 820, 825 (D.C. Cir. 1973)).

According to the FAA's description of the information it has withheld, however, it is apparent that the agency has not shown that it would be unable reasonably to segregate the information Appellants seek from Boeing's proprietary

38

technical information.  Appellants are seeking flight test plans and criteria that would address some very basic questions.  What was going to take place in a test flight and what was supposed to be shown? What maneuvers would the pilot attempt?  What would the pilot do to put the formerly problematic features of the aircraft through their paces?  How long was the test?  Where would the plane be flown and under what kind of weather and other conditions?

None of this information constitutes proprietary technical information – and the FAA has not really claimed that it does.  Rather, the FAA simply avers that flight test plans "are specific to a particular manufacturer's airplane design as they *contain* descriptions of the airplane's flight control systems, flight characteristics such as stability and maneuverability and the flight control laws and algorithms encoded in the flight control computer."  Cabler Decl. ¶30, JA 236 (emphasis added).  But the fact that technical information is "contained" in these plans does not mean that the entire plan consists of such information.  And it does not make sense that it would.  FAA has not explained why the technical design details cannot be separated from the information that Plaintiff seeks, and that the FAA necessarily pledged to disclose.

Similarly, with respect to flight test results, FAA states that the "results of an applicant's flights tests describe how their design performed and whether it met FAA requirements…"  Cabler Decl. ¶32, JA 237. The agency suggests that "flight test results *include* detailed technical flight test data gathered through extensive

39

instrumentation and analyzed after the test to correlate and confirm the perceived results of any specific test." *Id.* (emphasis added).   But the FAA does not claim that the test results themselves consist solely of technical details about the aircraft design or that any such details could not be redacted.

Rather, the FAA simply asserted in conclusory fashion that all of the information being withheld "is so inextricably intertwined with the technical information and the proprietary compliance information that segregation and release would result in disclosure of only partial sentences or single sentences…"   Cabler Decl. ¶67, JA 249-50.

In *Stolt-Nielson*, the agency similarly submitted a "conclusory affidavit… declaring that a Division paralegal had 'reviewed each page line by line to assure himself that he was withholding from disclosure only information exempt pursuant to the Act.'"   *Stolt-Nielsen*, 534 F.3d at 734.   This Court held that the agency's "conclusion on a matter of law is not sufficient support for a court to conclude that the self-serving conclusion is the correct one." *Id*.   This Court also rejected the agency's assertion that so little could be released that it would be meaningless. "FOIA does not require that information must be helpful to the requestee before the government must disclose it.   FOIA mandates disclosure of information, not solely disclosure of helpful information." *Id.*

40

In this case, as in *Stolt-Nielsen*, the District Court simply accepted the agency's conclusory affidavit without making the required "specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007). That was erroneous. The case should be remanded to the District Court for a new review of what reasonably segregable portions of the withheld documents can be released.

## CONCLUSION

For the reasons set forth above, the judgment of the District Court should be reversed.

Respectfully Submitted,


<u>/s/ Joseph E. Sandler</u>

Joseph E. Sandler
Christina E. Bustos
Sandler Reiff Lamb Rosenstein & Birkenstock
1090 Vermont Ave N.W. Suite 750
Washington, D.C. 20005
(202) 479-1111
Sandler@sandlerreiff.com
Counsel for Petitioners

Dated: May 25, 2022


## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that the foregoing principal Brief for Appellants complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because the Brief was prepared

using a 14-point Times New Roman font and contains 9,366 words using the Word

Count function of Microsoft Word, not including the items excluded by Fed. R. App.

P. 32(f).

/s/ Joseph E. Sandler
Joseph E. Sandler
Counsel for Petitioners


Dated:  May 25, 2022

## <u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 21-5257

_____

FLYERS RIGHTS EDUCATION FUND, INC, *et. al.,*
*Appellants,*

v.

