ORAL ARGUMENT NOT YET SCHEDULED

No. 21-5257

================================================

## United States Court of Appeals
## for the District of Columbia Circuit

_____

FLYERS RIGHTS EDUCATION FUND, INC., *ET AL.,*

*Appellants,*

v.

FEDERAL AVIATION ADMINISTRATION

*Appellee.*

_____

Appeal from the United States District Court for the District of Columbia Case No. 1:19-cv-03749-CKK
Judge Colleen Kollar-Kotelly

_____

## BRIEF OF *AMICI CURIAE* IN SUPPORT OF APPELLANTS

_____

Burt Braverman
DAVIS WRIGHT TREMAINE LLP
1301 K Street, N.W.
Suite 500 East
Washington, DC  20005-3317
202-973-4210
burtbraverman@dwt.com

Of Counsel:
Robert Heverly
80 New Scotland Avenue
Albany, NY 12208
(518) 460-5446
rheve@albanylaw.edu

*Counsel for Amici Curiae*
*Six Aviation Safety Experts*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), *Amici Curiae* Six Aviation Safety Experts certify as follows:

**A.     Parties and *Amici*.**  All parties appearing before the District Court and in this Court are listed in Appellants' brief on the merits.  *Amici* did not appear before the District Court, although one of the *Amici* parties filed a letter that was rejected by the District Court below and another filed a declaration included in the record below.  The *Amici* parties previously appeared in this appeal by filing, with leave of this Court, a memorandum in support of Appellants' opposition to Appellee's motion for summary affirmance.  The *Amici* parties appearing in this Court and represented on this brief are:

> Ajit Agtey
> Geoff Barrance
> David Gellert
> Chris Moore
> Ed Pierson
> Gregory Travis

**B.     Ruling Under Review.**  The ruling at issue is accurately identified in Appellants' brief on the merits.

**C.     Related Cases.**  *Amici* are not aware of any related cases.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF AUTHORITIES ................................................................. iv

INTEREST OF *AMICI CURIAE* .......................................... vii

INTRODUCTION ...............................................................................1

ARGUMENT ....................................................................................6

    I.    THE FAA'S POSITION KEEPS VITAL INFORMATION
    HIDDEN FROM PILOTS, SAFETY EXPERTS, AND THE
    PUBLIC, THEREBY PREVENTING THEM FROM
    VERIFYING THE SAFETY OF THE 737 MAX AND
    SCRUTINIZING THE FAA'S PERFORMANCE OF ITS
    REGULATORY RESPONSIBILITIES..............................................6

        A.    The Freedom of Information Act provides a backstop for
        safety and legal obligations in relation to aviation ....................6

        B.    The FAA's role in ensuring the safety of the nation's air
        travel network requires that it be more transparent, not
        less, as befits FOIA's purposes and the language of the
        statute ........................................................................8

        C.    The FAA's position is neither required nor supported by
        the Supreme Court's decision in *Food Marketing
        Institute v. Argus Leader Media* ................................12

        D.    Pilots and independent aviation safety experts must have
        the ability to verify the safety of the 737 MAX.......................16

        E.    The information currently available from Boeing and the
        FAA leaves too many open questions regarding the
        safety and utilization of the MCAS system, and thus of
        the Boeing 737 MAX ...............................................19

CONCLUSION.................................................................................22

CERTIFICATE OF COMPLIANCE....................................................26

CERTIFICATE OF SERVICE ................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*DOJ v. Reporters Comm. for Freedom of the Press*,
  489 U.S. 749 (1989)..............................................................................18

*FBI v. Abramson*,
  456 U.S. 615 (1982)................................................................................9

*Food Marketing Inst. v. Argus Leader Media*,
  139 S. Ct. 2356 (2019)........................................... 7, 9-15, 23, 24

*Synopsys, Inc. v. U.S. Dep't of Labor*,
  No. 20-16414, 2022 WL 1501094 (9th Cir. May 12, 2022) ..............13

*United States v. Newman*,
  331 F. Supp. 1240 (D. Haw. 1971) ....................................................17

**State Cases**

*Sw. Airlines Pilots Ass'n v. Boeing Co.*,
  No. 05-20-01067-CV, 2022 WL 951027 (Tex. App. Mar. 30, 2022)..................2

**Federal Statutes**

5 U.S.C. § 552(b)(4)..............................................................................4

Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731,
  § 102(a)(1) & (2), codified at 49 U.S.C. § 40101(a)(1) and
  § 40101(a)(2) .........................................................................................8

Freedom of Information Act (FOIA), 552 U.S.C. § 552 ....4-9, 11-13, 16,18, 23, 24

**Regulations**

14 C.F.R.

    part 21 ....................................................................................14
    part 23 ....................................................................................14
    part 39 ....................................................................................14
    § 91.3.....................................................................................16
    § 91.3(a)................................................................................17
    § 91.3(b)................................................................................17
    § 91.7.....................................................................................17

**Other Authorities**

*Airworthiness Directives; The Boeing Company Airplanes*,
    85 Fed. Reg. 74560 (Nov. 20, 2020) ................................................7

