**ORAL ARGUMENT NOT SCHEDULED**

————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

No. 21-5257

————

FLYERS RIGHTS EDUCATION FUND, INC., *et al.*,                    Appellants,

v.

FEDERAL AVIATION ADMINISTRATION,                    Appellee.

————

# BRIEF FOR APPELLEE

————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————

<div style="margin-left:40%">

MATTHEW M. GRAVES,
*United States Attorney*

R. CRAIG LAWRENCE,
DEREK S. HAMMOND,
*Assistant United States Attorneys*

</div>

(C.A. No. 19-3749)

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### Parties and Amici

Appellants, plaintiffs below, are Flyers Rights Education Fund, Inc. and its President, Paul Hudson, (together "Requesters"). Appellee, defendant below, is the Federal Aviation Administration ("FAA"). Ajit Agtey, Geoff Barrance, David Gellert, Chris Moore, Ed Pierson, and Gregory Travis have appeared before this Court as amici.

### Rulings Under Review

At issue is the Honorable Colleen Kollar-Kotelly's September 16, 2021, Memorandum Opinion and Order denying Requesters' motion for summary judgment and granting the Federal Aviation Administration's cross-motion for summary judgment and. JA 455-476.

### Related Cases

This case has not previously been before this Court or any court other than the district court. Undersigned counsel is unaware of any related cases.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................... ii

GLOSSARY OF ABBREVIATIONS .................................................... vii

JURISDICTIONAL STATEMENT ..........................................................1

STATEMENT OF ISSUES ......................................................................1

PERTINENT STATUTORY PROVISION................................................2

COUNTERSTATEMENT OF THE CASE................................................2

SUMMARY OF ARGUMENT ...............................................................11

STANDARD OF REVIEW .....................................................................14

ARGUMENT ..........................................................................................15

   I.   ALL OF THE WITHHELD INFORMATION QUALIFIES FOR
       PROTECTION UNDER EXEMPTION 4. ....................................15

  II.   REQUESTERS' CHALLENGES TO FAA'S SHOWING OF EXEMPTION
       4 APPLICABILITY ARE UNPERSUASIVE. ............................22

        A.    FAA's Statements About Transparency Neither Waive Nor Supersede
            Its Assurances of Appropriate Confidentiality to Boeing, and Finding
            Otherwise Would Negatively Impact Future Regulatory Proceedings.
            ..................................................................................................23

        B.    All The Withheld Information Was "Obtained From A Person"—
            Namely, Boeing..................................................................37

 III.  BOEING'S PROPRIETARY MEANS OF COMPLIANCE DO NOT
       CONSTITUTE A BODY OF "SECRET LAW" FOR FAA........................42

 IV.  FAA RELEASED ALL REASONABLY SEGREGABLE NON-EXEMPT
       INFORMATION. ............................................................................48

CONCLUSION ......................................................................................55

i

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abdelfattah v. Dep't of Homeland Sec.*,
    787 F.3d 524 (D.C. Cir. 2015)................................................................14

*ACLU v. Dep't of Just.*,
    655 F.3d 1 (D.C. Cir. 2011)..................................................................14

*Afshar v. Dep't of State*,
    702 F.2d 1125 (D.C. Cir. 1983)............................................... 30, 45, 47

*Altayyar v. Etsy, Inc.*,
    731 F. App'x 35 (2d Cir. 2018) ............................................................28

*Armstrong v. Exec. Off. of the President*,
    97 F.3d 575 (D.C. Cir. 1996).................................................................49

*Baker & Hostetler LLP v. Dep't of Com.*,
    473 F.3d 312 (D.C. Cir. 2006)........................................................ 16, 17

*Bassiouni v. CIA*,
    392 F.3d 244 (7th Cir. 2004) ................................................................31

*Bd. of Regents of Univ. of Wash. v. EPA*,
    86 F.3d 1214 (D.C. Cir. 1996)..............................................................14

*Bd. of Trade v. CFTC*,
    627 F.2d 392 (D.C. Cir. 1980)..............................................................16

*Brinton v. Dep't of State*,
    636 F.2d 600 (D.C. Cir. 1980)..............................................................46

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n*,
    975 F.2d  (D.C. Cir. 1992)....................................................... 17, 18, 19

*Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*,
    244 F.3d 144 (D.C. Cir. 2001)................................................... 17, 33

*Cuneo v. Schlesinger*,
    484 F.2d 1086 (D.C. Cir. 1973)............................................................45

*Kimberlin v. Dep't of Just.*,
   139 F.3d 994, (D.C. Cir. 1998) ................................................................ 29, 30

*Dep't of Just. v. Reps. Comm. for Freedom of the Press*,
   489 U.S. 749 (1989) ........................................................................................45

*Doe v. Hampton*,
   566 F.2d 265 (D.C. Cir. 1977) .......................................................................25

*Elliott v. Dep't of Agric.*,
   596 F.3d 842 (D.C. Cir. 2010) .......................................................................14

*Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*,
   905 F.3d 892 (5th Cir. 2018) ................................................................... 28, 29

*Fed. Open Market Comm. of the Fed. Reserve Sys. v. Merrill*,
   443 U.S. 340 (1979) ........................................................................................45

*Fish & Wildlife Serv. v. Sierra Club, Inc.*,
   141 S. Ct. 777 (2021) ............................................................................... 44, 48

*Food Mktg. Inst. v. Argus Leader Media*,
   139 S. Ct. 2356 (2019) .......................................... 16, 17, 18, 22, 24, 31, 36, 41, 42

*Frontier Found. v. Dep't of Just.*,
   739 F.3d 1 (D.C. Cir. 2014) ...........................................................................46

*GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*,
   445 U.S. 375 (1980) ........................................................................................15

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) .........................................................................28

*Johnson v. Exec. Off. for U.S. Att'ys*,
   310 F.3d 771 (D.C. Cir. 2002) ................................................................. 49, 50

*Jud. Watch, Inc. v. Dep't of Homeland Sec.*,
   895 F.3d 770 (D.C. Cir. 2018) .......................................................................31

*Krikorian v. Dep't of State*,
   984 F.2d 461 (D.C. Cir. 1993) .......................................................................49

*Loving v. Dep't of,*
   *Def.*, 550 F.3d 32 (D.C. Cir. 2008) ..............................................................51

*Machado Amadis v. Dep't of State*,
　971 F.3d 364 (D.C. Cir. 2020)...............................................................50

*Mead Data Cent., Inc. v. Dep't of Air Force*,
　566 F.2d 242 (D.C. Cir. 1977)...............................................................49

*Milner v. Dep't of Navy*,
　562 U.S. 562 (2011)...............................................................................42

*N.Y. Times Co. v. Dep't of Just.*,
　939 F.3d 479 (2d Cir. 2019) .................................................................30

*NLRB v. Sears, Roebuck & Co.*,
　421 U.S. 132 (1975).............................................................. 44, 45, 48

*Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*,
　21-5223, 2023 WL 192419 (D.C. Cir. Jan. 17, 2023).........................54

*Porup v. CIA*,
　997 F.3d 1224 (D.C. Cir. 2021).............................................................50

*Potter v. District of Columbia*,
　558 F.3d 542 (D.C. Cir. 2009)..................................................... 14, 49

*Pub. Citizen Health Rsch. Grp. v. FDA*,
　704 F.2d 1280 (D.C. Cir. 1983).............................................................16

*Pub. Citizen v. Dep't of State*,
　11 F.3d 198 (D.C. Cir. 1993).................................................................30

*Rockwell Int'l Corp. v. Dep't of Just.*,
　235 F.3d 598 (D.C. Cir. 2001)...............................................................30

*Schlefer v. United States*,
　702 F.2d 233 (D.C. Cir. 1983)...............................................................46

*Soucie v. David*,
　448 F.2d 1067 (D.C. Cir. 1971).............................................................38

*Stolt-Nielson Transportation Group Ltd. v. United States*,
　534 F.3d 728 (D.C. Cir. 2008)...............................................................53

*Summers v. Dep't of Just.*,
　140 F.3d 1077 (D.C. Cir. 1998).............................................................49

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007)........................................................... 49, 50, 52, 54

*Gulf & W. Indus. v. United States*,
   615 F.2d 527 (D.C. Cir. 1979)....................................................... 38, 40, 41

*Wash. Post Co. v. Dep't of Health & Human Servs.*,
   690 F.2d 252 (D.C. Cir. 1982) ...............................................................16

Statutes

5 U.S.C. § 551(6) ..............................................................................................48

5 U.S.C. § 552 ....................................................................................................2

5 U.S.C. § 552(a)(4)(B) ............................................................................... 1, 15

5 U.S.C. § 552(b) ....................................................................................... 15, 31

5 U.S.C. § 552(b)(4)............................................................................... 15, 37, 41

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1331 .................................................................................................1

§ 552(a)(2)................................................................................................. 44, 45

Rules

Fed. R. App. P. 4(a)(1)(B) ..................................................................................1

Fed. R. App. P. 32(f).........................................................................................56

FRAP 32(g) .......................................................................................................56

Regulations

14 C.F.R. § 23.2010 ..........................................................................................43

Other Authorities

85 Fed. Reg. 85 Fed. Reg. 47,698 (Aug. 6, 2020)............................................7

85 Fed. Reg. 74,560 (Nov. 20, 2020) .............................................................3, 7

v

Davis, The Information Act: A Preliminary Analysis,
   34 U. Chi. L. Rev. 761 (1967) ................................................................44

Privacy and the Optimal Extent of Disclosure Under the Freedom of Information
   Act,
   9 J. Legal Stud. 775 (1980)...................................................................45

## <u>GLOSSARY OF ABBREVIATIONS</u>

FAA.........................................................................Federal Aviation Administration

FOIA ................................................................Freedom of Information Act

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the FOIA claims under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331. On September 16, 2021, the District Court entered a final judgment in favor of the FAA. JA 475. This Court has jurisdiction under 28 U.S.C. § 1291 because Requesters timely filed a notice of appeal on November 9, 2021. *See* Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF ISSUES

1.       In responding to a FOIA request, whether an agency's generalized affirmation that it is committed to "transparency" in carrying out its regulatory duties in a particular matter precludes the agency from subsequently withholding information obtained from a third-party submitter—information that the record demonstrates the submitter actually and customarily treats as confidential and was supplied to the government in reliance upon express and implied assurances of privacy.

