<u>**ORAL ARGUMENT SCHEDULED FOR APRIL 20, 2023**</u>

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 21-5257
_____

FLYERS RIGHTS EDUCATION FUND, INC, *et al.,*
*Appellants,*

v.

FEDERAL AVIATION ADMINISTRATION,
*Appellee.*
_____

Appeal from the United States District Court for the District of Columbia in Civil
Case No. 1:19-cv-03749-CKK
Judge Colleen Kollar-Kotelly
_____

**REPLY  BRIEF FOR APPELLANTS**
_____

Joseph E. Sandler
Christina E. Bustos
SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK P.C.
1090 Vermont Ave N.W. Suite 750
Washington, D.C. 20005
(202) 479-1111
sandler@sandlerreiff.com
bustos@sandlerreiff.com

*Counsel for Appellants*

February 27, 2023

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................ iv

SUMMARY OF THE ARGUMENT ..................................................... 1

ARGUMENT ....................................................................................... 3

   I.    BOEING REASONABLY SHOULD HAVE UNDERSTOOD THE DISPUTED DOCUMENTS WOULD BE SUBJECT TO PUBLIC DISCLOSURE ................................................................................ 6

       A. The FAA Pledged Transparency to the Public ................... 7

       B. The FAA Pledges Were Not Meaningless General Puffery But Had a Specific Purpose and Context ............................. 8

       C. Boeing's Own Statements Indicate That It Expected Public Disclosure ........................................................................ 10

       D. Transparency Necessarily Implies Disclosure of the Disputed Information Categories .................................... 13

       E. The Purported Harm to the FAA is Irrelevant .................. 15

       F. FOIA's Policy Purposes Support Disclosure .................... 16

   II.   THE FAA'S OWN COMMENTS ON BOEING'S SUBMISSIONS WERE NOT "OBTAINED FROM A PERSON" .......................... 1

   III.  MEANS OF COMPLIANCE WITH FAA REGULATIONS ARE PART OF THE FAA'S "WORKING LAW" ................................ 20

   IV.  THE FAA'S CLAIM TO HAVE RELEASED ALL REASONABLY SEGREGABLE NON-EXEMPT INFORMATION IS NOT CREDIBLE ........................................................................... 23

CONCLUSION .................................................................................. 25

CERTIFICATE OF COMPLIANCE WITH RULE 32(A) .................. 25

CERTIFICATE OF SERVICE ................................................................................26

# TABLE OF AUTHORITIES

## CASES

*Afshar v. Department of State*, 702 F.2d 1125 (D.C. Cir. 1983) ...........................22

*Bloomberg, L.P. v. Bd. of Governors of the Federal Reserve System*, 601 F.3d 143 (2d Cir. 2010) ....................................................................................19

*Board of Trade v. Commodity Futures Trading Commission,* 627 F. 2d 392 (D.C. Cir. 1980) ..........................................................................................17

*Citizens for Responsibility & Ethics in Wash. v. U.S. Department of Justice*, No. 21-5276, 2023 U.S. App. LEXIS 2444 (D.C. Cir., Jan. 31, 2023) ................3, 6, 15

*Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356 (2019) .............5

*Gulf & Western Industries, Inc. v. United States,* 615 F.2d 527 (D.C. Cir. 1979) ....................................................................................................18, 19

*National Association of Home Builders v. Norton*, 309 F.3d 26 (D.C. Cir. 2002)...5

*Naumes v. Department of the Army*, 588 F. Supp. 3d 23 (D.D.C. 2022) ..............19

*NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132 (1975)...........................................21

*Stolt-Nielsen Transportation Group Ltd. v. United States*, 534 F.3d 728 (D.C. Cir. 2008) ..........................................................................................24

## OTHER AUTHORITIES

Final Committee Report: The Design, Development and Certification of the Boeing 737 MAX  13 (Sept. 2020)....................................................................9, 17

The Boeing 737 MAX: Examining the FAA's Oversight of the Aircraft's Certification: Hearing Before the House Comm. On Transportation & Infrastructure, 116[h] Cong. 1st Sess. 14 (2019) .........................................................7

## SUMMARY OF THE ARGUMENT

The Brief of Appellee Federal Aviation Administration ("FAA") does not provide justification for the agency's failure to open to the "light of public scrutiny" the basis for its crucial decision to unground the 737 MAX aircraft following two fatal crashes that cost 346 lives.