FEDERAL AVIATION ADMINISTRATION,
*Appellee.*

_____

Appeal from the United States District Court for the District of Columbia in Civil
Case No. 1:19-cv-03749-CKK
Judge Colleen Kollar-Kotelly

_____

## STATUTORY AND REGULATORY ADDENDUM

_____

Joseph E. Sandler
Christina E. Bustos
SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK P.C.
1090 Vermont Ave N.W. Suite 750
Washington, D.C. 20005
(202) 479-1111
sandler@sandlerreiff.com
bustos@sandlerreiff.com
*Counsel for Petitioners*

May 25, 2022

# TABLE OF CONTENTS

Freedom of Information Act, 5 U.S.C. §………………………………………….3

14 C.F.R. 21.20………………………………………………………………………24

**Freedom of Information Act-- 5 U.S.C. §552**

552. Public information; agency rules, opinions, orders, records, and proceedings

(a) Each agency shall make available to the public information as follows:

(1) Each agency shall separately state and currently publish in the Federal Register for the guidance of the public--

(A) descriptions of its central and field organization and the established places at which, the employees (and in the case of a uniformed service, the members) from whom, and the methods whereby, the public may obtain information, make submittals or requests, or obtain decisions;

(B) statements of the general course and method by which its functions are channeled and determined, including the nature and requirements of all formal and informal procedures available;

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency; and

(E) each amendment, revision, or repeal of the foregoing.

Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published. For the purpose of this paragraph, matter reasonably available to the class of persons affected thereby is deemed published in the Federal Register when incorporated by reference therein with the approval of the Director of the Federal Register.

(2) Each agency, in accordance with published rules, shall make available for public inspection in an electronic format--

(A) final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases;

(B) those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register;

(C) administrative staff manuals and instructions to staff that affect a member of the public;

(D) copies of all records, regardless of form or format--

(i) that have been released to any person under paragraph (3); and

(ii)(I) that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records; or

(II) that have been requested 3 or more times; and

(E) a general index of the records referred to under subparagraph (D);

unless the materials are promptly published and copies offered for sale. For records created on or after November 1, 1996, within one year after such date, each agency shall make such records available, including by computer telecommunications or, if computer telecommunications means have not been established by the agency, by other electronic means. To the extent required to prevent a clearly unwarranted invasion of personal privacy, an agency may delete identifying details when it makes available or publishes an opinion, statement of policy, interpretation, staff manual, instruction, or copies of records referred to in subparagraph (D). However, in each case the justification for the deletion shall be explained fully in writing, and the extent of such deletion shall be indicated on the portion of the record which is made available or published, unless including that indication would harm an interest protected by the exemption in subsection (b) under which the deletion is made. If technically feasible, the extent of the deletion shall be indicated at the place in the record where the deletion was made. Each agency shall also maintain and make available for public inspection in an electronic format current indexes providing identifying information for the public as to any matter issued, adopted, or promulgated after July 4, 1967, and required by this paragraph to be made available or published. Each agency shall promptly publish, quarterly or more frequently, and distribute (by sale or otherwise) copies of each index or supplements thereto unless it determines by order published in the Federal Register that the publication would be unnecessary and impracticable, in which case the agency shall nonetheless provide copies of such index on request at a cost not to exceed the direct cost of duplication. Each agency shall make the index referred to in subparagraph (E) available by computer telecommunications by December 31, 1999. A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if--

4

(i) it has been indexed and either made available or published as provided by this paragraph; or

(ii) the party has actual and timely notice of the terms thereof.

(3)(A) Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person.

(B) In making any record available to a person under this paragraph, an agency shall provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format. Each agency shall make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of this section.

(C) In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system.

(D) For purposes of this paragraph, the term "search" means to review, manually or by automated means, agency records for the purpose of locating those records which are responsive to a request.

(E) An agency, or part of an agency, that is an element of the intelligence community (as that term is defined in section 3(4) of the National Security Act of 1947 (50 U.S.C. 401a(4))) shall not make any record available under this paragraph to--

(i) any government entity, other than a State, territory, commonwealth, or district of the United States, or any subdivision thereof; or

(ii) a representative of a government entity described in clause (i).

(4)(A)(i) In order to carry out the provisions of this section, each agency shall promulgate regulations, pursuant to notice and receipt of public comment, specifying the schedule of fees applicable to the processing of requests under this section and establishing procedures and guidelines for determining when such fees should be waived or reduced. Such schedule shall conform to the guidelines which shall be promulgated, pursuant to notice and receipt of public comment, by the Director of the Office of Management and Budget and which shall provide for a uniform schedule of fees for all agencies.