Attorney General Merrick B. Garland Issues New FOIA Guidelines to Favor
    Disclosure and Transparency, Department of Justice, Office of Public
    Affairs (March 15, 2022), https://www.justice.gov/opa/pr/attorney-
    general-merrick-b-garland-issues-new-foia-guidelines-favor-disclosure-
    and (last visited May 25, 2022) ............................................7

Boeing "Multi Operator Message," MOM-MOM-18-0655-01B, Final
    Aircraft Accident Investigation Report, Lion Airlines, KNKT, Republic
    of Indonesia, Appendix 6.5 (October 2019) ..................................2, 24

Critical Lapses in Federal Aviation Administration Safety Oversight of
    Airlines: Abuses of Regulatory "Partnership Programs," Hearing before
    the Committee on Transportation and Infrastructure, House of
    Representatives, 110-109 (April 3, 2008)...........................................5

Majority Staff of H. Comm. on Transp. & Infrastructure, Final Committee
    Report: *The Design, Development & Certification of the Boeing 737
    MAX* (Sept. 2020) ............................................2, 4, 20, 24

Michael Doran, Did Southwest Ask For A Modification To A 737 MAX To
    Deceive The FAA? Simple Flying (May 22, 2022),
    https://simpleflying.com/southwest-737-max-faa-deceit/ (last visited,
    May 25, 2022).......................................................................2

"Pilot's Handbook of Aeronautical Knowledge," FAA-H-8083-25B (2016)...........1

Press Release, FAA, *Boeing to Pay $6.6 Million in Penalties to FAA*,
  https://www.faa.gov/newsroom/boeing-pay-66-million-penalties-faa
  (Feb. 25, 2021)....................................................................................................18

Staff of Subcomm. on Admin. Practice & Procedure of the S. Committee on
  the Judiciary, 93rd Cong., *Freedom of Information Act Source Book:
  Legislative Materials, Cases, Articles* 1 (Comm. Print 1974).............................6

\*  Authorities marked with an asterisk are chiefly relied upon.

## INTEREST OF *AMICI CURIAE*[1]

The Six Aviation Safety Experts ("Safety Experts" or "*Amici*") filing this brief as *amici curiae* do so in the interest of ensuring that the flying public, pilots, and the nation are safeguarded from unsafe aircraft. Among them, *Amici* have extensive experience as commercial airline pilots with air carriers throughout the world in aviation operations and safety. Their goal is to reveal and understand the basis for the FAA's recertification of the Boeing 737 MAX airliner.

---

[1] This brief was not authored in whole or in part by counsel for a party. No person or entity other than *Amici* or their counsel made a monetary contribution to preparation or submission of this brief. Appellants consented to the filing of this brief. Appellee took no position regarding the submission of this brief.

**INTRODUCTION**

The first Boeing 737 MAX was delivered for commercial use on May 16, 2017.  In October of 2018, more than one year after 737 MAX was put into service, a 737 MAX crashed soon after takeoff.  A second 737 MAX crashed in May 2019.  A number of countries grounded the 737 MAX following the 2019 crash, and the FAA followed suit soon thereafter.  Three-hundred-forty-six people died in those catastrophic accidents, which were attributed to the implementation of Boeing's Maneuvering Characteristics Augmentation System (MCAS) system on the aircraft.  MCAS was designed to compensate for changed flight characteristics of the 737 MAX as compared with previous models of that aircraft.  These new characteristics had the potential to cause the aircraft to stall and potentially crash in certain conditions that were more likely to occur given the 737 MAX's new configuration.

During the initial certification and operational rollout of the 737 MAX, pilots were not told that the system was programmed to take control of the plane if the angle of attack (AOA) exceeded a certain threshold.[2]  Of particular note, the FAA approved a Boeing request to remove mention of the MCAS system from

---

[2] The "Pilot's Handbook of Aeronautical Knowledge," FAA-H-8083-25B (2016), defines angle of attack at page G-3, as follows: "The angle of attack is the angle at which relative wind meets an airfoil.  It is the angle that is formed by the chord of the airfoil and the direction of the relative wind or between the chord line and the flight path.  The angle of attack changes during a flight as the pilot changes the direction of the aircraft and is related to the amount of lift being produced."

1

documentation supplied to air carriers,[3] which was not acknowledged generally by Boeing until November 10, 2018, when it was first mentioned in a memo to airline operators.[4]  This meant that pilots did not have the information they needed to be able to fly the airplane if MCAS cut in due to an error in the single AOA indicator that the MCAS system relied on.  This was, it has since been concluded, a critical causative factor in the catastrophic failure of the two 737 MAXs that crashed due to the system.  The failure to provide information to pilots about MCAS has resulted in a number of lawsuits, including one instituted by pilots for Southwest Airlines, which flies the 737 MAX,[5] that recently survived a motion to dismiss by Boeing and Southwest Airlines.[6]

Twenty months after grounding the 737 MAX, the FAA ungrounded the airplane.  Following recertification, and during the rulemaking necessary to

---

[3] *See* Majority Staff of H. Comm. on Transp. & Infrastructure, Final Committee Report: *The Design, Development & Certification of the Boeing 737 MAX*, at 73, 92 n.551, 119 (Sept. 2020) (hereinafter "Final Committee Report").