2.       Whether comments by agency officials that would reveal confidential commercial information supplied by a third party may be withheld under FOIA Exemption 4 if the underlying confidential commercial information is protected and withheld under Exemption 4.

3.       Whether the judicially created "working law" doctrine creates an exception to FOIA Exemption 4, which allows withholding of a regulated third

party's "means of compliance" with inquiries and requirements of the regulating agency.

4.    Whether the District Court correctly found that FAA met its burden of demonstrating that it had produced all non-exempt, reasonably segregable material to Requesters in response to their FOIA request.

## PERTINENT STATUTORY PROVISION

### Freedom of Information Act, 5 U.S.C. § 552

(b) This section does not apply to matters that are—

\*        \*        \*

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential

\*        \*        \*

Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.  The amount of information deleted, and the exemption under which the deletion is made, shall be indicated on the released portion of the record, unless including that indication would harm an interest protected by the exemption in this subsection under which the deletion is made.  If technically feasible, the amount of the information deleted, and the exemption under which the deletion is made, shall be indicated at the place in the record where such deletion is made.

## COUNTERSTATEMENT OF THE CASE

### I.    Grounding and Return to Service of the Boeing 737 MAX Aircraft

In March 2019, following two tragic crashes of The Boeing Company's ("Boeing's") 737 MAX aircraft operated by foreign carriers, FAA issued an

emergency order grounding the aircraft pending further investigation. FAA then undertook an exhaustive twenty-month review, which involved careful investigation of the 737 MAX certification process; review of proposed design changes to the 737 MAX; repeated testing of those changes; close cooperation with other civil aviation authorities; and opportunities for public comment on FAA's technical findings and proposals. Throughout this process, Boeing submitted a significant number of documents to FAA containing Boeing's confidential and proprietary business information, which, in accord with its regulations and historical practice, FAA has treated as confidential upon receipt and at all times since receipt.

Exercising its expert safety judgment, FAA ultimately concluded that the 737 MAX could safely return to service once Boeing took certain specified remedial actions. Accordingly, on November 20, 2020, FAA issued an airworthiness directive addressing the safety issue on the 737 MAX and rescinded the agency's prior grounding order, enabling airlines to take the further steps necessary to obtain final FAA approval to return the planes to service. *See* 85 Fed. Reg. 74,560 (Nov. 20, 2020).

## II.    Inquiries Following the 737 MAX Grounding

Following the grounding of the 737 MAX, aviation authorities, the flying public, and the media were naturally interested in multiple topics bearing upon the

aircraft, its initial certification, and FAA's investigation and eventual ungrounding of the aircraft.  These included FAA's aircraft certification process generally, the circumstances attendant to FAA's prior certification of the 737 MAX, as well as the design changes and FAA's return to service of that aircraft.  In addition to FAA, Congress and other federal and foreign governmental authorities examined related issues.  From the outset, FAA both welcomed these independent reviews and noted its commitment to "transparency."

The first review commenced in March 2019, when the Department of Transportation's Office of the Inspector General initiated an audit of FAA at the request of Secretary of Transportation and several members of Congress.  *See Dep't of Transp., Office of Inspector General*, Timeline of Activities Leading to the Certification of the Boeing 737 MAX 8 Aircraft and Actions Taken After the October 2018 Lion Air Accident (Jun. 29, 2020) (available at https://www.oig.dot.gov/sites/default/files/FAA%20Oversight%20of%20Boeing%20737%20MAX%20Certification%20Timeline%20Final%20Report.pdf).  The primary aim was to compile an objective and detailed factual history of the activities that resulted in the initial certification of the Boeing 737 MAX aircraft.  *Id.*    The Inspector General completed that audit and published a publicly available report in June 2020.  *See id.*

The Transportation Secretary also created a Special Committee to Review the Federal Aviation Administration's Aircraft Certification Process.  *See Special*

*Committee to Review FAA's Aircraft Certification Process*, Official Report (Jan. 16, 2020) (available at https://www.transportation.gov/sites/dot.gov/files/2020-01/scc-final-report.pdf). It was commissioned as an independent panel of aviation and safety experts to conduct an objective review of FAA's procedures for product certification and the processes followed by FAA and Boeing during the initial certification of the 737 MAX. *See id.* The Committee was instructed to review the certification process, evaluate potential enhancements to the system, and make recommendations to bolster aviation safety. *See id.* The Special Committee issued its publicly available official report in January 2020, and FAA issued its publicly available response in April 2020. *See id.; FAA*, Response to Official Report of the Special Committee on FAA's Aircraft Certification Process (Apr. 2020) (available at https://www.faa.gov/sites/faa.gov/files/2022-08/FAAActionPlan_ResponseTo SpecialCommitteeReport.pdf).

FAA also commissioned a Joint Authorities Technical Review to conduct a comprehensive assessment of the initial certification of the automated flight control system on the 737 MAX. *See* JA 00331 at ¶ 9; *Joint Authorities Technical Review*, Boeing 737 MAX Flight Control System: Observations, Findings, and Recommendations (Oct. 11, 2019) (available at https://www.faa.gov/news/media/attachments/Final_JATR_Submittal_to_FAA_Oct_2019.pdf). The Joint Authorities Technical Review was chaired by former National Transportation

5

Safety Board Chairman Christopher Hart and was comprised of a team of experts from FAA, National Aeronautics and Space Administration, and the aviation authorities of Australia, Brazil, Canada, China, the European Union, Indonesia, Japan, Singapore, and the United Arab Emirates. *See id.* That group completed their review and published their observations, findings, and recommendations in a public report on October 11, 2019. *See id.*

FAA also constituted a Technical Advisory Board  made up of FAA Chief Scientists and experts from the U.S. Air Force, NASA, and Volpe National Transportation Systems Center (a component of the Department of Transportation). *See* JA 00330 at ¶ 9; *Technical Advisory Board on the Design Change to the B737 MAX Maneuvering Characteristics Augmentation System*, Final Report at 26 (Nov. 18, 2020) (available at https://www.faa.gov/foia/electronic_reading_room/boeing_reading_room/media/737_Technical_Advisory_Board_Final_Report.pdf).     The Technical Advisory Board was tasked with conducting an independent review of the newly proposed integrated system, training, and continued operational safety determination for the 737 MAX. *See id.* It issued a publicly available final report on November 18, 2020, in which it concluded that Boeing's design changes to its automated flight control system were "compliant and safe." *See id.*

FAA also worked closely with Congress. *See* JA 00330 at ¶ 9. FAA officials testified before Congress at least seven times concerning FAA's review of the 737

MAX accidents, enhancements of its certification processes, commitment to international leadership, and institutionalization of these efforts. *Id.* FAA provided Congress with dozens of briefings on these topics and arranged meetings for congressional staff with members of independent review bodies and produced all technical documents requested by Congressional oversight committees regarding the certification basis for the 737 MAX. *Id.*

FAA also sought input from the public about design changes to the 737 MAX. In August 2020, FAA published a Notice of Proposed Rulemaking concerning the 737 MAX return-to-service airworthiness directive, which went through a 45-day open comment period and included in the public docket a supplemental summary of FAA's then undertaken work and an explanation of the proposed changes. *See* 85 Fed. Reg. 47,698 (Aug. 6, 2020). FAA also published and sought comment upon a draft Flight Standards Board report concerning flight crew operations and training for the aircraft. *See* JA 00326 at ¶ 36; 85 Fed. Reg. 63,641-42 (Oct. 8, 2020).

Ultimately, FAA's review of the 737 MAX culminated in a comprehensive public report, entitled *Summary of the FAA's Review of the Boeing 737 MAX: Return to Service of the Boeing 737 MAX Aircraft. See* JA 00335, 00340, 00350 (to "provide[] a detailed technical account of the lessons learned since the two fatal accidents involving the 737 MAX aircraft, as well as the actions the FAA took to

ensure its safe return to service."). This report provides a thoroughgoing recitation of the background that led FAA to ground the aircraft, to investigate and identify particular safety issues, and to require changes to aircraft's design, operation, and software to address the issues. FAA concluded that "[t]hrough a thorough, transparent, and inclusive process, the FAA has determined that Boeing's proposed changes to the 737 MAX design, flightcrew procedures and maintenance procedures effectively mitigate the airplane-related safety issues that contributed to the Flight 610 and Flight 302 accidents." JA00349.