First, the FAA, determined to maintain the "veil of administrative secrecy" draped over its ungrounding decision, contends in its Brief that the pledges of transparency made by its top officials with respect to the re-certification process were mere meaningless puffery – too general and vague to give Boeing any clue that the FAA would make public the materials submitted by the company needed to fully explain and justify the ungrounding decision.  In fact, given the specific, extraordinary, unique circumstances of the MAX 737 re-certification process, those pledges could have only been reasonably understood to mean that the FAA would, in fact, despite the general past practice of keeping such materials confidential, be compelled to disclose those materials.  Those circumstances included multiple investigations into how Boeing's deception, secrecy and concealment had significantly contributed to the fatally flawed original certification.  FAA and Boeing should not be permitted to continue to withhold these materials under Exemption 4 in the face of those affirmative pledges.

1

Second, the FAA contends that none of the FAA's own comments on Boeing's submissions can be disclosed because Boeing's proprietary information could be "extrapolated" from those comments  That contention defies logic. The FAA's own comments are not like specific numbers  provided by a private party and then repeated in a government report.  They are the Government's own creation – its own analysis and assessment. They were not "obtained from a person" within the meaning of FOIA Exemption 4.

Third, the FAA's attempt to cabin FOIA's prohibition of "secret law" to Exemption 5 does not mitigate the agency's failure to meet its affirmative obligation under FOIA to disclose conclusive, authoritative statements of the agency's policy and rules.  That includes rules imposing specific requirements on private parties – which would inherently include the "means of compliance" by which aircraft manufacturers show how they comply with FAA technical safety requirements.

Finally, the FAA's insistence that it cannot disclose any meaningful information from 9,000 pages of documents because nothing of substance can be "reasonably segregated" from Boeing's proprietary technical information, is simply not credible given the descriptions of the withheld materials in the *Vaughn* index and the nature of those materials.

2

**ARGUMENT**

"FOIA is 'designed to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Justice*, No. 21-5276, 2023 U.S. App. LEXIS 2444 *7 (D.C. Cir., Jan. 31, 2023)("*CREW*")(quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)(internal quotations omitted)).  It is difficult to imagine a more compelling case for "opening agency action to public scrutiny"  than the FAA's decision, in November 2020, to unground the 737 MAX aircraft.

The FAA's original decision to certify this aircraft – based on what was later found to be a criminal conspiracy by The Boeing Company, the aircraft's manufacturer, to conceal information from and deceive the FAA – resulted in the loss of 346 lives, in two crashes, in October 2018 and March 2019. As stated by the U.S. Department of Justice when the criminal charges were filed, "Boeing's employees chose the path of profit over candor by concealing material information from the FAA concerning the operation of its 737 MAX airplane and engaging in an effort to cover up their deception." USDOJ, Press Release, *Boeing Charged with 737 MAX Fraud Conspiracy and Agrees to Pay over $2.5 Billion* (Jan. 7, 2021) https://www.justice.gov/opa/pr/boeing-charged-737-max-fraud-conspiracy-and-agrees-pay-over-25-billion (last visited Feb. 27, 2023).

The FAA's decision to re-certify and unground the aircraft was based on submissions by Boeing about exactly what Boeing would do the fix the aircraft and make it safe to fly again, and on the results of flight tests and safety analyses of those purported fixes. Those submissions are at the heart of this FOIA case. The FAA has withheld testing methods, plans and conditions, means of compliance, flight test plans, criteria and results and safety analyses (the "Disputed Information Categories"). Appellants Flyers Rights Education Fund, Inc. ("Flyers Rights") and Paul Hudson have pursued this case because a group of independent experts has insisted throughout that, in the words of one the experts, without public disclosure of these Disputed Information Categories, "it is not possible for me or any other independent expert… to determine whether the design modifications that the FAA has determined now make the 737 MAX safe to fly in fact do make it safe to fly." Supplemental Declaration of Michael Neely ¶5, Joint Appendix ("JA") 445.

The 737 MAX has been flying again since early 2021, but the public still has a very strong interest in assessing the validity of the FAA's ungrounding decision. This interest has only heightened since the December 2022 publication by the Ethiopian Government of a report concluding both MAX airplanes that crashed had other technical defects besides MCAS that were never acknowledged or addressed by Boeing:

4

> Within a month of being placed into service, the airplane started experiencing a variety of intermittent electrical and electronic malfunctions.
> . . .
>  These accidents were triggered by production quality defects that presented as intermittent system malfunctions. These types of defects are difficult to identify and troubleshoot.
> . . .
> MCAS and the lack of pilot training did not trigger these accidents; however it was the failure of the sensors due to the production quality defects. Simply put, if the intermittent defects did not cause the AOA Sensors to fail on these flights, MCAS would not have activated, and these two accidents would not have occurred.