(ii) Such agency regulations shall provide that--

(I) fees shall be limited to reasonable standard charges for document search, duplication, and review, when records are requested for commercial use;

(II) fees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media; and

(III) for any request not described in (I) or (II), fees shall be limited to reasonable standard charges for document search and duplication.

In this clause, the term "a representative of the news media" means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term "news" means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of "news") who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities. A freelance journalist shall be regarded as working for a news-media entity if the journalist can demonstrate a solid basis for expecting publication through that entity, whether or not the journalist is actually employed by the entity. A publication contract would present a solid basis for such an expectation; the Government may also consider the past publication record of the requester in making such a determination.

(iii) Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

(iv) Fee schedules shall provide for the recovery of only the direct costs of search, duplication, or review. Review costs shall include only the direct costs incurred during the initial examination of a document for the purposes of determining whether the documents must be disclosed under this section and for the purposes of withholding any portions exempt from disclosure under this section. Review costs

6

may not include any costs incurred in resolving issues of law or policy that may be raised in the course of processing a request under this section. No fee may be charged by any agency under this section--

(I) if the costs of routine collection and processing of the fee are likely to equal or exceed the amount of the fee; or

(II) for any request described in clause (ii)(II) or (III) of this subparagraph for the first two hours of search time or for the first one hundred pages of duplication.

(v) No agency may require advance payment of any fee unless the requester has previously failed to pay fees in a timely fashion, or the agency has determined that the fee will exceed $250.

(vi) Nothing in this subparagraph shall supersede fees chargeable under a statute specifically providing for setting the level of fees for particular types of records.

(vii) In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: Provided, That the court's review of the matter shall be limited to the record before the agency.

(viii)(I) Except as provided in subclause (II), an agency shall not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) under this subparagraph if the agency has failed to comply with any time limit under paragraph (6).

(II)(aa) If an agency has determined that unusual circumstances apply (as the term is defined in paragraph (6)(B)) and the agency provided a timely written notice to the requester in accordance with paragraph (6)(B), a failure described in subclause (I) is excused for an additional 10 days. If the agency fails to comply with the extended time limit, the agency may not assess any search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees).

(bb) If an agency has determined that unusual circumstances apply and more than 5,000 pages are necessary to respond to the request, an agency may charge search fees (or in the case of a requester described under clause (ii)(II) of this subparagraph, duplication fees) if the agency has provided a timely written notice to the requester in accordance with paragraph (6)(B) and the agency has discussed with the requester via written mail, electronic mail, or telephone (or made not less than 3 good-faith attempts to do so) how the requester could effectively limit the scope of the request in accordance with paragraph (6)(B)(ii).

(cc) If a court has determined that exceptional circumstances exist (as that term is defined in paragraph (6)(C)), a failure described in subclause (I) shall be excused for the length of time provided by the court order.

7

(B) On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in subsection (b) of this section, and the burden is on the agency to sustain its action. In addition to any other matters to which a court accords substantial weight, a court shall accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility under paragraph (2)(C) and subsection (b) and reproducibility under paragraph (3)(B).

(C) Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.

[(D) Repealed. Pub.L. 98-620, Title IV, § 402(2), Nov. 8, 1984, 98 Stat. 3357]

(E)(i) The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.

(ii) For purposes of this subparagraph, a complainant has substantially prevailed if the complainant has obtained relief through either--

(I) a judicial order, or an enforceable written agreement or consent decree; or

(II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial.

(F)(i) Whenever the court orders the production of any agency records improperly withheld from the complainant and assesses against the United States reasonable attorney fees and other litigation costs, and the court additionally issues a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, the Special Counsel shall promptly initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding. The Special Counsel, after investigation and consideration of the evidence submitted, shall submit his findings and recommendations to the administrative authority of the agency concerned and shall send copies of the findings and recommendations to the officer or employee or his

8

representative. The administrative authority shall take the corrective action that the Special Counsel recommends.

(ii) The Attorney General shall--

(I) notify the Special Counsel of each civil action described under the first sentence of clause (i); and

(II) annually submit a report to Congress on the number of such civil actions in the preceding year.

(iii) The Special Counsel shall annually submit a report to Congress on the actions taken by the Special Counsel under clause (i).