[4] *See* Boeing "Multi Operator Message," MOM-MOM-18-0655-01B (Nov. 10, 2018), in KNKT Final Aircraft Accident Investigation Report, Lion Air, Republic of Indonesia, Appendix 6.5, at 290 (Oct. 2019) (hereinafter "KNKT Final Report Appendix 6.5").

[5] Southwest Airlines is alleged to have asked Boeing to "mock up" an older version of the 737 NG with MCAS in the hopes of easing its acceptance by the FAA. Michael Doran, *Did Southwest Ask For A Modification To A 737 MAX To Deceive The FAA?*, SIMPLE FLYING (May 22, 2022), https://simpleflying.com/southwest-737-max-faa-deceit/ (last visited May 25, 2022).

[6] *See Sw. Airlines Pilots Ass'n v. Boeing Co.*, No. 05-20-01067-CV, 2022 WL 951027 (Tex. App. Mar. 30, 2022).

unground the 737 MAX, both Boeing and the FAA steadfastly, persistently, and ultimately refused to answer basic aviation-related safety questions or to provide access to the data necessary for pilots and independent safety experts to verify and confirm the airworthiness of the aircraft. In response to a Freedom of Information Act request filed by Appellants seeking documents and data related to the ungrounding of Boeing's 737 MAX, the FAA identified over 49,000 pages of responsive documents. The parties then narrowed the request to "those records upon which the FAA would rely in considering the 737 MAX's 'return to service.'" Memorandum Opinion at 4, JA 458), 2021 WL 4206594, at *2 (D.D.C. Sept. 16, 2021). After the documents were winnowed by party agreement to 108, the FAA released five in their entirety, but the remainder were either substantially redacted or withheld in their entirety. Appellants have characterized the withheld documents as directly related to the recertification process. *Id.* at 6, JA 460, 2021WL 4206594, at *3.

    An unknown number of these documents would provide insight into the modified workings of the MCAS system. This is critical information for pilots and experts to have – information that had already been denied to them once when the 737 MAX was first certified by the FAA. It is especially important that these documents be made available given the weaknesses and faults identified in the initial development and certification of the 737 MAX, during which process Boeing

specifically asked the FAA, and the FAA agreed, to remove references to the ultimately at-fault MCAS system from the documents provided to airlines and pilots.[7]

These documents would tell the story of the 737 MAX's ungrounding, and provide information on which basis Boeing's actions and the FAA's oversight of the recertification process could be scrutinized by experts, pilots, and the public. They are the key to understanding whether the 737 MAX is safe to fly and assessing whether the FAA fulfilled its statutory duties in recertifying the aircraft. The FAA justified its refusal to produce the documents under an exemption to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, that allows records to be withheld from public disclosure where they are "trade secrets and commercial or financial information obtained from a person and privileged or confidential." *Id.* § 552(b)(4).

Perhaps in normal circumstances this position might be defensible. But these are not normal circumstances. The FAA both failed to understand and, at the behest of Boeing and the airlines, to account for the effects of MCAS on aircraft safety. Visibility into the program is now critical, more so than perhaps in the past, even

---

[7] *See* Final Committee Report, *supra* note 3, at 98, 117–18, 203, 236.

4

though the past has provided sufficient examples of grievous shortcomings in the way in which the FAA oversees the industry while also cooperating with it.[8]

The FAA should not be permitted to keep basic airplane safety information out of public view, and out of reach of pilots and independent aviation safety experts, through the application of a limited exemption to FOIA's disclosure mandate. That over 49,000 pages of documents at issue in this case have been hidden behind the FAA's refusal to respond to basic inquiries about the 737 MAX's airworthiness and the certification process that put the plane back into service, is telling. These documents would allow pilots to meet their obligations and outside safety experts to confirm that the 737 MAX is safe to fly. With so much data hidden by the exemption, the exemption swallows the rule, jeopardizes FOIA's disclosure mandate, and thereby undermines FOIA's open government mission. Such an interpretation is contrary to congressional intent and the language of the statute, and leaves the safety of the Boeing aircraft and the passengers they carry in doubt.

---

[8] *See Critical Lapses in Federal Aviation Administration Safety Oversight of Airlines: Abuses of Regulatory "Partnership Programs," Hearing before the H. Comm. on Transp. and Infrastructure*, 110th Cong. (2008).