From Boeing's perspective, all the actions described above were "consistent with public transparency, and [were] the types of actions that the FAA could reasonably be expected to take." JA 00326-27 at ¶ 37. Further, none of those actions "negate[d] Boeing's understanding that its proprietary and confidential data submitted to support certification activities would be kept private by the FAA." *Id.*

## III.  Requesters' FOIA Request

On October 31, 2019—while the return-to-service review was still ongoing—Requesters submitted a Freedom of Information Act ("FOIA") request to FAA seeking several categories of records concerning FAA's review of the Boeing 737 MAX and, shortly thereafter, initiated this lawsuit. *See* JA 00228 at ¶ 8; JA 00254; JA 008. FAA's initial search for records identified approximately 49,000 pages of responsive materials. During the litigation, the parties agreed to

8

narrow the scope of the FOIA request to encompass only those documents in possession of FAA on which it would actually rely in deciding about the possible return to service of the Boeing 737 MAX airplanes.  JA 00228 at ¶ 9; JA 458.  The parties subsequently further narrowed the dispute to the 108 responsive records described in the *Vaughn* index filed on October 9, 2020.  JA 00228 at ¶ 9.

Between March and September 2020, FAA processed the records responsive to Requesters' narrowed request.  In doing so, FAA withheld information pursuant to FOIA Exemptions 4 and 6.  *See* JA 0019-53.  After FAA filed a *Vaughn* index and supporting declaration detailing FAA's withholdings, the parties met, conferred, and agreed that the only issues still in dispute concerned FAA's withholding of seven categories information under FOIA Exemption 4.  *See* JA 0064-65.  These categories were: (1) Boeing's certification plans; (2) Boeing's testing methods, plans, and conditions; (3) Boeing's means of compliance; (4) Boeing's flight test plans and criteria; (5) Boeing's flight test results; (6) Boeing's safety analyses; and (7) FAA and foreign government comments.  *See id.*

Requesters thereafter moved for Summary Judgment and FAA filed a Cross-Motion for Summary Judgment.  R. 21, 23.  FAA supported its Exemption 4 withholdings with five declarations and a *Vaughn* index.  *See* JA 019, 054, 225, 317, 328, 449.  FAA argued that summary judgment was appropriate on the issue of its Exemption 4 claims because it had sufficiently demonstrated that the

withheld information involved sensitive commercial information that had been obtained from Boeing under express and implied assurances of privacy and that Boeing customarily and actually treated this information as confidential. Requesters argued, in relevant part, that FAA had not adequately demonstrated that the withheld information was confidential based on FAA's public statements concerning "transparency" and that comments made by FAA officials did not qualify for Exemption 4 protection. In addition, it claimed that Boeing's "means of compliance" constituted "secret law" within FAA that must be disclosed and that, in any event, FAA had not adequately demonstrated that it complied with its obligation to produce all reasonably segregable material.

On September 16, 2021, the District Court issued a Memorandum Opinion and Order denying Requesters' motion and granting FAA's cross-motion. JA 455. The Court rejected each of Requesters' contentions. On the issue of "confidentiality," the District Court correctly observed that Requesters had not identified any statements in which FAA "committed to releasing any specific document or any particular piece of Boeing's proprietary information." JA 473. And it concluded that "a commitment to 'transparency' does not equate to a commitment to public release of proprietary or confidential information." *Id.* While the District Court appreciated Requesters' "desire to independently analyze the safety of the 737 MAX, the 'importance' or 'necessity' of the withheld

materials to any such external scrutiny has no bearing on whether such material must be disclosed under FOIA." JA 473-74. The District Court also addressed Requesters' contention with respect to FAA's comments, concluding that they could be withheld under Exemption 4 because the comments "involve information 'obtained from' Boeing, the disclosure of which could allow others to extrapolate Boeing's information." JA 465. The District Court also rejected the argument that Boeing's proprietary means of compliance established "secret law" within FAA that must be disclosed. JA 467. And, lastly, the District Court found that FAA had discharged its burden concerning segregability. JA 475.

This appeal followed.

## SUMMARY OF ARGUMENT

Because the information contained in the disputed records reflects Boeing's confidential commercial information, FAA properly withheld it pursuant to FOIA Exemption 4. All the information was "obtained from a person" because it was obtained from Boeing, who submitted the information in connection with its efforts to return its 737 MAX aircraft to service. The withheld information is "commercial" because Boeing used it in its commercial and business activities to certify the design change of an airplane that it manufactures and sells. And the information is "confidential" because Boeing "actually and customarily" treated this information as private. In addition, when Boeing submitted the information at issue, it relied

11

on its longstanding understanding–based on past practices, FAA's guidance, an agreement with FAA, as well as notices and disclaimers contained in Boeing's submissions themselves—that FAA would treat such information as private.

Although Requesters contend that this information could not have been submitted with any reasonable belief that it would be shielded from disclosure based on certain public statement made by FAA officials, that argument is belied by the record.  Requesters have identified no statement in which FAA ever claimed it would release any proprietary of confidential information submitted by Boeing. Instead, Requesters point only to vague aspirational statements in which FAA noted its commitment to working with the independent review authorities and to the notion of "transparency" with respect to FAA's actions, not Boeing's highly valuable commercial information.  None of these statements, however, actually or reasonably would have alerted Boeing that FAA intended to depart from its historical treatment of Boeing's proprietary information as confidential and would be publicly releasing it.  Indeed, FAA had no such intention.  As such, the mere utterance of these general statements did not cause Boeing's information to lose its confidential character.

Requesters also contend that information in four disputed documents was not "obtained from a person" under Exemption 4 because the redacted statements were comments from FAA.  But Exemption 4 protects not just the precise records or

12

words used by Boeing, but the "information" obtained from Boeing. And, in cases like this, where the confidential information can be extrapolated from a government-authored statement, it still falls within the ambit of Exemption 4.

Requesters also challenge FAA's withholding of documents pertaining to Boeing's "means of compliance," which are documents in which Boeing describes the methods that it will use to show that its design comport with the relevant FAA regulations and standards. Requesters claim that these documents must be disclosed because they constitute "binding agency policy" such that withholding this information would proliferate a body of "secret law" within FAA. But the "secret law" or "working law" doctrine has never been used to vitiate withholdings under Exemption 4—it has only ever been considered and applied in connection with the deliberative process privilege and Exemption 5. In any event, Boeing's means of compliance do not fall within the narrow definition of "working law" because they neither create nor determine the extent of the substantive rights and liabilities of any person. They are also not binding on an agency or the public, do not govern the adjudication of individual rights, nor do they require particular conduct or forbearance by any member of the public. As such, Boeing's means of compliance fall well beyond the kind of "working law" that an agency must otherwise disclose.

Lastly, Requesters contend that FAA failed to adequately demonstrate that it released all reasonably segregable material. But FAA's declarations and *Vaughn*

13

index show, with reasonable specificity akin to that found sufficient in other cases considered by this Court, that the information could not be further segregated. Indeed, FAA's *Vaughn* index provided a detailed explanation of all information withheld and the bases for those withholdings and its declarations demonstrated that it had completed a line-by-line review of each of the documents responsive to Requesters' FOIA Request, and where exempt information was reasonably segregable from nonexempt information, FAA redacted only the exempt information and produced the rest.

## STANDARD OF REVIEW

This Court's review of the merits of summary judgment is *de novo*. *ACLU v. Dep't of Just.*, 655 F.3d 1, 5 (D.C. Cir. 2011). This review is limited, absent exceptional circumstances, insofar as the Court considers only arguments made in the District Court and raised on appeal. *See Abdelfattah v. Dep't of Homeland Sec.*, 787 F.3d 524, 532 (D.C. Cir. 2015); *Elliott v. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010); *Potter v. District of Columbia*, 558 F.3d 542, 547, 550 (D.C. Cir. 2009); *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996).

## ARGUMENT

## I.   ALL OF THE WITHHELD INFORMATION QUALIFIES FOR PROTECTION UNDER EXEMPTION 4.

Under FOIA, federal courts have jurisdiction to compel the production of agency records only where those records have been "improperly withheld." 5 U.S.C. § 552(a)(4)(B); *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 384 (1980).   FOIA sets forth several exemptions that permit an agency to withhold certain kinds of information. *See* 5 U.S.C. § 552(b).  Exemption 4 allows agencies to withhold both "trade secrets" as well as "commercial or financial information [that was] obtained from a person and [is] privilege[d] or confidential."  5 U.S.C. § 552(b)(4).  Here, FAA demonstrated that all information it withheld from Requesters qualifies as confidential, commercial information that was obtained from a person and was thus properly withheld under Exemption 4.

*First*, the withheld information at issue was "obtained from a person," which is defined by statute as "an individual, partnership, corporation, association, or public or private organization other than an agency." *Id.* § 551(2).  In this case, all the information at issue was obtained from Boeing—a person within the meaning of FOIA.  *See* JA 00243 at ¶ 49.  Requesters do not challenge the origin of the information at issue here.

*Second*, the information qualifies as "commercial or financial."  FOIA does not define these terms and thus the Court must ask "ask what that term's 'ordinary,

15

contemporary, common meaning' was when Congress enacted FOIA in 1966."

*Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2362 (2019).  This Court

has previously explained that "commercial or financial information" are broad

terms that, given their "ordinary meanings," encompass any information in which

the submitter of the information has a "commercial interest."  *Pub. Citizen Health*

*Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (citing *Wash. Post Co. v.*

*Dep't of Health & Human Servs.*, 690 F.2d 252, 266 (D.C. Cir. 1982), and *Bd. of*

*Trade v. CFTC*, 627 F.2d 392, 403 (D.C. Cir. 1980)); *Baker & Hostetler LLP v.*

*Dep't of Com.*, 473 F.3d 312, 319 (D.C. Cir. 2006).

Here, all the withheld information in dispute is "commercial" because

"Boeing used it in its commercial and business activities to certify the design change

of an airplane that it manufactures and sells."  JA 00243 at ¶ 47; *see also id.* at ¶ 48.