Federal Dem. Republic of Ethiopia, Ministry of Transport and Logistics, *Investigation Report on Accident to the B737-MAX8* at 229-30 (March 10, 2019), [Aircraft Accident Investigation Report B737- MAX 8, ET-AVJ December 2022 (website-files.com)](website-files.com) (last visited Feb. 27, 2023).

As recently explained by a retired Boeing 737 Production System Support Senior Manager, "one U.S. airline with 35 new MAX planes delivered in 2021-22 submitted a whopping 425 malfunction reports in the past year alone… Many of those reports describe intermittent safety issues in flight systems with multiple components."  Ed Pierson, *The Boeing 737 MAX is still flying worldwide—despite mounting evidence that the aircraft is unsafe*, Lioness (Jan. 13, 2023). [https://www.lioness.co/post/the-boeing-737-max-is-still-flying-worldwide-despite-mounting-evidence-that-the-aircraft-is-unsafe](https://www.lioness.co/post/the-boeing-737-max-is-still-flying-worldwide-despite-mounting-evidence-that-the-aircraft-is-unsafe) (last visited Feb. 27, 2023)

## I.    BOEING REASONABLY SHOULD HAVE UNDERSTOOD THE DISPUTED DOCUMENTS WOULD BE SUBJECT TO PUBLIC DISCLOSURE

The second prong of the test for confidentiality under Exemption 4 is that the government has provided some assurance of confidentiality.  *Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019). This Court has not decided whether that second condition must be met.  *CREW*, 2023 U.S. App. LEXIS 2444 at *29.  The parties agree, however, that "an explicit representation by the government informing a submitter that its confidential information will be disclosed would negate any reasonable explanation that the submitter would have in the government keeping subsequently submitted information 'private' or 'secret.'" Brief of FAA filed Jan. 17, 2023 ("FAA Br.") at 23. In this case, the pledges of transparency made specifically by the FAA, and by Boeing, in relation to the process of re-certifying the 737 MAX, constitute such an "explicit representation" with respect to the disputed documents withheld by the FAA in this case.

The FAA points to its past practice of keeping this type of information confidential and to Boeing's transmittal letters claiming confidentiality.  FAA Br. at 18-21.  But the FAA does not dispute that senior agency officials made pledges of transparency specifically with respect to the 737 MAX  re-certification process, before or during the period when  most of the disputed documents were submitted by Boeing to the FAA.   The question is whether Boeing reasonably should have

understood those pledges would override the general, routine practice of keeping all of Boeing's certification submissions confidential. The answer is yes, and the FAA's arguments to the contrary are ultimately unpersuasive.

## A. The FAA Pledged Transparency to the Public

The FAA contends that certain of the statements referring to the FAA "welcoming external review" and "sharing" the FAA "process to certify a design change," were referring only to review by other governmental agencies.  FAA Br. at 25-27.  But those governmental agencies included congressional committees, as the FAA acknowledges,  which routinely make public the information obtained through their investigations.

Moreover,  in December 2019 and again in June 2020, the then-acting FAA Administrator told Congress expressly that, "We believe that transparency, open and honest communication are keys to restoring *public* trust in the FAA *and the safety of the 737 MAX*."  *The Boeing 737 MAX: Examining the FAA's Oversight of the Aircraft's Certification: Hearing Before the House Comm. On Transportation & Infrastructure*, 116[h] Cong. 1st Sess. 14 (2019)(emphasis added)). Clearly the Acting Administrator was referring to transparency with the *public*—not merely with other government agencies.

7

## B. The FAA Pledges Were Not Meaningless General Puffery But Had a Specific Purpose and Context

The FAA characterizes these transparency pledges as "vague aspirational statements" which "can be accorded no legal effect as they are not relied upon by reasonable persons." FAA Br. at 28 (quoting *Altayyar v. Etsy, Inc*., 731 Fed. App'x 35, 38 (2d Cir. 2018)). The FAA cites cases invoking the "puffery doctrine" in the securities fraud context, under which general pledges of "transparency" are not actionable because they are not anything on which a reasonable person would rely. *Id.* at 28-29. The FAA asserts that "a general desire to bring some amount of openness or transparency to a subject, does not equate to a full-fledged committal to public release of all otherwise protectable information pertaining to that subject." *Id.* at 29.