(G) In the event of noncompliance with the order of the court, the district court may punish for contempt the responsible employee, and in the case of a uniformed service, the responsible member.

(5) Each agency having more than one member shall maintain and make available for public inspection a record of the final votes of each member in every agency proceeding.

(6)(A) Each agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall--

(i) determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of--

(I) such determination and the reasons therefor;

(II) the right of such person to seek assistance from the FOIA Public Liaison of the agency; and

(III) in the case of an adverse determination--

(aa) the right of such person to appeal to the head of the agency, within a period determined by the head of the agency that is not less than 90 days after the date of such adverse determination; and

(bb) the right of such person to seek dispute resolution services from the FOIA Public Liaison of the agency or the Office of Government Information Services; and

(ii) make a determination with respect to any appeal within twenty days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of such appeal. If on appeal the denial of the request for records is in whole or in part upheld, the agency shall notify the person making such request of the provisions for judicial review of that determination under paragraph (4) of this subsection.

The 20-day period under clause (i) shall commence on the date on which the request is first received by the appropriate component of the agency, but in any

event not later than ten days after the request is first received by any component of the agency that is designated in the agency's regulations under this section to receive requests under this section. The 20-day period shall not be tolled by the agency except--

(I) that the agency may make one request to the requester for information and toll the 20-day period while it is awaiting such information that it has reasonably requested from the requester under this section; or

(II) if necessary to clarify with the requester issues regarding fee assessment. In either case, the agency's receipt of the requester's response to the agency's request for information or clarification ends the tolling period.

(B)(i) In unusual circumstances as specified in this subparagraph, the time limits prescribed in either clause (i) or clause (ii) of subparagraph (A) may be extended by written notice to the person making such request setting forth the unusual circumstances for such extension and the date on which a determination is expected to be dispatched. No such notice shall specify a date that would result in an extension for more than ten working days, except as provided in clause (ii) of this subparagraph.

(ii) With respect to a request for which a written notice under clause (i) extends the time limits prescribed under clause (i) of subparagraph (A), the agency shall notify the person making the request if the request cannot be processed within the time limit specified in that clause and shall provide the person an opportunity to limit the scope of the request so that it may be processed within that time limit or an opportunity to arrange with the agency an alternative time frame for processing the request or a modified request. To aid the requester, each agency shall make available its FOIA Public Liaison, who shall assist in the resolution of any disputes between the requester and the agency, and notify the requester of the right of the requester to seek dispute resolution services from the Office of Government Information Services. Refusal by the person to reasonably modify the request or arrange such an alternative time frame shall be considered as a factor in determining whether exceptional circumstances exist for purposes of subparagraph (C).

(iii) As used in this subparagraph, "unusual circumstances" means, but only to the extent reasonably necessary to the proper processing of the particular requests--

(I) the need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request;

(II) the need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request; or

10

(III) the need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject-matter interest therein.

(iv) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for the aggregation of certain requests by the same requestor, or by a group of requestors acting in concert, if the agency reasonably believes that such requests actually constitute a single request, which would otherwise satisfy the unusual circumstances specified in this subparagraph, and the requests involve clearly related matters. Multiple requests involving unrelated matters shall not be aggregated.

(C)(i) Any person making a request to any agency for records under paragraph (1), (2), or (3) of this subsection shall be deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph. If the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request, the court may retain jurisdiction and allow the agency additional time to complete its review of the records. Upon any determination by an agency to comply with a request for records, the records shall be made promptly available to such person making such request. Any notification of denial of any request for records under this subsection shall set forth the names and titles or positions of each person responsible for the denial of such request.

(ii) For purposes of this subparagraph, the term "exceptional circumstances" does not include a delay that results from a predictable agency workload of requests under this section, unless the agency demonstrates reasonable progress in reducing its backlog of pending requests.

(iii) Refusal by a person to reasonably modify the scope of a request or arrange an alternative time frame for processing a request (or a modified request) under clause (ii) after being given an opportunity to do so by the agency to whom the person made the request shall be considered as a factor in determining whether exceptional circumstances exist for purposes of this subparagraph.

(D)(i) Each agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests.

(ii) Regulations under this subparagraph may provide a person making a request that does not qualify for the fastest multitrack processing an opportunity to limit the scope of the request in order to qualify for faster processing.