**ARGUMENT**

**I.    THE FAA'S POSITION KEEPS VITAL INFORMATION HIDDEN FROM PILOTS, SAFETY EXPERTS, AND THE PUBLIC, THEREBY PREVENTING THEM FROM VERIFYING THE SAFETY OF THE 737 MAX AND SCRUTINIZING THE FAA'S PERFORMANCE OF ITS REGULATORY RESPONSIBILITIES**

**A.    The Freedom of Information Act provides a backstop for safety and legal obligations in relation to aviation**

The Freedom of Information Act provides a remedy for this problem through its requirement that federal agencies disclose records under their control.  FOIA's purpose was clearly articulated and effectuated when it was first enacted in 1966.  The 1966 legislation was designed to change agency practice under prior law by creating a general rule of disclosure, subject to only several limited exemptions.  In signing the legislation, President Lyndon B. Johnson stated: "This legislation springs from one of our most essential principles: a democracy works best when the people have all the information that the security of the Nation permits."[9]  A congressional report in 1974 emphasized the openness expected by Congress in enacting FOIA: "It should be emphasized that the exemptions in the FOIA were not intended by Congress to be used either to prohibit disclosure of information or to justify automatic withholding of information."[10]  Openness of government decision-

---

[9] Staff of Subcomm. on Admin. Practice & Procedure of the S. Committee on the Judiciary, 93rd Cong., *Freedom of Information Act Source Book: Legislative Materials, Cases, Articles* 1 (Comm. Print 1974).

[10] *Id.* at 2.

making, so as to enable the public to know whether and how its government agencies

and officials are performing their duties, is the core value of FOIA.[11]

       The FAA, however, has taken a contrary position, going so far as to state:

> The FAA supports the public's rights to be reasonably informed of the
> basis for agency rulemaking.  This does not, however, require putting
> interested members of the public in a position to reconstruct for
> themselves the underlying technical analyses that are based on
> proprietary data.[12]

       The FAA seems to be relying on an understanding of *Food Marketing Institute*

*v. Argus Leader Media*, 139 S. Ct. 2356 (2019), that would allow the documents

provided here to be held confidentially to encourage private parties to participate in

various federal programs, such as the SNAP program at issue in *Food Marketing*

*Institute.  Id.* at 2363.  But airline manufacturers are not grocery retailers being asked

to participate in a federal program that benefits citizens.  They are participants in a

highly regulated industry, involved in a coordinated and cozy relationship with their

regulators, and their actions and those of regulators must be transparent so as to

protect citizens from the use and operation of unsafe aircraft.  Within this highly

---

[11] This value has recently been reaffirmed by the current administration.  *See* Press
Release, Department of Justice, *Attorney General Merrick B. Garland Issues New
FOIA Guidelines to Favor Disclosure and Transparency* (Mar. 15, 2022),
https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-issues-new-
foia-guidelines-favor-disclosure-and (last visited May 25, 2022).

[12] *Airworthiness Directives; The Boeing Company Airplanes*, 85 Fed. Reg. 74560,
74578 (Nov. 20, 2020) (responding to comments received in recertification
proceeding).

regulated industry, FOIA is a key method by which airline safety experts such as *Amici*, other industry players, and the citizenry generally can verify that the agency and industry participants are meeting their obligations.  Limiting the oversight facilitated through FOIA by writing industry a blank check to claim information is confidential simply because they say so, especially where the withheld information is central to verifying the validity of government processes, subverts FOIA's intended purpose and is neither required nor sanctioned by the law.

> **B.    The FAA's role in ensuring the safety of the nation's air travel network requires that it be more transparent, not less, as befits FOIA's purposes and the language of the statute**

Since its creation in 1958, the FAA has been charged with ensuring the safety of the nation's air transportation systems.[13]  The first requirements imposed on the FAA were then and remain safety-focused:

> In carrying out subpart II of this part and those provisions of subpart IV applicable in carrying out subpart II, the Secretary of Transportation shall consider the following matters, among others, as being in the public interest and consistent with public convenience and necessity:
>
> (1) assigning and maintaining safety as the highest priority in air commerce.
>
> (2) before authorizing new air transportation services, evaluating the safety implications of those services.[14]

---

[13] *See* Federal Aviation Act of 1958, Pub. L. No. 85-726, 72 Stat. 731, § 102(a)(1) & (2); these provisions remain codified at 49 U.S.C. § 40101(a)(1) & (2).

[14] 49 U.S.C. § 40101(a)(1) & (2).

The FAA's primary mandate is safety.  Yet, in certifying the 737 MAX for operation, the FAA relied extensively on Boeing both for information about the safety of the aircraft and for decisions on what information to release to the public and to pilots.  As argued above, Boeing is not entitled under FOIA to a web of secrecy to keep information related to the safety of its aircraft – the very information on which the FAA relied in certifying the airworthiness of the 737 MAX – confidential.  The FAA likewise is not empowered to assert the proprietary nature of information provided to it by Boeing to avoid oversight by aviation experts and the public of whether it is adequately serving the primary focus of its mission: safety.

While courts have not construed FOIA's exemptions so narrowly  as to read them out of existence,[15] nor should they be interpreted so broadly as to allow the FAA to avoid disclosure of the most important information it relies upon in making key determinations regarding the safety of aircraft it is certifying for operation in the national airspace system.  The application of *Food Marketing Institute* asserted by the FDA and Boeing, and applied by the court below, would do just that.

*Food Marketing Institute* involved participants in the grocery industry that the government sought to cajole into being participants in distributing government benefits to needy individuals in society.  The grocery store owners in *Food*

---

[15] *See Food Marketing Inst.*, 139 S. Ct. at 2366 (citing *FBI v. Abramson*, 456 U.S. 615, 630–31 (1982)).