As Boeing's declarants confirmed, the documents at issue contain "highly detailed

technical information about Boeing products, such as descriptions of aircraft

systems, as well as information about the methods by which Boeing demonstrates

compliance with applicable regulations in order to obtain certification."  JA 00318

at ¶ 5; *see also* JA 00243 at ¶ 48.  They were "largely prepared by Boeing's

engineering teams" and "reflect and embody the technical know-how and expertise

that Boeing developed over decades of designing, certifying, and manufacturing

aircraft."  JA 00318 at ¶ 6.  This information was developed by Boeing "at

considerable time and expense," JA 0057 at ¶ 11, and its "decades of efforts established the very valuable ability of Boeing to define and execute the complex activities required for product compliance with the FAA's regulations," JA 00318-19 at ¶ 6.  If this information were made public, it "could be used advantageously by other manufacturers for very little time investment and developmental costs." JA 00243 at ¶ 48.  Because Boeing has a commercial interest in the information at issue, it necessarily qualifies as the kind of "commercial" information protected by Exemption 4.  *See Baker & Hostetler*, 473 F.3d at 319.  Requesters have never disputed this.

*Third*, the information is "confidential" within the meaning of Exemption 4. The term "confidential" is to be understood based on the "ordinary, contemporary, common meaning" of that word at the time FOIA was enacted in 1966.  *Argus Leader*, 139 S. Ct. at 2362.  "The term 'confidential' meant then, as it does now, 'private' or 'secret.'"  *Id.* at 2363.  And the focus of the inquiry is "how the particular party customarily treats the information[.]"  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 148 (D.C. Cir. 2001) (citing *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 879, 872, 878–80 (D.C. Cir. 1992))).

In *Argus Leader*, the Supreme Court held that commercial or financial information is "confidential" "[a]t least" where the information is "customarily and

actually treated as private by its owner" and, perhaps, also "provided to the government under an assurance of privacy." *Id.* at 2366. The Court explained that "confidentiality" necessarily requires the submitter to treat the information as private because it would be "hard to see how information could be deemed confidential if its owner shares it freely." *Id.* The Court further questioned, however, whether, in some instances, it might be possible for "privately held information [to] lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private[.]" *Id.* at 2363 (emphasis in original). But the Court had no need to resolve that question in *Argus Leader* because the record was clear in that case that such assurances had been made. *Id.* Prior to *Argus Leader,* this Court had only required a showing that the information was "of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained," without the need for any showing of agency assurances. *Critical Mass*, 975 F.2d at 879. Regardless, both criteria are met here.

There is no dispute that Boeing actually and customarily treats the information at issue as private. Due to the value this information has to the company, "Boeing limits access to such information and does not disclose it publicly, in order to prevent competitors from gaining commercial advantage by obtaining detailed technical knowledge about Boeing's products and methods of

conducting certification activities." JA 00318 at ¶ 5. Thus, "Boeing requires its employees to follow security protocols when accessing or handling such information, including using secure IT networks to access and store it," "imposes strict limitations on the release of such information outside of the company[,]" and "submits such information to the FAA only as necessary and to the extent required to support product certification activities." JA 0057 at ¶¶ 11-12.

Further, when Boeing submitted the documents to FAA, they included formal transmittal letters containing the following notice:

> The information being forwarded to the FAA by or with this correspondence is for the exclusive purpose of support of applications for or amendments to Type Certificates, is considered proprietary to The Boeing Company and/or its suppliers, and is provided on a confidential basis. . . .

> The data provided should be returned to Boeing immediately following use by the FAA, including any copies thereof which the FAA may be required to make in the course of its review. Boeing does not authorize the FAA to retain any portion of the materials being supplied.

JA 00325 at ¶ 30. And, the documents themselves bear proprietary markings of Boeing (e.g., "BOEING PROPRIETARY") or its suppliers, appearing, in most cases, on each page of each document. JA 00325 at ¶ 31. Requesters did not argue below—and do not argue now—that Boeing treats the information in any way inconsistent with "confidentiality." As such, FAA has demonstrated that the records are "confidential" and subject to withholding under Exemption 4 and this Court's precedent. *See Critical Mass*, 975 F.2d at 879 (information is confidential

under Exemption 4 "if it is of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained").

Further, the record amply demonstrates that Boeing only provided the information to the federal government based on a reasonable expectation that confidence would be maintained. To start, FAA "has a longstanding history of maintaining confidentiality of documents that applicants provide to show compliance with FAA regulations, and ultimately obtain a type certificate" and it "historically has not released this information to the public without the express consent of the applicant." JA 00248 at ¶ 62. Indeed, FAA "has repeatedly made clear, in a variety of guidance documents made available to the industry and the public, that it will protect from public disclosure confidential information submitted by manufacturers such as Boeing in connection with product certification activities to substantiate and demonstrate compliance." JA 00323 at 25. For example, FAA Order 8110.4C, Type Certification, provides that "[t]he FAA must not release proprietary information (descriptive, design, and substantiating data received from applicants) to any party who does not have written permission from the applicant (or certificate holder)." JA 00295. Similarly, FAA Advisory Circular 20-179, Certification Data Retention Agreements and Government Records, states that: "FAA employees have an obligation to protect your [i.e. the Boeing's, as the applicant for certification] proprietary data from unauthorized release." JA 00308.

20

Also, Boeing and FAA have specifically entered into agreements, including an Airworthiness Records Management Agreement, which governs the handling, retention, and protection from disclosure of Boeing proprietary and confidential data submitted to FAA in connection with aircraft certification and other activities. JA 00324 at ¶ 28.  These agreements consistently provide for protection from disclosure of Boeing's proprietary and confidential data.  Thus, in view of the foregoing, "[f]or decades, Boeing has submitted to the FAA information of the sort sought by [Requesters] with an understanding and expectation that the FAA would treat it as private."  JA 00323 at ¶ 23.

"[W]hen Boeing submitted the information at issue it relied on its longstanding understanding—based on past practices, the FAA's guidance, the Airworthiness Records Management Agreement, the notices contained on the transmittal letters, and the disclaimers on the submissions themselves—that the FAA would treat such information as private."  JA 00325 at ¶ 33.  And "[a]t no time did any FAA official or employee ever indicate to Boeing that the information at issue here would not be protected from public disclosure in accordance with past practices, the FAA's guidance, the Airworthiness Records Management Agreement, the notices contained on the transmittal letters, or the disclaimers on the submissions themselves."  JA 00325 at ¶ 32.  Because the information is actually and customarily treated as private by Boeing and Boeing provided it to the

government under both express and implied assurances of privacy, it is "confidential" within the meaning of Exemption 4. [1] *See Argus Leader*, 139 S. Ct. at 2366.

In sum, FAA amply demonstrated that the withheld information qualified for protection under Exemption 4.

## II.   REQUESTERS' CHALLENGES TO FAA'S SHOWING OF EXEMPTION 4 APPLICABILITY ARE UNPERSUASIVE.

Requesters contend that FAA has not established the applicability of Exemption 4 for two reasons. Their principal contention is that, despite Boeing's confidential treatment of its information and despite its reasonable reliance on FAA's regular assurances that the information would continue to be held in confidence, the information here cannot be deemed "confidential" because FAA's statements committed it to public "transparency" in its administrative proceedings before receiving these records from Boeing. *See* Requesters' Brief ("Reqs.' Br.") at 14-32. And even if the public statements about transparency made by FAA officials did not preclude a finding that the information was "confidential," then

---

[1]     The FAA also showed that release of this information would have serious, foreseeable repercussions for Boeing and the FAA. *See* JA 0059 at ¶ 19 (noting harm to Boeing's competitive position); JA 00321-23 at ¶¶ 12-22; JA 00333 at ¶¶ 15-18. Appellants did not argue that the FAA failed to make an adequate showing of foreseeable harm below, *see* R. 27 at 22-23, and they do not assign error on that basis now on appeal, *see generally* Reqs.' Br.

Requesters also argue that Exemption 4 should not apply to four documents containing non-public comments by FAA officials to Boeing or within FAA, even though the comments reflect confidential information provided by Boeing. *See id.* at 36-37. Both arguments are without merit.

### A.    FAA's Statements About Transparency Neither Waive Nor Supersede Its Assurances of Appropriate Confidentiality to Boeing, and Finding Otherwise Would Negatively Impact Future Regulatory Proceedings.

Requesters do not doubt that Boeing relied upon FAA's assurances of privacy when it submitted its propriety information to FAA. Rather, Requesters attempt to rebut FAA's showing of "confidentiality" by arguing that the assurances that Boeing relied upon had been "superseded" by later public statements made by FAA. Reqs.' Br. at 31. Requesters note that it is not necessary to resolve the issue left open in *Argus Leader* as to whether government assurances of privacy are required in all cases, but instead contend that information is not confidential where the government has affirmatively indicated that the information will later be disclosed. *See* Reqs.' Br. at 15.

FAA does not dispute that an explicit representation by the government informing a submitter that its confidential information will be disclosed would negate any reasonable expectation that the submitter would have in the government keeping subsequently submitted information "private" or "secret." *See Dep't of Justice*, *Step-By-Step Guide for Determining if Commercial or Financial*

23

*Information Obtained from a Person is Confidential Under Exemption 4 of the FOIA*, (available at https://www.justice.gov/oip/step-step-guide-determining-if-commercial-or-financial-information-obtained-person-confidential). The submittal of information in those circumstances would therefore cause the information to lose its "confidential" character because the act of submitting information to the government when the submitter knew or reasonably should have known that the information would be made public is antithetical to "confidential" treatment. In such a case, the information is arguably not "actually treated as private by its owner." *Argus Leader*, 139 S. Ct. at 2366. But that is simply not what happened here.