The FAA's characterization of these pledges as meaningless puffery, however, is entirely misplaced. First, these statements were not boilerplate pledges of transparency about the agency's policy or practice generally. These pledges were made specifically about, and specifically in reference to, the process of re-certification of the 737 MAX following the fatal crashes.

Second, the reason these pledges of transparency were made in the first place is manifestly that the FAA intended to contrast the re-certification/ungrounding process with original certification process in which a lack of transparency contributed directly to the fatally flawed decision to certify the 737

8

MAX to fly in the first place. As the House Transportation and Infrastructure Committee Majority found it its investigation, a key issue was Boeing's "Culture of Concealment," in which in "several critical instances, Boeing withheld crucial information from the FAA, its customers and 737 MAX pilots. . . Boeing not only concealed this information from both the FAA and pilots, but also continued to deliver MAX aircraft to its customers knowing that the AOA Disagree Alert was inoperable on most of these aircraft. Further, Boeing concealed internal test data it had that revealed it took a Boeing test pilot more than 10 seconds to diagnose and respond to uncommanded MCAS activation 'in a flight simulator, a condition the pilot found to be catastrophic[.]'" Majority Staff, U.S. House Committee on Transportation and Infrastructure, *Final Committee Report: The Design, Development and Certification of the Boeing 737 MAX* 13 (Sept. 2020) https://www.washingtonpost.com/context/final-house-committee-report-on-the-boeing-737-max/2ab7a376-79ec-4da4-bf0f-f7a4ecf8f4af/

 (last visited Feb. 27, 2023)("House T&I Committee Majority Report").

There was intense public focus on the flawed original certification of the 737 MAX, including a federal criminal investigation, a House committee investigation, a Senate committee investigation, a U.S. Department of Transportation Office of Inspector General Report, other investigations and press interest evidenced by almost 4.5 million press and online stories, by Google's count.

Thus, the FAA's transparency pledges were not general aspirational statements about its future practices, but specific statements about the re-certification/ungrounding process intended to contrast it with the original process in which concealment, deceit and lack of transparency had fatal consequences. The FAA manifestly intended the public to believe and understand that the basis for any decision to unground the MAX and allow it to fly again would be publicly disclosed. And that message could not possibly have been lost on Boeing.

### C. Boeing's Own Statements Indicate That It Expected Public Disclosure

The FAA's dismissal of its transparency pledges overlooks Boeing's own pledges strongly implying that the company itself understood and expected that information and materials needed to justify any ungrounding decision would be made public. To be sure, Boeing now claims that it did not understand the FAA's pledges of transparency as indicating that its submissions supporting re-certification would be made public. Declaration of David Polland ¶35, JA 326. But in a 2020 television interview, Boeing CEO David Calhoun stated that, "I think transparency, of the lessons, I learned over the past year. That is where Boeing fell short, and we will not fall short on that subject under my leadership. It will be uncomfortable, but *we will be transparent on every subject*, whether it is training, *whether it's the certification process*, everything along the way…. [Y]ou'll know what I know." CNBC     Interview,     of     David     Calhoun     (Jan.     29,     2020),

10

https://www.youtube.com/watch?v=kOuIKggApLc (last visited Feb. 27, 2023) (emphasis added).

> A month later, Mr. Calhoun publicly stated:

> We're going to have the most open book the world has ever seen on this subject. Transparency is what we lost for a moment and it's what we have to regain because it speaks to the trust that the world has in us . . . we are going to share any and all issues that arise in the course of designing and producing airplanes, so that when things do go a little wrong, we can get ahead of them, we can do it in the open air with all of our employees and with the public.

KING-TV Channel 5 (Seattle) Interview, Feb. 19, 2020, https://www.youtube.com/watch?v=rbKCSqKRDzl (last visited Feb. 27, 2023). In an email sent to Boeing employees at about the same time, Mr. Calhoun stated that he saw "opportunities to be better. Much better. That includes engaging one another and our stakeholders with great transparency, … and incorporating outside-in perspective on what we do and how we do it." David Shepardson, *New Boeing chief executive: planemaker can be 'much better,'* Reuters (Jan. 13, 2020) https://www.reuters.com/article/us-boeing-737-max-ceo-calhoun-idUKKBN1ZC0TO (last visited Feb. 27, 2023).

> The statement by Boeing's CEO that "you'll know what I know" concerning the "certification process" clearly indicated that Boeing would have actually understood and expected that any information needed to publicly explain and justify any re-certification would have to be made public. Indeed, at the time Boeing's CEO made that statement, Boeing knew two things.