11

(iii) This subparagraph shall not be considered to affect the requirement under subparagraph (C) to exercise due diligence.

(E)(i) Each agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records--

(I) in cases in which the person requesting the records demonstrates a compelling need; and

(II) in other cases determined by the agency.

(ii) Notwithstanding clause (i), regulations under this subparagraph must ensure--

(I) that a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request; and

(II) expeditious consideration of administrative appeals of such determinations of whether to provide expedited processing.

(iii) An agency shall process as soon as practicable any request for records to which the agency has granted expedited processing under this subparagraph. Agency action to deny or affirm denial of a request for expedited processing pursuant to this subparagraph, and failure by an agency to respond in a timely manner to such a request shall be subject to judicial review under paragraph (4), except that the judicial review shall be based on the record before the agency at the time of the determination.

(iv) A district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request.

(v) For purposes of this subparagraph, the term "compelling need" means--

(I) that a failure to obtain requested records on an expedited basis under this paragraph could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or

(II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

(vi) A demonstration of a compelling need by a person making a request for expedited processing shall be made by a statement certified by such person to be true and correct to the best of such person's knowledge and belief.

(F) In denying a request for records, in whole or in part, an agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the

12

request, unless providing such estimate would harm an interest protected by the exemption in subsection (b) pursuant to which the denial is made.

(7) Each agency shall--

(A) establish a system to assign an individualized tracking number for each request received that will take longer than ten days to process and provide to each person making a request the tracking number assigned to the request; and

(B) establish a telephone line or Internet service that provides information about the status of a request to the person making the request using the assigned tracking number, including--

(i) the date on which the agency originally received the request; and

(ii) an estimated date on which the agency will complete action on the request.

(8)(A) An agency shall--

(i) withhold information under this section only if--

(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b); or

(II) disclosure is prohibited by law; and

(ii)(I) consider whether partial disclosure of information is possible whenever the agency determines that a full disclosure of a requested record is not possible; and

(II) take reasonable steps necessary to segregate and release nonexempt information; and

(B) Nothing in this paragraph requires disclosure of information that is otherwise prohibited from disclosure by law, or otherwise exempted from disclosure under subsection (b)(3).


(b) This section does not apply to matters that are--

(1)(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(2) related solely to the internal personnel rules and practices of an agency;

(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute--

(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

13

(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(5) inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested;

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual;

(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(9) geological and geophysical information and data, including maps, concerning wells.

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection. The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this

14

subsection under which the deletion is made. If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

(c)(1) Whenever a request is made which involves access to records described in subsection (b)(7)(A) and--
(A) the investigation or proceeding involves a possible violation of criminal law; and
(B) there is reason to believe that (i) the subject of the investigation or proceeding is not aware of its pendency, and (ii) disclosure of the existence of the records could reasonably be expected to interfere with enforcement proceedings,

the agency may, during only such time as that circumstance continues, treat the records as not subject to the requirements of this section.
(2) Whenever informant records maintained by a criminal law enforcement agency under an informant's name or personal identifier are requested by a third party according to the informant's name or personal identifier, the agency may treat the records as not subject to the requirements of this section unless the informant's status as an informant has been officially confirmed.
(3) Whenever a request is made which involves access to records maintained by the Federal Bureau of Investigation pertaining to foreign intelligence or counterintelligence, or international terrorism, and the existence of the records is classified information as provided in subsection (b)(1), the Bureau may, as long as the existence of the records remains classified information, treat the records as not subject to the requirements of this section.
(d) This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section. This section is not authority to withhold information from Congress.
(e)(1) On or before February 1 of each year, each agency shall submit to the Attorney General of the United States and to the Director of the Office of Government Information Services a report which shall cover the preceding fiscal year and which shall include--
(A) the number of determinations made by the agency not to comply with requests for records made to such agency under subsection (a) and the reasons for each such determination;

(B)(i) the number of appeals made by persons under subsection (a)(6), the result of such appeals, and the reason for the action upon each appeal that results in a denial of information; and

(ii) a complete list of all statutes that the agency relies upon to authorize the agency to withhold information under subsection (b)(3), the number of occasions on which each statute was relied upon, a description of whether a court has upheld the decision of the agency to withhold information under each such statute, and a concise description of the scope of any information withheld;