*Marketing Institute* could have believed that their own sales data would be kept secret because that is what they were assured by the Department of Agriculture, and they had no reason to think a lack of confidentiality would be necessary. There is no public safety reason to disclose the grocer-level data that the Argus Leader newspaper sought to obtain, and while that data may have provided evidence of irregularities in the Supplemental Nutrition Assistance Program (SNAP) participation by local grocers, the Supreme Court held that Exemption 4 reflected Congress's preference that such information not be released where it is otherwise held as confidential by the submitters.

The same considerations do not hold here. This case involves a choice by Boeing to participate in a historically highly regulated industry, where safety concerns dictate that there be public scrutiny not only of Boeing's actions but also *of the FAA's*. Because the history of the 737 MAX shows that the relationship between Boeing and the FAA is one of cooperation rather than regulation, the public, including Appellants and *Amici*, need now more than ever the opportunity to review the FAA's actions in relation to the 737 MAX's recertification to know whether it adequately performed its statutory obligations. The public should not be asked to simply trust the FAA. Nor should the public be asked to not scrutinize and verify the FAA's decisions and the process by which those decisions were reached. Rather, the public must be given the opportunity that the purpose, history and language of

10

FOIA provide it should have: the opportunity to review the actions of the FAA in the antiseptic sunlight of disclosure.

This is not a remaking of the argument, rejected in *Food Marketing Institute*, that the purpose of the Freedom of Information Act can somehow overcome the explicit text included in the Act. Rather, the entirety of the structure and regulatory scheme of the aviation industry must be considered in determining what information and records can be recognized as confidential under FOIA. Given the FAA's critical role in ensuring the safety of air travel, FOIA's goal of making government operations more transparent applies in the strongest terms. We need not read it to try to obfuscate or override the text, but instead to aid in understanding how the context of federal regulatory decision-making varies from agency to agency and from regulatory domain to regulatory domain. The regulatory domain here is air safety. The agency responsible for ensuring air safety is the FAA. The need for the public – including pilots, passengers and safety experts such as *Amici* – to have adequate information upon which to form knowledge-based judgments about whether the aircraft they board are safe, and whether the FAA is doing its job, is paramount. Boeing cannot have understood, either objectively or subjectively, that information it provided to the FAA would be kept confidential for FOIA purposes given the nature of the regulatory process in which it was participating, especially

11

given the tragic events that unfolded after the 737 MAX was first certified for operation.

**C.     The FAA's position is neither required nor supported by the Supreme Court's decision in *Food Marketing Institute v. Argus Leader Media***

The FAA withheld the documents at issue in this appeal based on FOIA Exemption 4, which provides that FOIA's disclosure requirement does not apply to "trade secrets and commercial or financial information obtained from a person and privileged or confidential."  The U.S. Supreme Court addressed this exemption in *Food Marketing Institute v. Argus Leader Media*.  In *Food Marketing Institute*, a local newspaper requested disclosure by the U.S. Department of Agriculture of individual grocery store redemption data relating to the Supplemental Nutrition Assistance Program.  The Supreme Court rejected a standard long used by federal Circuit Courts of Appeals that required information to be disclosed unless the disclosure would likely result in substantial competitive harm to the submitter. Instead, the Court held that, "where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."[16]

---

[16] *Food Marketing Inst.*, 139 S. Ct. at 2366.

*Food Marketing Institute* arguably expanded the application of FOIA Exemption 4 by broadening the kind of "submitted" information that could be withheld by an agency.[17]  Yet the removal of the Circuit Court-imposed "substantial competitive injury" requirement should not be read as setting a standard that allows for withholding of any information submitted to the federal government simply because the submitter does not want it to be disclosed.  While the "customarily and actually treated" standard appears, on its face, to be based on the subjective desires of the submitter, as evidenced by its actions, that cannot be the entirety of the inquiry.

The aviation industry shares little in common with the grocery industry at issue in *Food Marketing Institute*.  Someone who operates a grocery store can quite easily avoid federal involvement in the day-to-day operation of their grocery store by not accepting SNAP payments from customers.  Because the federal government wishes to encourage wide-spread acceptance of SNAP so that SNAP users have greater choice in the use of their benefits, promising to maintain confidentiality of records submitted by those grocers helps the government realize this goal.  Private entities – grocers – were enticed to participate in a program in which they had no obligation to participate, and confidentiality was one of the reasons for their

---

[17] *See*, *e.g.*, *Synopsys, Inc. v. U.S. Dep't of Labor*, No. 20-16414, <u>2022 WL 1501094</u>, at *4 n.3 (9th Cir. May 12, 2022).

participation. The confidentiality also did not undercut either the obligations of the Department of Agriculture or any other participant in the grocery industry.