To be clear, Requesters has never identified any statements in which FAA ever "committed to releasing any specific document or any particular piece of Boeing's proprietary information." JA 00473 (internal citations and quotations omitted); *see also* Reqs.' Br. at 19-22 (conceding that "FAA may not have referred to any 'specific document' in its pledges of transparency and disclosure"). Instead, Requesters rely on a handful of general statements in which FAA officials merely embraced the independent reviews by other governmental authorities and generally committed to "transparency." *See* Reqs.' Br. at 19-22. Requesters point to five statements that they contend "effectively [] express affirmative commitment by FAA" that the documents at issue "would be made public." Reqs.' Br. at 19.

24

Requesters are incorrect, whether the statements are considered in isolation or collectively. An objective understanding of agency intent can typically by "ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." *Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977). As shown below, none of these indicia here suggest that FAA intended to change course in terms of its treatment of Boeing's confidential proprietary information. As such, Boeing would have no reason to expect that submitted confidential information here would be publicly disclosed.

First, considering the statements individually does not reveal any specific intention to publicly disclose the confidential information at issue here—treatment that would contravene decades of historical practice. Requesters first point to then-FAA Acting Administrator, Daniel K. Elwell, and a statement he made in March 2019, just after FAA issued its grounding order. He told Congress that "[t]he 737 MAX will return to service for U.S. carriers and in U.S. airspace only when the FAA's analysis of the facts and technical data indicate that it is appropriate. In our quest for continuous safety improvement, the FAA welcomes external review of our systems, processes, and recommendations." Reqs.' Br. at 19 (quoting Statement of Daniel K. Elwell, Acting Administrator, FAA, Before the Senate Committee on Commerce, Science, & Transportation, Subcommittee on Aviation and Space on the State of Airline Safety: Federal Oversight of Commercial Aviation (Mar. 27,

2019) (the "March 2019 Elwell Statement") (available at https://www.commerce.
senate.gov/services/files/        1454ADDB-047F-444F-BEDE-DC9413D6D141).
Requesters ignore, however, that the "external review" to which Acting
Administrator Elwell referred was a review by other governmental authorities of
FAA.  Indeed, in the very next sentence, he said "[w]e will work with the newly
established Special Committee to Review FAA's Aircraft Certification Process,
cooperate fully with the Inspector General's review, and continue our work with
the congressionally-mandated Safety Oversight and Certification Advisory
Committee and ODA Expert Review Panel."  Thus, both the statement and its
context—i.e. testimony before a congressional committee with oversight
responsibilities for FAA—suggest only that FAA welcomed the independent
reviews of other governmental authorities.   In no way does FAA commit in that
statement to the public release of Boeing's confidential materials.

Requesters next highlight Acting Administrator Elwell's response to a
written question, following a May 2019 House subcommittee hearing.  *See* Reqs.'
Br. at 20. https://www.govinfo.gov/content/pkg/CHRG-116hhrg37277/pdf/CHRG-
116hhrg37277.pdf.  There, he noted that "[t]he FAA has shared actions, the timeline
of what the agency knew and when, and the FAA process to certify a design change
for the 737 MAX and ensure it is safe to fly."  Reqs.' Br. at 20  But nothing about
this statement even remotely suggests that Boeing's otherwise confidential

26

commercial information had been or would be publicly disclosed. That FAA has generally described the "FAA process to certify a design change" in no way suggests that FAA will publicly reveal the confidential proprietary information that Boeing would submit as part of that process.

Requesters also cite a December 2019 statement by then-FAA Administrator, Steve Dickson, to the House Committee on Transportation and Infrastructure. There, he said "[t]oday's unprecedented U.S. safety record was built on the willingness of aviation professionals to embrace hard lessons . . . the FAA both welcomes and invites scrutiny of our processes and procedures." Reqs.' Br. at 20. But Requesters once more elide the fact that Administrator Dickson was specifically referencing the investigation then-being conducted by the Committee and the "several independent reviews [that] have been initiated to look at different aspects of the 737 Max certification and the FAA's certification and delegation processes generally." https://www.govinfo.gov/content/pkg/CHRG-116hhrg40697/pdf/CHRG-116hhrg40697.pdf. Again, nothing here suggests that FAA was committing to public divulgence of Boeing's proprietary materials.

Finally, Requesters point to instances in December 2019 and June 2020 where Administrator Dickson told Congress that "[w]e believe that transparency, open and honest communication, and our willingness to improve our systems and processes are the keys to restoring public trust in the FAA and the safety of the 737

27

MAX." *See* Reqs.' Br. at 20-21. Requesters place significant stock in this generalized commitment to "transparency." But merely agreeing to be "transparent" does not equate to an agreement to publicly disclose all available information nor does it even evince an intention to publicly disclose any particular information—let alone a private party's confidential commercial information. And there is certainly no reason why Boeing would necessarily understand such a statement to mean as much here. *See* JA 00326-27 at ¶¶ 35-39.

A reaffirmation that "transparency" is important or desirable is simply far too general a statement for it to meaningfully put Boeing on notice that FAA would be departing from decades-long treatment of its information. Indeed, in other contexts, Courts have repeatedly concluded that "vague aspirational statements" such as these can be accorded no legal effect as they are not relied upon by reasonable persons. *See, e.g., Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 38 (2d Cir. 2018) (holding that "vague aspirational statements," including that company is a "transparent . . . business," are not actionable as material misstatements or omissions); *Emps.' Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018) (holding no actionable fraud claim "based on the defendants' generalized statements about [company's] transparency, quality, and integrity."); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) (explaining that "generalized statements of optimism that are not capable of objective verification" are not

28

actionable as fraud because they "employ terms that are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would" rely upon) (internal citations and quotation marks omitted)).

Considering all the statements together, the most that can be said is that FAA officials touted the agency's commitment to work with the independent review bodies and to the general concept of "transparency." But a general desire to bring some amount of openness or transparency to a subject, does not equate to a full-fledged committal to public release of all otherwise protectable information pertaining to that subject.

This Court and others have held that general discussion of sensitive subjects in public does not vitiate an agency's ability to assert FOIA exemptions over the more-detailed information reflected in records covering the same topic. For example, in *Kimberlin v. Department of Justice*, 139 F.3d 994, 947 (D.C. Cir. 1998), the requester sought records pertaining to a particular investigation of a government official. Amicus argued that the subject of that investigation had waived any privacy interest he may have had by publicly acknowledging that he was investigated and disciplined. *Id.* at 949. But this Court rejected that argument because "surely [the official] did not, merely by acknowledging the investigation and making a vague reference to its conclusion, waive all his interest in keeping the contents of the [investigation] confidential." *Id.* So too here. Just as the mere

29

"acknowledg[ment]" of the investigation and "vague reference" to its outcome was insufficient to find waiver of a privacy interest, FAA's public discussion of the 737 MAX return to service and its general commitment to "transparency" cannot reasonably be viewed as a repudiation of its historical treatment of Boeing's sensitive information. *Id.; see also Rockwell Int'l Corp. v. Dep't of Just.*, 235 F.3d 598, 605 (D.C. Cir. 2001) (finding privilege not waived because "quoting portions of some attachments" is not "inconsistent with a desire to keep the rest secret"); *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 201 (D.C. Cir. 1993) ("The law of this circuit provides that an agency official does not waive FOIA exemption 1 by publicly discussing the general subject matter of documents which are otherwise properly exempt from disclosure under that exemption."); *Afshar v. Dep't of State*, 702 F.2d 1125, 1131-33 (D.C. Cir. 1983) (explaining that because "disclosure of the withheld information could cause damage not already caused by the information released[,]" release of general comments is not waiver); *N.Y. Times Co. v. Dep't of Just.*, 939 F.3d 479, 497 (2d Cir. 2019) (finding that references to United States Attorney's Office reports in public statements made by the Attorney General, even "with an intent to explain [a] decision not to prosecute," "do not waive the work product privilege over the documents"). This treatment makes sense because any other holding "would give the Government a strong disincentive ever to provide its citizenry with briefings of any kind on sensitive topics." *Pub. Citizen*, 11 F.3d

at 203; *see also Bassiouni v. CIA*, 392 F.3d 244, 247 (7th Cir. 2004) ("[I]f even a smidgen of disclosure required the CIA to open its files, there would be no smidgens.")

Further, protecting a company's confidential information from public disclosure—as FAA has historically done—is not inconsistent with the notion of "transparency." Indeed, FOIA itself is rooted in the principle of transparency and openness and yet the statute explicitly recognizes multiple legitimate reasons to withhold certain classes of information. *See* 5 U.S.C. § 552(b); *Jud. Watch, Inc. v. Dep't of Homeland Sec.*, 895 F.3d 770, 783 (D.C. Cir. 2018) ("Congress's purpose in enacting FOIA was to achieve greater transparency in support of open government[.]"). Thus, "when Congress enacted FOIA it sought a 'workable balance' between disclosure and other governmental interests—interests that may include providing private parties with sufficient assurances about the treatment of their proprietary information so they will cooperate in federal programs and supply the government with information vital to its work." *Argus Leader*, 139 S. Ct. at 2366. Such is the case here.