First, it knew that it was under criminal investigation for conspiring to conceal information from the FAA.   In January 2021, Boeing admitted to a criminal conspiracy to defraud the FAA by withholding critical information and misleading the agency during the original certification process.   Deferred Prosecution Agreement, *United States v. The Boeing Co*., No. 4:21-cr-00005 (N.D. Tex., Jan. 7, 2021), Dkt. No. 4.

Second, Boeing must have known that it was under investigation by the Securities and Exchange Commission for withholding information from the public, right after the crashes, about the original certification process.  On September 22, 2022, the SEC entered a settlement agreement with Boeing in which the company agreed to pay a $200 million civil penalty for misleading investors "by providing assurances about the safety of the 737 MAX despite knowing about serious safety concerns."  Statement of SEC Chair Gary Gensler, SEC Press Release, *Boeing to Pay $200 Million to Settle SEC Charges that it Misled Investors about the 737 MAX* (Sept. 22, 2022), www.sec.gov/news/press-release/2022-170 (last visited Feb. 27, 2023). Specifically, Boeing's the- CEO was charged with falsely telling analysts and reporters in April 2019 that nothing had been overlooked in the original certification process.  *Id*.

In these circumstances, in which Boeing was under active investigation for lack of transparency and deceit, Boeing's own commitment to full transparency –

not merely as a general business practice but with specific reference to the 737 MAX re-certification process – underscores that it reasonably should have understood and expected that the documents and information it submitted to the FAA that were minimally necessary fully to understand the basis for the ungrounding decision, would have to be made public.

### D. Transparency Necessarily Implies Disclosure of the Disputed Information Categories

The FAA itself stated, in this litigation, that its "statements regarding the importance of transparency were not a commitment or indication by the FAA that it intended to release Boeing's proprietary certification documents, or information within these documents, to the public *beyond what is necessary to document and explain changes to the 737 MAX b*efore it was returned to service." Declaration of Earl Lawrence, Executive Director of FAA Certification Service, ¶ 13, JA 332 (emphasis added).  The FAA contends that the only information "necessary" to document and explain the proposed fixes to the MAX was information that FAA had decided to disclose—in other words, it was only necessary if FAA said so. FAA Br. at 33 n. 2.

But what is necessary to document and explain the ungrounding decision can be determined objectively.  In this case, in the District Court,  Appellants submitted declarations from seven independent  experts unambiguously concluding

that the information withheld by the FAA was in fact necessary to document and explain Boeing's proposed fixes to the 737 MAX.

An aviation industry expert who spent 20 years at Boeing as a project engineer and program manager stated that the Disputed Information Categories "are the most critical and essential information that would need to be made public in order to disclose the actual basis for any decision by the FAA to unground the aircraft." Declaration of Michael Neely ¶25, JA 76. A software engineer, experienced pilot and Department of Defense software security auditor who has written extensively about aviation and technology over three decades agreed that the withheld documents "are the most critical and essential information that would need to be made public… in order for any independent expert, aviation journalist or public interest advocate to advise the public whether there is a sufficient basis for any FAA decision to unground the aircraft." Declaration of Gregory Reed Travis ¶9, JA 165. The same conclusion was reached by an aeronautical engineer, regular contributor to technical journals and MIT lecturer/research associate (Declaration of Javier de Luis, PhD ¶¶10-11, JA 155); and an aeronautical/avionics systems and safety engineer with more than 30 years of experience. (Declaration of Geoffrey Barrance ¶¶8-10, JA 173). These conclusions stand unrebutted and undisputed by the FAA in the record before this Court.

14

The specific pledges of transparency made by the FAA and affirmed by Boeing, then, directly and necessarily implied that the FAA would disclose the information needed for the public to fully understand the basis for the ungrounding decision.  As explained by Mr. Neely, the former Boeing engineer,  "Boeing would have clearly understood that the FAA could not meet its commitment to transparency without making these categories of information publicly available."   Neely Declaration ¶32, JA 78. Mr. Travis agreed that given the pledges made by the FAA, "Boeing could not possibly have believed or understood that FAA was providing any assurance that the information Boeing was providing with respect to certification plans, testing plans, details and results, means of compliance, flight test plans and results, and safety analyses would be kept confidential."  Travis Declaration ¶16, JA 167.