(C) the number of requests for records pending before the agency as of September 30 of the preceding year, and the median and average number of days that such requests had been pending before the agency as of that date;

(D) the number of requests for records received by the agency and the number of requests which the agency processed;

(E) the median number of days taken by the agency to process different types of requests, based on the date on which the requests were received by the agency;

(F) the average number of days for the agency to respond to a request beginning on the date on which the request was received by the agency, the median number of days for the agency to respond to such requests, and the range in number of days for the agency to respond to such requests;

(G) based on the number of business days that have elapsed since each request was originally received by the agency--

(i) the number of requests for records to which the agency has responded with a determination within a period up to and including 20 days, and in 20-day increments up to and including 200 days;

(ii) the number of requests for records to which the agency has responded with a determination within a period greater than 200 days and less than 301 days;

(iii) the number of requests for records to which the agency has responded with a determination within a period greater than 300 days and less than 401 days; and

(iv) the number of requests for records to which the agency has responded with a determination within a period greater than 400 days;

(H) the average number of days for the agency to provide the granted information beginning on the date on which the request was originally filed, the median number of days for the agency to provide the granted information, and the range in number of days for the agency to provide the granted information;

(I) the median and average number of days for the agency to respond to administrative appeals based on the date on which the appeals originally were received by the agency, the highest number of business days taken by the agency to

16

respond to an administrative appeal, and the lowest number of business days taken by the agency to respond to an administrative appeal;

(J) data on the 10 active requests with the earliest filing dates pending at each agency, including the amount of time that has elapsed since each request was originally received by the agency;

(K) data on the 10 active administrative appeals with the earliest filing dates pending before the agency as of September 30 of the preceding year, including the number of business days that have elapsed since the requests were originally received by the agency;

(L) the number of expedited review requests that are granted and denied, the average and median number of days for adjudicating expedited review requests, and the number adjudicated within the required 10 days;

(M) the number of fee waiver requests that are granted and denied, and the average and median number of days for adjudicating fee waiver determinations;

(N) the total amount of fees collected by the agency for processing requests;

(O) the number of full-time staff of the agency devoted to processing requests for records under this section, and the total amount expended by the agency for processing such requests;

(P) the number of times the agency denied a request for records under subsection (c); and

(Q) the number of records that were made available for public inspection in an electronic format under subsection (a)(2).

(2) Information in each report submitted under paragraph (1) shall be expressed in terms of each principal component of the agency and for the agency overall.

(3) Each agency shall make each such report available for public inspection in an electronic format. In addition, each agency shall make the raw statistical data used in each report available in a timely manner for public inspection in an electronic format, which shall be made available--

(A) without charge, license, or registration requirement;

(B) in an aggregated, searchable format; and

(C) in a format that may be downloaded in bulk.

(4) The Attorney General of the United States shall make each report which has been made available by electronic means available at a single electronic access point. The Attorney General of the United States shall notify the Chairman and ranking minority member of the Committee on Oversight and Government Reform of the House of Representatives and the Chairman and ranking minority member of the Committees on Homeland Security and Governmental Affairs and the

17

Judiciary of the Senate, no later than March 1 of the year in which each such report is issued, that such reports are available by electronic means.

(5) The Attorney General of the United States, in consultation with the Director of the Office of Management and Budget, shall develop reporting and performance guidelines in connection with reports required by this subsection by October 1, 1997, and may establish additional requirements for such reports as the Attorney General determines may be useful.

(6)(A) The Attorney General of the United States shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President a report on or before March 1 of each calendar year, which shall include for the prior calendar year--

(i) a listing of the number of cases arising under this section;

(ii) a listing of--

(I) each subsection, and any exemption, if applicable, involved in each case arising under this section;

(II) the disposition of each case arising under this section; and

(III) the cost, fees, and penalties assessed under subparagraphs (E), (F), and (G) of subsection (a)(4); and

(iii) a description of the efforts undertaken by the Department of Justice to encourage agency compliance with this section.

(B) The Attorney General of the United States shall make--

(i) each report submitted under subparagraph (A) available for public inspection in an electronic format; and

(ii) the raw statistical data used in each report submitted under subparagraph (A) available for public inspection in an electronic format, which shall be made available--

(I) without charge, license, or registration requirement;

(II) in an aggregated, searchable format; and

(III) in a format that may be downloaded in bulk.