In contrast, members of the aviation industry have chosen to operate in a highly regulated industry. Where a participant in the highly regulated aviation industry submits information directly related to the airworthiness, and thus the safety, of its aircraft, its own attempts to keep that safety information confidential should not alone be relied upon to conclude that the information is confidential under Exemption 4. This is true even if the apparent second prong of *Food Marketing Institute* is met, i.e., the FAA provided participants with assurances of confidentiality. The submitter in such a regulated industry has the burden of proving the adequacy of its submissions relating to the safety and airworthiness of an aircraft designed and expected to carry people. It is the fundamental purpose of the regulatory certification requirement in the first place.[18]

Building, selling, and maintaining aircraft comes with a legal obligation to ensure the safety of those aircraft. We are not trying to *encourage* participants in the airline industry to make safe aircraft; that is something they are *required* to do. If they want to be a part of the airline industry, they must know that their actions will be subject to significant governmental *and* public review. There is no reasonable

---

[18] *See, e.g.*, 14 C.F.R. Part 21: Certification Procedures for Products and Articles; 14 C.F.R. Part 23: Airworthiness Standards: Normal Category Airplanes; 14 C.F.R. Part 39: Airworthiness Directives.

basis on which they can think that the information they submit will be kept confidential by the regulator, or that their assertion of confidentiality will shield the agency's certification process from public scrutiny.

This bears repeating: the safety of aircraft is not something that we want to *encourage* aircraft manufacturers to ensure. It is something we *require* of them. It is a primary concern in the FAA's aircraft certification process. Release of aircraft certification and safety information must be the default position in recognition of these obligations. Aircraft manufacturers know this, and that knowledge must be considered when assessing whether information sought to be withheld is reasonably considered confidential under Exemption 4 and the Supreme Court's *Food Marketing Institute* decision.

Yet, it is not simply that the industry is a heavily regulated one that pushes the needle to disclosure here. This case additionally involves obligations imposed on pilots that require that the information at issue be released so that those pilots can meet their legal obligations to ensure that the aircraft they fly are safe.[19]

---

[19] *Amici* agree fully with, and support, Appellants' position on appeal – that, by their explicit public statements, Boeing and the FAA waived any claim they might otherwise have made that information submitted by Boeing to the FAA in relation to the 737 MAX recertification should be confidential within the meaning of FOIA. *Amici* make here an argument supplementing Appellants' position: that even if the FAA and Boeing had not given repeated explicit assurances that the 737 MAX recertification would be transparent, neither the FAA nor Boeing could have had an expectation that information submitted by Boeing as a core element of the recertification process would be treated as confidential under Exemption 4 where,

**D.      Pilots and independent aviation safety experts must have the ability to verify the safety of the 737 MAX**

Federal law imposes significant obligations on pilots. These include being fully and legally responsible for their aircraft, its safety, and its operation. To meet their legal obligations, pilots need information sufficient to be able to know the plane and its workings, be prepared for emergencies that might occur while in flight, and understand the ways in which the aircraft responds to stress and system failures. The FAA's refusal, and Boeing's failure, to provide basic information related to its MCAS system leaves pilots in the untenable position of being required to fly an aircraft that they cannot personally ensure is safe and ready for flight. It also leaves outside safety experts unable to "check" Boeing's and the FAA's work leading up to recertification.

Complete responsibility for the safe operation of aircraft is placed on the pilot-in-command. *See* 14 C.F.R. § 91.3: Responsibility and authority of the pilot-in-command; *see also* 14 C.F.R. § 91.7: Civil aircraft worthiness. Section 91.3(a) of the FAA's regulations provides as follows: "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."

---

as here, (1) the information is essential to the public's ability to scrutinize the safety of the 737 MAX, and (2) other stakeholders such as pilots have legal obligations that require that such information be released to allow them to fulfill those obligations.

This regulation both imposes a legal responsibility on the pilot ("is directly responsible for") and provides authority to meet that responsibility ("is the final authority as to the[] operation of that aircraft"). This obligation was noted by the court in *United States v. Newman*, where the court observed:

> Air Line operation generally requires the highest standard of care, and a commercial pilot, upon whose skill and judgment the lives and property of others are peculiarly dependent, owes at all times in the operation of the aircraft entrusted to him, the duty of exercising the highest standard of care.

331 F. Supp. 1240, 1244 (D. Haw. 1971).

FAA regulations further provide: "In an in-flight emergency requiring immediate action, the pilot-in-command may deviate from any rule of this part to the extent required to meet that emergency." 14 C.F.R. § 91.3(b). This awesome power, both in breadth and in responsibility, which is given only to the pilot-in-command, is unequaled in any other FAA regulatory or aviation statutory provision. The pilot-in-command plays *the* pivotal role in aircraft safety.

In a related vein, independent aviation safety experts have a vital role to play in understanding and independently verifying that aircraft certified as airworthy are as they are claimed to be. At a time when the FAA works closely with Boeing on safety matters, and Boeing is fined millions of dollars for violating the terms of an

17

FAA-delegated safety inspection program and deceiving the FAA,[20] it is more important than ever that the information that forms the basis of FAA air safety decision-making be transparent and externally verifiable.  Only through such access can the public have confidence that the FAA is performing its statutory duties.  *See DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 772–74 (1989) (whether disclosure of a private document is warranted within the meaning of the exemption turns upon the nature of the requested document and its relationship to the FOIA's central purpose of exposing to public scrutiny official information that sheds light on an agency's performance of its statutory duties).