As FAA's declarant explained, "[i]f the FAA were to release proprietary certification records received from aircraft manufacturers seeking FAA certification of their aircraft and changes to the aircraft, the resulting harm to the FAA's certification and continued operational safety processes and to aviation safety in the

31

U.S. in general cannot be overstated." JA 00333 at ¶ 15. Applicants seeking FAA approvals need to have confidence that by providing their confidential information to FAA to support the agency's evaluation of a particular aircraft's safety and airworthiness, FAA is not also releasing these documents to competitors. *Id.* ¶ 16. Aviation safety depends on the free flow of technical and other information both during and after the aircraft certification process, and FAA's continuing access to this data is essential to its certification and oversight processes. *Id.* Thus, public disclosure of the information at issue here would have a predictable chilling effect on the willingness of manufacturers and operators throughout the aviation industry to share information openly with FAA. *Id.* at ¶ 17. This is information that FAA relies upon to monitor the continued safety of the U.S. fleet, thus public disclosure of this information, including to Boeing's competitors, would impede FAA's ability to conduct vigorous oversight, impairing aviation safety. *Id.*

Notably, both Boeing and FAA have confirmed that they never perceived any of the statements concerning "transparency" as unraveling the confidential treatment that FAA had, for decades, accorded Boeing's proprietary information. Boeing was "aware that the FAA ha[d] made public statements about transparency with respect to the process for returning the 737 MAX to service" and, indeed, "support[ed] such transparency." JA00326 at ¶ 35. But "nothing in the FAA's statements regarding transparency suggested that the FAA would treat the specific

32

types of proprietary and commercially sensitive information sought by the [Requesters] as anything other than private, and at no time did Boeing understand the FAA's statements to suggest that the FAA might disclose such information to the public." *Id.* FAA has likewise confirmed that its "statements regarding the importance of transparency were not a commitment or indication by the FAA that it intend[ed] to release Boeing's proprietary certification documents, or information within these documents, to the public beyond what is necessary to document and explain changes to the 737 MAX before it [was] returned to service."[2] JA 00332 at ¶ 13. FAA, in fact, took numerous actions consistent with its commitment to transparency, all while maintaining Boeing's confidential information.

As previously explained, FAA, among other things, testified before Congress on multiple occasions "regarding the agency's review of the 737 MAX accidents, enhancements of [its] certification processes, commitment to international

---

[2]    Appellants seize on the word "necessary" here and attempt to supplant their notion of what is "necessary" to document and explain changes to the 737 MAX for that which the FAA intended. *See* Reqs.' Br. at 32. Obviously, the information that the FAA deemed "necessary" to document and explain changes to the 737 MAX was that information that FAA publicly disclosed in public hearings and in its public reports. Regardless of the reasonableness of Boeing's belief that FAA would maintain its confidentiality, the Court should find that a third-party submitter's expectation of confidential treatment be judged solely on what was expressed to it, not on otherwise unexpressed intentions. *See Ctr. for Auto Safety*, 244 F.3d at 148 (focus of Exemption 4 inquiry is on owner of information). Here, the FAA's declarant merely confirms that its understanding and intentions accorded with the reasonable interpretation of its statement and with Boeing's understanding of those statements.

leadership, and institutionalization of these efforts;" provided Congress "with dozens of briefings on these topics and arranged meetings for congressional staff with members of independent review bodies;" and provided Congressional oversight committees all documents they requested regarding the certification basis for the 737 MAX.  JA 00330 at ¶ 9.  FAA also embraced multiple external reviews by other federal and international authorities into matters concerning FAA's certification process generally and the 737 MAX specifically—bodies that went on to produce their own public reports.  *See id.*  And, prior to issuing the return-to-service airworthiness directive, FAA issued a notice of proposed rulemaking, which explained the proposed remedial actions to be taken, and solicited comments from the public.  *See id.*  FAA also contemporaneously published a public report detailing its review up to that point without revealing Boeing's confidential commercial information.  *See id.*; JA 00326 at ¶ 36; *FAA*, Preliminary Summary of the FAA's Review of the Boeing 737 MAX: Return to Service of the Boeing 737 MAX Aircraft (Aug. 3, 2020) (available at https://www.faa.gov/sites/faa.gov/files/2021-08/737-MAX-RTS-Preliminary-Summary-v-1.pdf); JA 00326 at ¶ 36.

Ultimately, FAA's review of the 737 MAX culminated in an extensive public report, issued on November 18, 2020, entitled *Summary of the FAA's Review of the Boeing 737 MAX: Return to Service of the Boeing 737 MAX Aircraft.  See* JA 00335.  The purpose of this report was to "provide[] a detailed technical account of

the lessons learned since the two fatal accidents involving the 737 MAX aircraft, as well as the actions the FAA took to ensure its safe return to service." JA 00340, 00350. Indeed, this report provides a thoroughgoing recitation of the background that led to the grounding of the aircraft, the safety issues that were identified, the remedial actions required, and the bases for FAA's determinations. It concluded that "[t]hrough a thorough, transparent, and inclusive process, the FAA has determined that Boeing's proposed changes to the 737 MAX design, flightcrew procedures and maintenance procedures effectively mitigate the airplane-related safety issues that contributed to the Flight 610 and Flight 302 accidents." JA00349. That FAA took all the foregoing actions without revealing the information at issue here, only serves as further evidence that its prior statements were not indications that FAA intended to publicly disclose Boeing's private proprietary information.

In short, Boeing actually and reasonably believed that the information at issue would be kept private or secret at the time it was submitted to the government and the statements that Requesters underscore did not make that expectation unreasonable or create any exception to or waiver of FAA's regulations (and longstanding practice) for protecting confidential commercial information under Exemption 4. Indeed, FAA was able to fulfill its pledge of "transparency" without contravening the confidence that Boeing had placed in it—just as it fully intended.

35

At bottom, the argument apparently pressed by Requesters and amici boils down to their belief that Boeing's confidential information should be made publicly available for policy reasons. They effectively argue that this information should be disclosed because, without it, they do not believe it "possible to determine whether the fixes submitted by Boeing, and relied upon by the FAA, actually make the aircraft safe to fly again." *See* Reqs.' Br. at 23. They apparently seek this information so that they can double-check or verify the work performed by the experts at FAA.

However noble their cause may be, Congress charged FAA—not Requesters or amici—with responsibility for aviation safety in the United States and compliance with Exemption 4. And it was Congress that struck the balance between what government information should be released and what information should be withheld under the FOIA. "FOIA expressly recognizes that 'important interests [are] served by [its] exemptions,' . . . , and '[t]hose exemptions are as much a part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirement." *See Argus Leader*, 139 S. Ct. at 2366. As such, the Supreme Court has been clear that the text of the FOIA should be faithfully applied, regardless of policy arguments such as this. *See id.* (refusing to adopt atextual requirement as a "matter of policy" because "just as we cannot properly expand Exemption 4 beyond what its terms permit, . . . we cannot arbitrarily constrict it either by adding limitations found

36

nowhere in its terms").  And as shown above, FAA amply demonstrated that information it was withholding fell within the ambit of Exemption 4.  As such, the Court should affirm the District Court's decision.

**B.    All The Withheld Information Was "Obtained From A Person"—Namely, Boeing.**

Requesters next challenge FAA's withholding of four documents, which include FAA comments to Boeing's project deliverables and Boeing's subsequent responses.[3]  Requesters argue that, at a minimum, comments made by FAA staff and officials could not be withheld pursuant to Exemption 4 because, in their view, it was not "obtained from a person."  *See* Reqs.' Br. at 36-37.  There is no merit to these arguments.

To qualify for protection, Exemption 4 requires the information be "obtained from a person," *see* 5 U.S.C. § 552(b)(4), which is defined by statute as "an individual, partnership, corporation, association, or public or private organization other than an agency," *id.* at § 551(2).  Although "an agency" is not considered a person, this Court has also long recognized that government-generated documents may still qualify for Exemption 4 protection if they contain confidential commercial information that was originally "obtained from a person outside the government" or if "information supplied by [a non-government person] could be extrapolated"

---

[3]    These documents are identified in the FAA's *Vaughn* index as document numbers 41, 45, 50, and 83.  JA 463; *see also* JA 32-33, 35, 45

from the document. *Gulf & W. Indus. v. United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979) (holding that agency properly withheld information in Defense Contract Audit Agency Audit Report under Exemption 4); *see also Soucie v. David*, 448 F.2d 1067, 1079 n.47 (D.C. Cir. 1971) (noting that information in report created by government panel is eligible for Exemption 4 "to the extent it contains private information given confidentially by panel members or information obtained from nongovernmental parties on a confidential basis"). If FAA could not use or mention the information obtained from Boeing without vitiating the Exemption 4 status, then FAA would have grave practical difficulties doing its vital work and it would revolutionize the understanding of Exemption 4 to hold that it does not attach to the information.

Here, the confidential commercial information contained in the four documents identified by Requesters was "obtained from a person" for purposes of Exemption 4 because that information originated from Boeing. Indeed, in each case, FAA "received the underlying document to which the FAA . . . commented directly from a Boeing employee acting on behalf of Boeing." JA 243-44. Further, the withheld information from FAA's comments "consists of information that reveals the contents of the documents, including technical information, submitted by Boeing." JA 243-44.

Documents 45 and 50—which consist of 79-pages of material—were charts that were created through collaboration by Boeing and FAA.  JA 244.  FAA's *Vaughn* index explains that Document 45 is "a draft document that contains FAA questions/comments and Boeing responses to several subjects, including technical information and data about MCAS, Airplane Safety Assessment Activities, Speed Trim Fail Lights, High AOA Mode, etc.," while Document 50 is a document containing "FAA comments and Boeing responses in connection with a specific flight test plan, with technical information about aircraft systems contained in the discussion."  JA 33, 35.  FAA withheld these records in full because, while they "contained FAA comments to Boeing's project deliverables," disclosure of those comments "would reveal technical data and Boeing's proprietary methods of compliance if released."  JA 239, 244.