### E.  The Purported Harm to the FAA Is Irrelevant

The FAA contends that if the requested information were to be released, FAA's "'certification and continued operational safety processes'" would be harmed because aircraft manufacturers "need to have confidence that by providing their confidential information to FAA to support the agency's evaluation of a particular aircraft safety and airworthiness, FAA is not also releasing these documents to competitors."  FA Br. at 31-32 (quoting Declaration of Earl Lawrence ¶15, JA 333). But as this Court has made clear, "Exemption 4 does not make potential

consequences of disclosure an explicit ground for withholding." *CREW*, 2023 U.S. App. LEXIS 2444 at *13. And "the text of Exemption 4 does not in any way refer to the government's interests." *Id*. at *15.

The question here is not whether disclosure would harm FAA's mission. It is whether in the unique, specific circumstances of the 737 MAX fatal crashes and subsequent re-certification, Boeing reasonably should have expected that information actually, objectively necessary "to support the agency's evaluation" of the supposedly remedied 737 MAX's "safety and airworthiness," would be publicly released. And the answer is yes.

### F.  FOIA's Policy Purposes Support Disclosure

The FAA argues that, at bottom, Appellants' case for disclosure is that "Boeing's confidential information should be made publicly available for policy reasons," which the agency characterizes as Appellants and their independent experts wanting to second-guess the FAA's experts.  FAA Br. at 36.  The FAA asserts that "Congress charged FAA – not Requesters or amici [independent experts] – with responsibility for aviation safety in the United States…" *Id*. But the FAA utterly failed in carrying out that responsibility in the original certification of the 737 MAX – a devastating failure that cost hundreds of lives.

A central reason for that failure was that a number of the FAA experts that the agency suggests should not be "checked" or second-guessed were, in fact, *Boeing*

employees – a massive conflict of interest faulted in part for the original certification failure.  The U.S. Department of Transportation Office of Inspector General found "conflicting duties and undue pressure."  USDOT, Office of Inspector General, *Weaknesses in FAA's Certification and Delegation Processes Hindered its Oversight of the 737 MAX 8* at 25 (Feb. 23, 2021). And as the House Committee Majority Report found, "the FAA's current oversight structure with respect to Boeing creates inherent conflicts of interest that have jeopardized the safety of the flying public… Some of the issues that were raised by the [Boeing Authorized Representative] and not thoroughly investigated or dismissed by his Boeing employees… were the core contributing factors that led to the Lion Air and Ethiopian Airlines crashes…"  House T&I Committee Majority Report at 14.

In those circumstances, the "policy reason" that counts here is "the basic policy that disclosure, not secrecy, is the dominant objective of the Act."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002)(quoting *Dept of the Air Force v. Rose*, 426 U.S. 352, 361 (1976)).  It is that policy objective that has been completely frustrated by the agency's withholding of the Disputed Information Categories.  Give the agency's affirmative and specific pledges of transparency, taken in context, Exemption 4 cannot be legitimately invoked to block the public disclosure of the Disputed Information Categories.

## II.     THE FAA'S OWN COMMENTS ON BOEING'S  SUBMISSIONS WERE NOT "OBTAINED FROM A PERSON"

To be covered by Exemption 4, documents must have been "obtained from a person."  It is fundamental that courts have "read the requirement that information be 'obtained from a person' to restrict the exemption's application to data which have not been generated within the Government."  *Board of Trade v. Commodity Futures Trading Comm'n,* 627 F. 2d 392, 403-04 (D.C. Cir. 1980). In this case, four key documents, comprising nearly 80 pages, withheld in full or almost entirely redacted by the FAA, are identified in the agency's *Vaughn* index as containing the FAA's *own* comments about crucial issues relating to the safety of the supposedly fixed MAX.  See *Vaughn* Index Documents 41, 454, 50 and 83, JA 32-33, 35, 45. By definition, the FAA's own comments have been "generated within the Government" and therefore are not covered by Exemption 4.

The FAA argues that its own comments should nevertheless be regarded as having been "obtained from" Boeing because the comments related to documents provided by Boeing and the withheld comments "'consist[] of information that reveals the contents of the documents, including technical information, submitted by Boeing."  FAA Br. at 38-39 (quoting Declaration of Susan Cabler ("Cabler Decl.") ¶ 50, JA 243-44). The FAA further cites the District Court's finding that disclosure of the FAA comments "'could allow others to extrapolate' Boeing information." District Court Opinion, JA 464 (quoting *Gulf & Western Indust. v. United States,* 615 F.2d 527, 529 (D.C. Cir. 1979)).