(f) For purposes of this section, the term--

(1) "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency; and

(2) "record" and any other term used in this section in reference to information includes--

(A) any information that would be an agency record subject to the requirements of this section when maintained by an agency in any format, including an electronic format; and

(B) any information described under subparagraph (A) that is maintained for an agency by an entity under Government contract, for the purposes of records management.

(g) The head of each agency shall prepare and make available for public inspection in an electronic format, reference material or a guide for requesting records or information from the agency, subject to the exemptions in subsection (b), including--

(1) an index of all major information systems of the agency;

(2) a description of major information and record locator systems maintained by the agency; and

(3) a handbook for obtaining various types and categories of public information from the agency pursuant to chapter 35 of title 44, and under this section.

(h)(1) There is established the Office of Government Information Services within the National Archives and Records Administration. The head of the Office shall be the Director of the Office of Government Information Services.

(2) The Office of Government Information Services shall--

(A) review policies and procedures of administrative agencies under this section;

(B) review compliance with this section by administrative agencies; and

(C) identify procedures and methods for improving compliance under this section.

(3) The Office of Government Information Services shall offer mediation services to resolve disputes between persons making requests under this section and administrative agencies as a nonexclusive alternative to litigation and may issue advisory opinions at the discretion of the Office or upon request of any party to a dispute.

(4)(A) Not less frequently than annually, the Director of the Office of Government Information Services shall submit to the Committee on Oversight and Government Reform of the House of Representatives, the Committee on the Judiciary of the Senate, and the President--

(i) a report on the findings of the information reviewed and identified under paragraph (2);

(ii) a summary of the activities of the Office of Government Information Services under paragraph (3), including--

(I) any advisory opinions issued; and

(II) the number of times each agency engaged in dispute resolution with the assistance of the Office of Government Information Services or the FOIA Public Liaison; and

(iii) legislative and regulatory recommendations, if any, to improve the administration of this section.

(B) The Director of the Office of Government Information Services shall make each report submitted under subparagraph (A) available for public inspection in an electronic format.

(C) The Director of the Office of Government Information Services shall not be required to obtain the prior approval, comment, or review of any officer or agency of the United States, including the Department of Justice, the Archivist of the United States, or the Office of Management and Budget before submitting to Congress, or any committee or subcommittee thereof, any reports, recommendations, testimony, or comments, if such submissions include a statement indicating that the views expressed therein are those of the Director and do not necessarily represent the views of the President.

(5) The Director of the Office of Government Information Services may directly submit additional information to Congress and the President as the Director determines to be appropriate.

(6) Not less frequently than annually, the Office of Government Information Services shall conduct a meeting that is open to the public on the review and reports by the Office and shall allow interested persons to appear and present oral or written statements at the meeting.

(i)     The Government Accountability Office shall conduct audits of administrative agencies on the implementation of this section and issue reports detailing the results of such audits.

(j)(1) Each agency shall designate a Chief FOIA Officer who shall be a senior official of such agency (at the Assistant Secretary or equivalent level).

(2) The Chief FOIA Officer of each agency shall, subject to the authority of the head of the agency--

(A) have agency-wide responsibility for efficient and appropriate compliance with this section;

(B) monitor implementation of this section throughout the agency and keep the head of the agency, the chief legal officer of the agency, and the Attorney General appropriately informed of the agency's performance in implementing this section;

20

(C) recommend to the head of the agency such adjustments to agency practices, policies, personnel, and funding as may be necessary to improve its implementation of this section;

(D) review and report to the Attorney General, through the head of the agency, at such times and in such formats as the Attorney General may direct, on the agency's performance in implementing this section;

(E) facilitate public understanding of the purposes of the statutory exemptions of this section by including concise descriptions of the exemptions in both the agency's handbook issued under subsection (g), and the agency's annual report on this section, and by providing an overview, where appropriate, of certain general categories of agency records to which those exemptions apply;

(F) offer training to agency staff regarding their responsibilities under this section;

(G) serve as the primary agency liaison with the Office of Government Information Services and the Office of Information Policy; and

(H) designate 1 or more FOIA Public Liaisons.