The initial rollout and certification of the 737 MAX provide additional support for this need for external verification.  The very existence of the MCAS system, a system that was not easy to override but that could play a critical role in the safe operation of the aircraft, was not disclosed to pilots flying the 737 MAX jets.  That lack of disclosure, along with the concomitant failure to train pilots to be ready for issues arising due to MCAS's operation, played a significant role in the 737 MAX crashes.  Had pilots been aware of the system, and external safety experts apprised of its existence, the problems that followed from its implementation and use might

---

[20] Press Release, FAA, *Boeing to Pay $6.6 Million in Penalties to FAA* (Feb. 25, 2021), https://www.faa.gov/newsroom/boeing-pay-66-million-penalties-faa.

have been avoided. That possibility, however, was hidden from view behind the veil of darkness pulled across the plane's certification by Boeing and the FAA.

Trust is earned. Given the experience with the initial rollout of the 737 MAX and the continuing recalcitrance of both the regulator and the regulated entity in relation to the Boeing 737 MAX to provide the basis for their actions – and at times not even clearly stating what those actions are – that trust has not been earned. In the absence of trust, external verification of the program that led to ungrounding of the aircraft is essential. Yet, given the FAA's refusal to provide the documents requested by Appellants in this case, in subservient deference to Boeing's desire to shield its actions regarding MCAS from public scrutiny, verification is not possible.

### E. The information currently available from Boeing and the FAA leaves too many open questions regarding the safety and utilization of the MCAS system, and thus of the Boeing 737 MAX

*Amici* are concerned by a number of questions about the ungrounded 737 MAX that have been posed to the FAA and Boeing but remain unanswered. Many of these relate directly to the MCAS system, and some relate directly to the most basic questions about how the system is designed to integrate with the remainder of the 737 MAX's flight control system and how pilots are being trained to use the system. Others relate to manufacturing and the growing number of inflight malfunctions that have occurred since the MAX ungrounding. Meanwhile, Boeing is announcing plans to ramp up production.

19

MCAS was added to the 737 MAX to make the plane fly in a way that pilots of Boeing's other 737s would be accustomed to.  According to a report of the House Committee on Transportation and Infrastructure compiled in 2020, following the two 737 MAX disasters:

> [T]he 737 MAX contained a new feature in its flight control computer—the Maneuvering Characteristics Augmentation System (MCAS)—that has become the center of scrutiny for both MAX crashes.  The new system had the ability to trigger non-pilot-commanded flight control movements that could place the airplane into a dangerous nose-down attitude that challenged the pilots' ability to control the aircraft.  In addition, the MCAS software operated on input from one of the two angle-of-attack (AOA) sensors externally mounted on the fuselage on either side of the airplane.[21]

From the information that is currently available, the MCAS system has been redesigned in the recertified 737 MAX such that it disengages when inputs from the aircraft's two angle of attack sensors disagree.[22]  This means that, while MCAS is active as a part of the flight control system on all 737 MAX aircraft, it can at any time be shut off such that the pilot-in-command will be required to operate the aircraft without it.

---

[21] Final Committee Report, *supra* note 3, at 8.

[22] The system previously relied on one sensor.  If that one sensor provided a false reading, the MCAS system could erroneously engage and force the plane into a nosedive.  This is what occurred in both of the crashes of the originally certified 737 MAX.  *See id.* at 8-9.

Yet, even with the difficulties that inhered in the initial certification of the 737 MAX and the MCAS system, and the designed potential for the aircraft to have to operate without MCAS in place, it is still unclear whether MCAS is present in the recertified 737 MAX for its handling qualities or whether it is a necessary element of the aircraft's recertification.  Boeing's own publicly available documents do not make clear which of these understandings is correct.  At the top of its "737 MAX Updates" webpage, Boeing states: "The Maneuvering Characteristics Augmentation System (MCAS) flight control law was designed and certified for the 737 MAX to enhance the pitch stability of the airplane – so that it feels and flies like other 737s."[23] Yet, in the definitions section on that same page, Boeing defines MCAS as a "flight control law implemented on the 737 MAX to improve aircraft handling characteristics and decrease pitch-up tendency at elevated angles of attack,"[24] defining a "control law" as a "set of software that performs flight control function or task."

If it is the former, and MCAS is simply for aircraft handling, then issues with MCAS do not affect the safety of the aircraft and the aircraft may be safely flown if the MCAS system disengages.  If it is the latter – if MCAS is a "control law" related

---

[23] https://www.boeing.com/commercial/737max/737-max-software-updates.page.
[24] *Id.*

21

to the safety of the aircraft in flight – then any time it disengages, the aircraft becomes un-airworthy and unsafe and the pilot must land at the earliest opportunity.

Which is it?  We do not know, because Boeing's own publicly available information on this point is contradictory and the FAA has refused to provide an answer.  This means that pilots-in-command cannot conceivably meet the law's requirements that they determine whether a 737 MAX they have been directed to pilot is airworthy and safe.