Documents 41 and 83—which consist of 8 pages of records—were produced in part, with five pages of redactions.  JA 239.  These documents likewise contained comments made by FAA, but in withholding information, FAA "redacted only that information that originated with Boeing."  JA 244.  Indeed, while the redacted information includes FAA-authored comments, "these comments nonetheless reveal proprietary information originally provided to FAA by Boeing."  *Id*; *see also* JA 32 (noting that, from Document 41, FAA was withholding "technical information contained in the record, including detailed comments from the FAA

regarding failure conditions in the Functional Hazard Assessment"); JA 83 (explaining that, from Document 83, FAA was withholding "technical information contained in the record included in the FAA's comments on the Software Aspects of Certification for the FCC-730 on the Boeing 737-NG/MAX").

Based on the record of careful segregation, the District Court was correct in holding that "FAA has provided sufficient information to conclude that these 'FAA comments' involving information 'obtained from' Boeing, the disclosure of which 'could allow others to extrapolate' Boeing information" and that it therefore had "satisfied its obligation to demonstration that the information at issue . . . meets the 'obtained from a person' requirement of Exemption 4." JA 464-65 (internal citations omitted); *see also Gulf & W. Indus.*, 615 F.2d at 529-30.

Requesters insist, however, that the withheld information could not have been "obtained from a person" for purposes of Exemption 4 because the "charts manifestly do not consist merely of Boeing information 'repeated verbatim.'" Reqs.' Br. at 37. But neither the text of the statute nor this Court's precedent requires a "verbatim" rendition of another's confidential information. It is enough that the "information supplied by [a non-government person] could be extrapolated" from the document. *Gulf & W. Indus.*, 615 F.2d at 529–30. Thus, for example, in *Gulf Western Industries*, this Court rejected an argument that information in a government audit report was "information produced by the government and not

40

information obtained from an outside party" because the withheld information "contained information supplied by [a third party] or from which information supplied by [the third party] could be extrapolated." *Id.* That is precisely what has been shown here.

Further, Requesters' novel "repeated-verbatim" requirement would gravely undermine the government's significant interest in providing "private parties with sufficient assurances about the treatment of their proprietary information so they will cooperate in federal programs and supply the government with information vital to its work." *Argus Leader*, 139 S. Ct. at 2366. Indeed, adopting Requesters' interpretation would mean that anytime agency employees discussed a private person's otherwise protectable confidential information, that information would be at risk of public disclosure merely because it was not a letter-perfect recitation of what the private party had submitted.

That this is not what Congress intended is evident from the fact that Exemption 4 expressly protects third party "information," without regard to the form that the information is maintained or presented. *See* 5 U.S.C. § 552(b)(4). As such, Exemption 4 protects, not just the specific records or documents that a third party might submit to the government, but all the "facts," "data," or "knowledge" contained therein. *See* Webster's Seventh New Collegiate Dictionary 433 (1963) (defining "information"). Accordingly, this Court should apply Exemption 4 as

41

written and reject the notion that it only protects "information" if it is "repeated verbatim," a requirement that finds no support in the text of the statute. *See Argus Leader*, 139 S. Ct. at 2366 ("[J]ust as we cannot properly expand Exemption 4 beyond what its terms permit. . . we cannot arbitrarily constrict it either by adding limitations found nowhere in its terms.").

## III.  BOEING'S PROPRIETARY MEANS OF COMPLIANCE DO NOT CONSTITUTE A BODY OF "SECRET LAW" FOR FAA.

Requesters next argue that documents pertaining to Boeing's proprietary "means of compliance" must be disclosed because, even if they qualify for Exemption 4 protection, in their view, they constitute "binding agency policy" such that withholding this information would proliferate a body of "secret law" within FAA. *See* Reqs.' Br. at 33-36. Not so. Repurposing case law developed in connection with the deliberative process privilege to subvert the plain language of Exemption 4 is unwarranted and contrary to the Supreme Court's directive to apply FOIA as written. *See Argus Leader*, 139 S. Ct. at 2366; *Milner v. Dep't of Navy*, 562 U.S. 562, 572-73 (2011) (reversing and rejecting judicial gloss on Exemption 2). No Court has applied the "secret law" doctrine to preclude the withholding of information pursuant to Exemption 4—and this Court should decline to do so here.

Applicants seeking a type certificate from FAA must demonstrate that their design meets all the relevant standards and criteria set forth in any applicable FAA

regulations.  Although FAA regulations set forth particular standards that must be met, they do not generally prescribe how an applicant must go about demonstrating that their designs comply with those standards.  JA 00321 at ¶ 16.  There are, in fact, various permutations for how applicants might be able to satisfy FAA their designs meet or exceed the standards.  JA 00234 at ¶ 26; JA 00321 at ¶ 16.  Once a manufacturer knows which regulations apply to a given project, it must develop and formulate the methods by which it will demonstrate that its designs satisfy those regulations.  JA 00453 at ¶ 15; *see also* 14 C.F.R. § 23.2010.  "Means of compliance" are "descriptions of how an applicant will show compliance to applicable FAA regulations."  JA 00234 at ¶ 26.  Means of compliance are specific to the manufacturer's particular design, and just as their design is proprietary, so too are their means of compliance.  *Id.*  FAA policy documents, including advisory circulars, provide manufacturers and other applicants with guidance on potential means of compliance.  JA 00452 at ¶ 13.

Ultimately, FAA determines whether the means of compliance in any given instance are acceptable and whether manufacturers adequately demonstrate that a design is compliant with the applicable regulations.  JA 00453 at ¶ 16.  Only when FAA is satisfied that a manufacturer has demonstrated compliance with these regulations is the manufacturer's design eligible for a type certificate.  *Id.*  If FAA

43

later determines that initially accepted means of compliance are unacceptable, it can require that a manufacturer revise its means of compliance. *Id.*

This kind of information falls far afield from an agency's "working law." First, the "secret law" (or "working law") doctrine has never been applied to defeat the invocation of Exemption 4 and compel disclosure of otherwise protectable confidential information obtained from a third party. This Court and the Supreme Court have applied the doctrine to hold only that information is not protected by the deliberative process privilege and thus cannot be withheld based on that privilege under Exemption 5. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 153-54 (1975) ("Exemption 5, properly construed, calls for 'disclosure of all 'opinions and interpretations' which embody the agency's effective law and policy, and the withholding of all papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be.'" (quoting Davis, The Information Act: A Preliminary Analysis, 34 U. Chi. L. Rev. 761, 797 (1967)); *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 788 (2021) (explaining "[i]f the evidence establishes that an agency has hidden a functionally final decision in draft form, the deliberative process privilege will not apply"). In this regard, the Supreme Court has explained that its conclusion that "working law" is outside of Exemption 5 was supported by the requirements of § 552(a)(2), *Sears, Roebuck & Co.*, 421 U.S. at 153-54, which requires government agencies to make available

their "final opinions ... as well as orders," "statements of policy and interpretations which have been adopted by the agency," and "administrative staff manuals and instructions . . . that affect a member of the public." 5 U.S.C. § 552(a)(2).

This Court has adopted "a narrow definition of 'working law' that limits the term to those policies or rules, and the interpretations thereof, that 'either create or determine the extent of the substantive rights and liabilities of a person.'" *Afshar*, 702 F.2d at 1141 (quoting *Cuneo v. Schlesinger*, 484 F.2d 1086, 1090 (D.C. Cir. 1973)). This definition was "understood by all the sources relied upon by the Supreme Court in *Sears* for the proposition that 'working law' is not protected by exemption 5." *Afshar*, 702 F.2d at 1141 (citing *Sears*, 421 U.S. at 153). Thus, "'[u]nder the FOIA an agency must disclose its rules governing relationships with private parties and its demands on private conduct.'" *Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 772 n.20 (1989) (quoting Easterbrook, Privacy and the Optimal Extent of Disclosure Under the Freedom of Information Act, 9 J. Legal Stud. 775, 777 (1980)). Those "agency documents that are binding on the public, 'govern the adjudication of individual rights, or require particular conduct or forbearance by any member of the public'" are "documents that fit approximately within the narrow interpretation of the term 'working law.'" *Afshar*, 702 F.2d at 1143 (quoting *Fed. Open Market Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (cleaned up)).

Further, while agencies must disclose "binding agency opinions and interpretations," *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983), disclosure is only required for agency documents that represent "a conclusive or authoritative statement of [the agency]'s policy," *Elec. Frontier Found. v. Dep't of Just.*, 739 F.3d 1, 7 (D.C. Cir. 2014).  For example, in *Electronic Frontier Foundation*, this Court held that a legal opinion prepared by Department of Justice's Office of Legal Counsel, which examined certain policy options available to Federal Bureau of Investigation ("FBI"), was not "working law" of the FBI and therefore was protected from disclosure by deliberative process privilege. *Id.* at 8-9. The Court explained that, "[b]ecause [Office of Legal Counsel] cannot speak authoritatively on the FBI's policy," the "[Office of Legal Counsel] Opinion is not the 'working law' of the FBI." *Id.* at 9-10.  Further, it noted that, even though the [Office of Legal Counsel] opinion described legal parameters of what FBI was permitted to do and it bore the indicia of binding legal decision, FBI was still free to decline to adopt the options presented in that opinion. *Id.*  Thus, it did not represent the FBI's working law, for which disclosure would be required.  *See id; Brinton v. Dep't of State*, 636 F.2d 600, 605 (D.C. Cir. 1980) (rejecting claim memoranda prepared by Legal Advisor were "final opinions" of the agency because the Legal Advisor had "no authority to make final decisions" in relevant area).