18

The problem with the FAA's position – and the finding of the District Court – is that they fail to articulate include any limit on how much the Government can discuss or analyze information provided by a private party before the Government-created material must be regarded as the Government's own.  To be sure, in *Gulf & Western Indus*., this Court held that *specific* cost numbers and cost calculations provided by a private company were "obtained by a person" even though they were cited in a Government-generated audit report. *Gulf & Western Indus.*, 615 F.2d at 530.  But Appellants are  not objecting here to the withholding of specific technical information quoted in the FAA's comments.  They are challenging the wholesale withholding of the comments themselves.  It cannot be the case that the mere reference or allusion to or discussion of technical information in an analysis prepared by the Government itself converts the Government-created material into material "obtained from" a private person.

"When an agency analyzes, rather than just summarizes, third party information, … such records will not be considered 'obtained from a person.'" *Naumes v. Dep't of the Army*, 588 F. Supp. 3d 23, 38 (D.D.C. 2022).  "The fact that information about an individual can sometimes be inferred from information generated with in an agency does not mean that such information was obtained from that person within the meaning of FOIA." *Bloomberg, L.P. v. Bd. of Governors of the Federal Reserve System*, 601 F.3d 143, 148 (2d Cir. 2010). In *Bloomberg*, the

19

Court distinguished *Gulf & Western Indus* on the grounds that it did "not bear upon the present case, where what is requested is not merely the information collected and slightly reprocessed by the government, but disclosure of the agency's own executive actions." *Bloomberg,* 601 F.3d at 148-49.

Here, too, the FAA's own comments necessarily reflect the agency's own analysis of the information submitted by Boeing – the agency's own executive decisions about and reactions to what was submitted. Those comments cannot, consistent with the purposes of FOIA and the limitations of Exemption 4, be withheld on the grounds that the government's own analysis and discussion was "obtained from Boeing." Any specific technical information directly provided by Boeing can be excised or redacted, but the remainder of the FAA's own comments in these documents was not "obtained from a person" and thus is not protected from disclosure by Exemption 4.

## III. MEANS OF COMPLIANCE WITH FAA REGULATIONS ARE PART OF THE FAA'S "WORKING LAW"

Aircraft manufacturers seeking FAA certification "must demonstrate their design meets all the relevant standards and criteria set forth in any applicable FAA regulations." FAA Br. at 42-43. "Means of compliance" are "the methods by which [the manufacturer] will demonstrate that its designs satisfy those regulations." *Id*. at 43. In other words, the "means of compliance" – which the agency allows manufacturers to propose for their own specific designs, *id*. – are, if accepted by the

20

FAA, then applied by the FAA to make a legally binding determination about whether a particular design complies with FAA regulations. For that reason, these "means of compliance" constitute the agency's "working law." But all of the "means of compliance" submitted by Boeing and accepted by the FAA, were withheld by the agency. *See* District Court Opinion at 6, JA 460 (chart, line 3), citing documents in *Vaughn* Index.

The FAA argues that the "working law" doctrine has been applied only to information claimed to be protected by Exemption 5, under the deliberative process privilege. FAA Br. at 44. What the FAA overlooks, however, is that the rationale for this doctrine is not specific to Exemption 5 but derives from the affirmative obligations imposed by FOIA generally. In *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132 (1975), the Court held that Exemption 5 calls for disclosure of all "'opinions and interpretations' which embody the agency's effective law and policy," but explained that:

> This conclusion is powerfully supported by the other provisions of the Act. The affirmative portion of the Act, requiring indexing of "final opinions," "statements of policy and interpretations which have been adopted by the agency," and "instructions to the staff that affect a member of the public," 5 U.S.C. §552(a)(2), represents a strong congressional aversion to "secret [agency] law . . and represents an affirmative congressional purpose to require disclosure of documents which have the force and effect of law.

*Sears, Roebuck*, 421 U.S. at 153 (quoting Davis, *The Information Act: A Preliminary Analysis*, 34 U. Chi. L. Rev. 761, 797 (1967)).

Consider the analogous situation that would arise were the FAA's logic applied by the Food and Drug Administration.  Pharmaceutical companies must show that their new drugs are safe and effective before they can market those drugs. They do that through clinical trials which have to meet certain criteria demanding statistical significance and validity.  If the FDA allowed each drug manufacturer to propose its own procedure for the clinical trials that would suffice to demonstrate compliance with the "safe and effective" standard, as long as the agency approved the proposal, could the agency withhold what it considers to be the necessary criteria for valid clinical trials?  Of course not, because  those criteria would form part of the binding law of the agency.  And the same is true here.