(3) The Chief FOIA Officer of each agency shall review, not less frequently than annually, all aspects of the administration of this section by the agency to ensure compliance with the requirements of this section, including--

(A) agency regulations;

(B) disclosure of records required under paragraphs (2) and (8) of subsection (a);

(C) assessment of fees and determination of eligibility for fee waivers;

(D) the timely processing of requests for information under this section;

(E) the use of exemptions under subsection (b); and

(F) dispute resolution services with the assistance of the Office of Government Information Services or the FOIA Public Liaison.

(k)(1) There is established in the executive branch the Chief FOIA Officers Council (referred to in this subsection as the "Council").

(2) The Council shall be comprised of the following members:

(A) The Deputy Director for Management of the Office of Management and Budget.

(B) The Director of the Office of Information Policy at the Department of Justice.

(C) The Director of the Office of Government Information Services.

(D) The Chief FOIA Officer of each agency.

(E) Any other officer or employee of the United States as designated by the Co-Chairs.

21

(3) The Director of the Office of Information Policy at the Department of Justice and the Director of the Office of Government Information Services shall be the Co-Chairs of the Council.

(4) The Administrator of General Services shall provide administrative and other support for the Council.

(5)(A) The duties of the Council shall include the following:

(i) Develop recommendations for increasing compliance and efficiency under this section.

(ii) Disseminate information about agency experiences, ideas, best practices, and innovative approaches related to this section.

(iii) Identify, develop, and coordinate initiatives to increase transparency and compliance with this section.

(iv) Promote the development and use of common performance measures for agency compliance with this section.

(B) In performing the duties described in subparagraph (A), the Council shall consult on a regular basis with members of the public who make requests under this section.

(6)(A) The Council shall meet regularly and such meetings shall be open to the public unless the Council determines to close the meeting for reasons of national security or to discuss information exempt under subsection (b).

(B) Not less frequently than annually, the Council shall hold a meeting that shall be open to the public and permit interested persons to appear and present oral and written statements to the Council.

(C) Not later than 10 business days before a meeting of the Council, notice of such meeting shall be published in the Federal Register.

(D) Except as provided in subsection (b), the records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agenda, or other documents that were made available to or prepared for or by the Council shall be made publicly available.

(E) Detailed minutes of each meeting of the Council shall be kept and shall contain a record of the persons present, a complete and accurate description of matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the Council. The minutes shall be redacted as necessary and made publicly available.

(l) FOIA Public Liaisons shall report to the agency Chief FOIA Officer and shall serve as supervisory officials to whom a requester under this section can raise

concerns about the service the requester has received from the FOIA Requester Center, following an initial response from the FOIA Requester Center Staff. FOIA Public Liaisons shall be responsible for assisting in reducing delays, increasing transparency and understanding of the status of requests, and assisting in the resolution of disputes.

(m)(1) The Director of the Office of Management and Budget, in consultation with the Attorney General, shall ensure the operation of a consolidated online request portal that allows a member of the public to submit a request for records under subsection (a) to any agency from a single website. The portal may include any additional tools the Director of the Office of Management and Budget finds will improve the implementation of this section.

(2) This subsection shall not be construed to alter the power of any other agency to create or maintain an independent online portal for the submission of a request for records under this section. The Director of the Office of Management and Budget shall establish standards for interoperability between the portal required under paragraph (1) and other request processing software used by agencies subject to this section.

**14 C.F.R. §21.20**

§ 21.20 Compliance with applicable requirements.

The applicant for a type certificate, including an amended or supplemental type certificate, must—
(a) Show compliance with all applicable requirements and must provide the FAA the means by which such compliance has been shown; and
(b) Provide a statement certifying that the applicant has complied with the applicable requirements.

**CERTIFICATE OF SERVICE**

I, Joseph E. Sandler, hereby certify that on this 25th day of May 2022, I electronically filed the foregoing Brief for Appellants with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. The following participants in this case who are registered CM/ECF users will be served by the CM/ECF system:

R. Craig Lawrence, Esq.
Derek S. Hammond, Esq.
Office of the US Attorney for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

Attorneys for Appellee

/s/ Joseph E. Sandler
Joseph E. Sandler

Counsel for Appellants

Dated: May 25, 2022