Additional questions revolve around whether pilots are being trained to fly the 737 MAX with MCAS disengaged.  MCAS was initially designed to give the 737 MAX flight characteristics that were closer to those of the previous version of the 737, the 737 NG.  Without MCAS, the 737 MAX will, inevitably, have *different flight characteristics*.  Yet, it appears from the available public information that pilots are not being trained in what to expect when the MCAS system cuts out, or how to fly the aircraft when this occurs.  This, again, means that 737 MAX pilots cannot confidently verify that the 737 MAX is safe to fly.

**CONCLUSION**

Information of a participant in a highly regulated industry such as aviation cannot be considered confidential based merely on the company's self-serving assertions, or even practice, of nondisclosure where it is central to a federal agency's oversight of the company's safety efforts and, in turn, the public's oversight of the

adequacy of the agency's performance of its regulatory enforcement duties. This is especially so where countervailing legal obligations require that information be released to allow others in that same industry to meet the legal burdens placed on them by federal law. Here, because Boeing is a participant in a highly regulated industry, because airline pilots are charged with verifying and ensuring the airworthiness of the aircraft they operate, and because the public – including *Amici* Safety Experts – cannot otherwise assess the safety of the 737 MAX or the fulfillment by the FAA of its statutory duties, the information requested by Appellants must not be deemed confidential under FOIA Exemption 4 and, therefore, should be released.

We need not dream of a parade of hypothetical horribles to further justify this conclusion, which is within the language of the statute and the Supreme Court's holding in *Food Marketing Institute*. We have a recent real-life case-study: the initial rollout of the 737 MAX. The first of the airline disasters that led to the initial grounding occurred approximately two years after the 737 MAX first went into operation. The 737 MAX has been back in operation since recertification for approximately 18 months. How long must we wait to be able to verify that the 737 MAX is safe to fly or for another crash to occur? As the two crashes prove, Boeing's close working relationship with the FAA, its withholding from airlines and pilots information relating to the operation of the MCAS system – including removing

23

references to the system from the documentation given to airlines about the system and the failure to train pilots in how to handle the system[25] – and its delay in releasing the MCAS information, even when it was requested,[26] all contributed to the loss of those 346 souls.

*Food Marketing Institute* does not permit the FAA to simply ask Boeing, as it has done here, "What should we withhold?"   Instead, it requires an overall assessment of what information Boeing can keep confidential in the light of the FAA's own mission, the highly regulated industry in which Boeing operates and its impact on public safety, FOIA's requirement that government administration be transparent, and the competing obligations of others involved in this highly regulated industry.  In light of these considerations, the FAA should be directed to disclose the withheld information.

*Amici* have presented important, unanswered questions about how the troubled Boeing 737 MAX came to be ungrounded following the 346 deaths caused by the initial implementation of Boeing's MCAS system.  The FAA's answer to these questions is: "Trust us."  FOIA's answer is and should be: "That's not how this works.  That's not how any of this works."  The clearest path to enabling pilots to meet their professional and legal obligations, safety experts to ensure that decision-

---

[25] *See* Final Committee Report, *supra* note 3.
[26] *See* KNKT Final Report Appendix 6.5, *supra* note 3, at 290.

making in relation to the problem-ridden Boeing 737 MAX is effective in overcoming the MCAS system's initial dangers and limitations, and the public to assess whether the FAA is fulfilling its statutory obligations, is for the FAA to release the information requested by Appellants in this case.

Dated:  June 1, 2022                          Respectfully submitted,

                                              */s/ Burt Braverman*
                                              Burt Braverman
                                              DAVIS WRIGHT TREMAINE LLP
                                              1301 K Street, N.W.
                                              Suite 500 East
                                              Washington, DC 20005-3317
                                              202-973-4210
                                              202-973-4410
                                              burtbraverman@dwt.com

Of Counsel:
Robert A. Heverly
80 New Scotland Ave
Albany, NY 12208
518 460-5446
rheve@albanylaw.edu

                                              *Counsel for Amici Curiae*
                                              *Six Aviation Safety Experts*

## CERTIFICATE OF COMPLIANCE

(1)     This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,073 words, excluding the parts of the brief exempted by Circuit Rule 32(a)(1), as determined by the word-counting feature of Microsoft Word.

(2)     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

*/s/ Burt Braverman*
Burt Braverman
DAVIS WRIGHT TREMAINE LLP
1301 K Street, N.W.
Suite 500 East
Washington, DC 20005-3317
202-973-4210
202-973-4410
burtbraverman@dwt.com

*Counsel for Amici Curiae*
*Six Aviation Safety Experts*

26

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of June 2022, I caused the foregoing Brief

*Amicus Curiae* in Support of Appellants to be electronically filed with the Court

using the CM/ECF system.

*/s/ Burt Braverman*
Burt Braverman
DAVIS WRIGHT TREMAINE LLP
1301 K Street, NW
Suite 500 East
Washington, DC 20005-3317
202-973-4210
202-973-4410
burtbraverman@dwt.com

*Counsel for Amici Curiae*
*Six Aviation Safety Experts*