46

Here, Boeing's proprietary means of compliance do not establish a "working law" for FAA.   Indeed, they neither "create [n]or determine the extent of the substantive rights and liabilities" of any person.  *Afshar*, 702 F.2d at 1141.  They are not "binding on the public," do not "govern the adjudication of individual rights," nor do they "require particular conduct or forbearance by any member of the public." *Id.* at 1143.  Boeing's means of compliance merely represent its own method of demonstrating to FAA that its design complies with the relevant standards.   It is neither a conclusive nor authoritative statement of FAA policies— as Boeing has no authority to make such decisions—and FAA is in no way bound to accept Boeing's means of compliance.  *See* JA 00452-53 at ¶¶ 13-14.  Indeed, FAA is always free to either accept or reject a manufacturer's means of compliance. *See id.* at ¶ 16.

Requesters nevertheless contend that, if FAA does accept the means of compliance, "those means do function as 'working law'" for FAA.  Reqs.' Br. at 35. But accepting a given means of compliance does not actually bring it any closer to the narrow definition of "working law" described above.   Boeing's means of compliance still do not create or determine any rights or liabilities, nor are they binding on anyone, even FAA.  *See* JA 00453 at ¶ 16.  If FAA does accept a means of compliance in one context, it is in no way bound to accept that same means of compliance in another.  *See id.*  And to the extent that Requesters mean to suggest

47

that they represent a "final order" subject to disclosure, they are not. An "order" must itself affect a "final disposition" of an agency matter. *See* 5 U.S.C. § 551(6). But Boeing's means of compliance do not do that—indeed, they have no real operative effect whatsoever. *See Sierra Club*, 141 S. Ct. at 787 ("While we have identified a decision's 'real operative effect' as an indication of its finality, that reference is to the legal, not practical, consequences that flow from an agency's action."). The only "final order" pertaining to the return to service of the 737 MAX is the November 20, 2020, airworthiness directive—not the means of compliance submitted by Boeing. *See Sears*, 421 U.S. at 159-60 (holding that decision forming one step of an established adjudicatory process, which would later result in a formal opinion, is not itself a "final opinion" because it "does not effect a 'final disposition'").

Ultimately, Boeing's means of compliance has no real operative effect anyone. As such, it can hardly be described as the "agency's working law."

## IV.    FAA RELEASED ALL REASONABLY SEGREGABLE NON-EXEMPT INFORMATION.

Finally, Requesters take issue with the District Court's conclusion that FAA had adequately demonstrated that it had released all reasonably segregable information. *See* Reqs.' Br. at 38-41. This argument too is without merit.

Under FOIA, agencies must "take reasonable steps necessary to segregate and release non[-]exempt information[.]" 5 U.S.C. § 552(a)(8)(A)(ii)(II); *see also*

48

*id.* at 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection"). But an agency need not "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 261, n.55 (D.C. Cir. 1977). Thus, "non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." As such, "[b]efore approving the application of a FOIA exemption, [a] district court must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007) (citing *Summers v. Dep't of Just.*, 140 F.3d 1077, 1081 (D.C. Cir. 1998); *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993)).

To establish that all reasonably segregable, nonexempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996). An agency need not, however, "provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data*, 566 F.2d at 261). And, in demonstrating segregability, "[a]gencies are entitled to a presumption that they complied with the obligation to

49

disclose reasonably segregable material," which can only be overcome with some "quantum of evidence." *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Thus, for example, in *Johnson*, 310 F.3d at 776, this Court held that the agency had fulfilled its segregability obligation through the combination of "a comprehensive Vaughn index, describing each document withheld, as well as the exemption under which it was withheld," and an affidavit from an agency employee explaining that she had performed "a line-by-line review of each document withheld in full and determined that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions." *Id.* (internal quotation marks omitted); *see also Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021) (holding "[a]gency has carried its burden in demonstrating that it released all segregable portions of the responsive documents" based on declaration attesting "that the [a]gency had 'conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information' within responsive records" and "'determined that no additional information may be released without divulging information that ... falls within the scope of one or more FOIA exemptions'"); *Machado Amadis v. Dep't of State*, 971 F.3d 364, 371-72 (D.C. Cir. 2020) (noting that government agency's "line-by-line review" of documents in responding to FOIA request was sufficient as to segregability responsibilities);

50

*Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (upholding segregability determination where "the district court relied on the very factors that we have previously deemed sufficient for this determination, i.e., the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material.").

Requesters argue that FAA's showing on segregability was insufficient because, in their view, the agency's declaration was too "conclusory." *See* Reqs.' Br. at 40-41. But, in fact, the agency's showing was entirely consistent with the cases in which this Court has found agencies have satisfied their burden on segregability. Here, as in *Johnson*, FAA supplied a detailed *Vaughn* index and supporting declarations which showed "with reasonable specificity" that the information could not be further segregated. To start, FAA's *Vaughn* index provided a detailed explanation of all information withheld and the bases for those withholdings. *See* JA 0019-53. In addition, FAA's declarations demonstrated that it had examined and processed all records responsive to Requesters' requests to determine whether any information they contained could be released. *See* JA 00249-50 at ¶¶ 66-68. Indeed, FAA "completed a line by line review of each of the documents responsive to [Requesters'] FOIA Request." JA 00249 at ¶ 66. Where exempt information was reasonably segregable from nonexempt information, FAA

redacted only the exempt information and produced the rest. *See* JA 00249-50 at ¶¶ 66-68; JA 59-61 at ¶¶ 20-24.

In the District Court, Requesters did little, if anything, to rebut the presumption that FAA complied with its segregability obligations. Instead, they argued—as they do here—that FAA has not met its burden with respect to segregability because it has "not shown that it would be unable reasonably to segregate the information Requesters seek from Boeing's proprietary technical information."[4] Reqs.' Br. at 38. But that is not the standard. FAA need only show that information cannot be further segregated from exempt information. To be sure, Boeing's proprietary technical information is exempt under Exemption 4 and that information is contained within the subject records. But protection under Exemption 4 is not limited only to technical information—it protects all information obtained from third parties that is both "commercial" and "confidential." In this case that included not only Boeing's proprietary technical information, but also its

---

[4]    Appellants argue, for example, that they are seeking flight test plans and criteria and speculate that, while these documents might contain proprietary technical information, that information could be segregated. *See* Reqs.' Br. at 39. But as the declarations show, it would be "impossible" to release these documents without revealing the "technical data, design drawing, and other underlying data that is completely intertwined with the flight plan." *See* JA 00237 at ¶ 31; JA 00249-50 at ¶¶ 66-68. Appellants' unadorned speculation that more than gibberish can be released is therefore not sufficient to rebut the presumption that the agency complied with its segregability obligations. *Sussman*, 494 F.3d at 1117

proprietary methods relating to design, testing, and certification of its products. Ultimately, FAA demonstrated that all that withheld information met criteria for Exemption 4 withholding and that there was no more reasonably segregable, non-exempt information that could be produced.

Lastly, Requesters attempt to compare this case to *Stolt-Nielson Transportation Group Ltd. v. United States*, 534 F.3d 728 (D.C. Cir. 2008). That comparison is inapt. In *Stolt-Nielson*, the Court held that the agency had not met its burden on segregability where it could not explain why names and dates reflected in the subject documents could not be released, regardless of whether the information might be "helpful to the requestee." *See id.* at 734. Requesters try to draw an analogy here by selectively quoting FAA's declarant, noting that she said that any non-exempt information is "so inextricably intertwined with the technical information and the proprietary compliance information that segregation and release would result in disclosure of only partial sentences or single sentence[.]" Reqs.' Br. at 40 (quoting JA 249-50, ellipses in original). But Requesters cut the declarant's statement short, omitting from their quotation that the only remaining words would be "entirely meaningless," and that FAA released everything except "incomprehensible sentences or portions of sentences." *See* JA 00250 at ¶¶ 67-68. Thus, unlike *Stolt-Nielson*, FAA did not withhold information merely because it was of questionable "helpfulness" to the requesters, rather it simply did not produce

sentences or fragments of sentences that were "incomprehensible" or "meaningless." This Court has long maintained that this is entirely consistent with an agency's obligations to "reasonably segregate" non-exempt information. *See Mead Data*, 566 F.2d at261, n.55 (agency need not "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content"); *Perioperative Servs. & Logistics, LLC v. Dep't of Veterans Affs.*, No. 21-5223, 2023 WL 192419, at *5 (D.C. Cir. Jan. 17, 2023) (affirming, holding agency "need not disclose a redacted version of the complaint if the unredacted markings would 'have minimal or no information content'" and the agency "declaration says that that is exactly what would happen here").

Because Requesters have not overcome the "presumption that [FAA] complied with the obligation to disclose reasonably segregable material," *Sussman*, 494 F.3d at 1117, this Court should uphold the District Court's segregability determination.

<center>* * *</center>

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, FAA respectfully requests that this

Court affirm the judgment below.

MATTHEW M. GRAVES
United States Attorney

R. CRAIG LAWRENCE
Assistant United States Attorney

*/s/ Derek S. Hammond*
DEREK S. HAMMOND
Assistant United States Attorney
601 D Street, N.W. – Civil Division
Washington, D.C. 20530
(202) 252-2511

*Attorneys for Appellee*

## CERTIFICATE OF COMPLIANCE
### FRAP 32(g)

The text for this Brief for Appellee is prepared using Times New Roman, 14 point and—except for those items described in Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1)—contains 12,483 words as counted by Microsoft Word.

*/s/ Derek S. Hammond*
DEREK S. HAMMOND
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of January 2023, the foregoing Brief for Appellee was served on appellant's counsel through the Court's ECF system.

*/s/ Derek S. Hammond*
DEREK S. HAMMOND
Assistant United States Attorney