The FAA argues that "Boeing's means of compliance still do not create or determine any rights or liabilities, nor are they binding on anyone…"  FAA Br. at 47.  To the contrary, once the FAA accepts those means of compliance, they *are* legally binding, on Boeing and the FAA: if Boeing uses those means of compliance to demonstrate compliance, it is then found in compliance.  The sources relied upon in Sears "apparently operate under the assumption that the reason 'working law' should be disclosed is that a private party may have cause to rely on it."  *Afshar v. Dep't of State*, 702 F.2d 1125, 1138 (D.C. Cir. 1983).   Boeing certainly had cause to rely on its means of compliance once approved by the FAA.  The "means of compliance" submitted by and approved by the FAA form part of the "working law"

22

of the agency. As the agency is affirmatively obligated to disclose its "working law,

"it cannot withhold those "means of compliance" under Exemption 4 or any other

exemption.

## IV.    THE FAA'S CLAIM TO HAVE RELEASED ALL REASONABLY SEGREGABLE NON-EXEMPT INFORMATION IS NOT CREDIBLE

Of more than 9,000 pages of documents the FAA concedes are responsive to

Appellants' FOIA request, the FAA released nothing at all of substance.  Yet the

FAA claims that it has met its obligation to release all "reasonably segregable" non-

exempt information, because it provided a *Vaughn* Index, and submitted an affidavit

from an agency employee stating that she performed a line-by-line review of each

document withheld.  FAA Br. at 50.

As Appellants argue in their principal brief, the agency repeatedly claimed

that documents withheld in their entirety "contain" or "include" confidential

commercial information covered by Exemption 4.  *See e.g.*, Cabler Decl., ¶¶30, 32,

JA 236-37. For example, with respect to the results of flight tests of the supposedly

fixed 737 MAX aircraft, FAA claimed that it could not release any portion of those

results because the results "include detailed technical flight test data gathered

through extensive instrumentation and analyzed after the test to correlate and

confirm the perceived results of any specific test." Cabler Decl. ¶32, JA 237.

23

But how that can preclude FAA from releasing the basic results of the tests? What happened?  How did the aircraft move and respond to pilot actions under different test conditions?  Revealing the basic actions of the plane and of its different components during a flight test inherently does not require disclosing "proprietary methods relating to design, testing and certification…"  FAA Br. at 53.  It simply defies credibility that none of this information could be segregated and disclosed.

Thus, in *Stolt-Nielsen Transp. Group Ltd. v. United States*, 534 F.3d 728 (D.C. Cir. 2008), as in this case, the agency submitted an affidavit declaring that one of its employees had reviewed each document line by line and concluded that all reasonably segregable information had been released.  But this Court declined to accept that conclusion,  when the agency could not explain why certain information could not be segregated so that the remainder could be released.  *Stolt-Nielsen*, 534 F.3d at 734. Here, too, the agency has failed to explain why portions of documents objectively necessary to explain the agency's decision to unground the MAX could not be separated from the technical and proprietary information that those documents "contain" or "include."

For that reason, the agency's claim that it has released all reasonably segregable non-exempt portions of the withheld documents is simply not credible.

24

## CONCLUSION

For the reasons set forth above, and in Appellants' Principal Brief, the judgment of the District Court should be reversed.

Respectfully Submitted,

/s/ Joseph E. Sandler

Joseph E. Sandler
Christina E. Bustos
Sandler Reiff Lamb Rosenstein & Birkenstock
1090 Vermont Ave N.W. Suite 750
Washington, D.C. 20005
(202) 479-1111
Sandler@sandlerreiff.com
Counsel for Petitioners

Dated: February 27, 2023

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that the foregoing Reply Brief for Appellants complies with the length limitation of Fed. R. App. P. 32(a)(7)(B) because the Brief was prepared using a 14-point Times New Roman font and contains 5,486 words using the Word Count function of Microsoft Word, not including the items excluded by Fed. R. App. P. 32(f).

/s/ Joseph E Sandler
Joseph E. Sandler
Counsel for Petitioners

Dated:  February 27, 2023

## CERTIFICATE OF SERVICE

I, Joseph E. Sandler, hereby certify that on this 27th day of February, 2023 I electronically filed the foregoing Reply Brief for Appellants with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system, which caused a copy  to be served on all counsel of record.


/s/ Joseph E. Sandler
Joseph E. Sandler

Counsel for Appellants